N. Ana Garner, NMSB No. 921
garnerlaw@yahoo.com
Telephone: 505.235.3302

Jonathan Diener, NMSB No. 4757
jonmdiener@gmail.com
Telephone: 575.388.1754

Warren V. Norred, Texas Bar No. 24045094
wnorred@norredlaw.com
515 E. Border St., Arlington, Texas 76010
Tel. (817) 704-3984, Fax. (817) 524-6686
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS - AMARILLO DIVISION

| | |
|---|---|
| **SNL WORKFORCE FREEDOM ALLIANCE, DAVID PETERSON, JON BROOKS, ANNA BURNS, JOHN DOE #1, JANE DOE #2,** )<br>Plaintiffs, )<br>v. )<br> )<br>**NATIONAL TECHNOLOGY AND ENGINEERING SOLUTIONS OF SANDIA, LLC** d/b/a **SANDIA NAT'L LABORATORIES,** )<br>**HONEYWELL INTERNAT'L, INC.** )<br>Defendants. ) | <u>**Case No. 2:21-256**</u> |

## COMPLAINT and REQUEST FOR INJUNCTIVE RELIEF

## I.    INTRODUCTION

Plaintiffs are employees of the Sandia National Laboratory facing a COVID vaccine mandate based on Executive Orders of President Biden. Some Plaintiffs have already been terminated over refusal to provide legally protected medical information concerning their health status pertaining to vaccination. This Complaint is a legal challenge to the mandates and will establish that the COVID vaccine mandates are unlawful and unconstitutional, and seek declaratory and injunctive relief to protect those who are or would suffer damage from forced vaccinations.

## II.   PARTIES, JURISDICTION, VENUE, STANDING

### A.   PLAINTIFFS

1.      As particularly alleged below, the named Plaintiffs are employed or were recently employed at Sandia National Laboratory (SNL), which employs thousands of employees. The plaintiffs have or are submitting EEOC claims based on discrimination against them for refusing to accept experimental vaccinations, the discrimination being based on a medical condition of not being injected. None of these claims have been adjudicated.

2.      Plaintiff Sandia Workforce Freedom Alliance (SWFA) is an unincorporated association of several hundred employees whose purpose is to advocate for the constitutional rights and freedoms concerning bodily autonomy, self-determination, privacy, and religious freedom, as it relates to mandates at SNL requiring COVID injections, mask wearing and medical testing. The exact number is not known as people continue to express desire to join this lawsuit. The interests at stake in this case are pertinent to SWFA's purpose, and neither the claims asserted, nor the relief requested requires the individual participation of all its members. Some plaintiffs reside in Texas; others who are New Mexico residents work and have strong connections with Pantex, which is managed by National Technology & Engineering Solutions of Sandia, LLC (NTESS). The named plaintiffs are SWFA members who can adequately represent the group's interests.

3.      All plaintiffs object to being coerced to take a medical intervention, especially one that is experimental and have no long-term supporting studies. While they assert the constitutional right to bodily integrity, most have made requests for medical, religious, or both types of exemptions from the mandate. Some stand on their rights to bodily integrity and to choose medical treatment with no exemptions requested. Others are concerned about the lack of adequate testing of the vaccines, and that clinical trials are still ongoing. Many have witnessed first-hand serious adverse effects and even death, on others (employees and family members) receiving these drugs, some claim exemptions based on having recovered from COVID, and therefore have natural immunity. For those persons, not only would the shots be unnecessary to accomplish any purpose, but the shots could also endanger their health by putting them at risk for a potentially lethal condition, Antibody Dependent Enhancement (ADE).

4.      Plaintiff David Peterson resides in the County of Hopkins, Texas, and has been affiliated with SNL/NTESS as an employee or contractor for almost twenty years. His current position at SNL is Senior Member of Technical Staff (Analyst). He is a full-time, *100% virtual employee*, who meets the needs of his SNL position from his home state of Texas. Mr. Peterson has religious and medical safety concerns that compel him to oppose submitting to a COVID injection. He has filed a religious exemption request with SNL which remains unresolved.

5.     Plaintiff Jon Brooks resides in the County of Bernalillo, New Mexico, while he was affiliated with SNL/NTESS as an employee or contractor for two years. His position at SNL, prior to his termination on October 8, 2021, was Electrical Engineer. He did not file any exemption request prior to being fired. He was terminated for refusal to complete the "Attestation Form", also known as the "Certification of Vaccine" form. *See* **Exhibit 1**, **Termination Letter and Form Questions.** Mr. Brooks has completed classes and done work at the SNL/NTESS Texas Pantex site and contends that if COVID were not a factor, he would probably spend from 5% to 10% of his time at that site. In addition to his religious objections to the experimental medical treatment, Mr. Brooks also has objections due to previous vaccine injuries.

6.     Plaintiff Anna Burns is a 67-year-old employee who opposes the mandated experimental medical treatment. She will suffer irreparable harm if injunctive relief is not granted. At her age, she is unlikely to be able to obtain other employment. She has health issues that require expensive medical treatment currently covered under her health insurance plan through SNL. She does not have enough money in savings to survive until she can draw her pension.

7.     Plaintiff John Doe #1 is a resident of Smith County, Texas who has been affiliated with SNL/NTESS and/or its contractors for a period of four years. He has been threatened with termination of his employment unless he complies with the

COVID injection mandate even though he is a virtual employee who lives in another state and does not work on-site at the Lab. Mr. Doe has religious beliefs that prevent him from receiving the COVID injections. He has submitted a religious exemption, but he has not yet received a definitive response. He prefers to be unnamed due to fear of retaliation and discrimination at the workplace.

8.      Plaintiff Jane Doe #2 has a primary residence in Harris County, Texas with a second home in Sandoval County, New Mexico and has been a SNL/NTESS employee for three years. This Plaintiff's decision to not be "vaccinated" is informed by moral and spiritual beliefs as well as her own research. J. Doe #2 has filed a religious exemption with SNL, which is unresolved as of this date. Doe #2 prefers to be unnamed due to fear of retaliation and discrimination at the workplace.

9.      At least three plaintiffs have been terminated over refusing the mandated shot and refusing to comply with invasive questioning into their religious beliefs upon which they base their refusal.

        B.      DEFENDANTS

10.     Sandia National Laboratories is operated and managed by National Technology and Engineering Solutions of Sandia, LLC, a wholly owned subsidiary of Honeywell International, Inc. NTESS, dba as the Sandia National Laboratories, manages and operates the lab as a contractor with the U.S. Department of Energy's National Nuclear Security Administration (NNSA) and works with numerous

federal, state, and local government agencies, companies, and organizations.

11.    Honeywell International, Inc. is a corporation organized in the State of Delaware, and authorized to, and doing business in Texas in various locations throughout the State of Texas, such as Austin, Houston, Galveston, Dallas, and other cities in Texas. Defendant Honeywell, as parent corporation of NTESS dba SNL, is vicariously liable for the actions of NTESS. "SNL" will be used throughout the complaint interchangeably with "the Defendants".

### C.    JURISDICTION

12.    SNL has significant connections with Texas, in that it partners with Pantex Nuclear Labs, which is in Amarillo, Texas, on various projects under the NNSA. Many of SNL's employees regularly work or train others working at Pantex. Texas A&M (not a party) is a Texas state university which works closely with SNL on various projects. SNL operates the Weapons Evaluation Test Laboratory (WETL) at Pantex.[1] Jurisdiction is thus vested in this Court and venue is also proper.

13.    This Court exercises subject matter jurisdiction under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States.

14.    This Court also exercises subject matter jurisdiction in accordance with 28 U.S.C. § 1361, which grants to the district court's original jurisdiction "of any action

---

[1] https://newsreleases.sandia.gov/releases/2007/wetl.html. (All URL addresses last checked December 21, 2021.)

to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Defendants, as agents of the United States government through their federal contracts with DOE, owe a duty to Plaintiffs to comply faithfully with 21 U.S.C. § 360bbb-3, the provisions of which are intended to protect them.

15.    This Court has the authority to grant the requested declaratory relief under 28 U.S.C. § 2201, and the requested injunctive relief under 28 U.S.C. § 1343(a).

16.    This Court has Jurisdiction under the Constitution of the United States and Authority under its own equitable powers.

D.    VENUE

17.    This Court is an appropriate venue for this litigation pursuant to 28 U.S.C. § 1391(d) since Defendant NTESS d/b/a SANDIA NATIONAL LABORATORIES has significant contacts with Texas by reason of its close association with Pantex Nuclear Facility and Texas A&M. "For purposes of venue under this chapter, in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts."

E.    STANDING

18.    Plaintiffs satisfy the "case-or-controversy" requirement of Article III of the

Constitution and have standing to sue because they:

> (1) [have] suffered an "injury in fact" that is (a) concrete and particularized
> and (b) actual or imminent, not conjectural or hypothetical;
> (2) the injury is fairly traceable to the challenged action of the defendant; and
> (3) it is likely, as opposed to merely speculative, that the injury will be
> redressed by a favorable decision.

*Fla Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th

Cir. 2011) (citing *Lujan v. Defs. of Wildlife*, 112 S. Ct. 2130, 2136 (1992)).

## III.   GENERAL ALLEGATIONS

19.    Over 99.8%[2] of all those infected with COVID survive, with the number

being far higher in a vast majority of the population. Even the highest risk

population has approximately a 95% recovery rate which is substantially higher

than many other diseases we have lived with for centuries with no emergency

measures taken. The infection fatality rate (IFR) has been steadily dropping, like

other influenza-like illnesses. Currently, the IFR is estimated to be approximately

0.15% — in line with seasonal influenza.[3]

20.    Merriam-Webster defines an emergency as: an unexpected and usually

dangerous situation that calls for immediate action.[4] COVID began in China in late

---

[2] https://www.who.int/bulletin/volumes/99/1/20-265892.pdf
[3] https://onlinelibrary.wiley.com/doi/epdf/10.1111/eci.13554
[4] https://www.merriam-webster.com/dictionary/emergency

fall of 2019, and there are no signs of it disappearing any time soon. Government officials have claimed it will remain with us forever; thus this is not an emergency but rather the "new normal". If we allow emergency measures indefinitely, we are constructively amending the Constitution and rewriting legislation through the use of the emergency declaration.

21.     Those who survive COVID or its variants obtain robust and durable natural immunity.[5] The natural immunity so obtained is superior to COVID vaccine-induced immunity. [6]

22.     At its Vaccines and Related Biological Products Advisory Committee meeting on October 22, 2020, the FDA disclosed to attendees 22 serious and life-threatening "adverse event outcomes" of COVID vaccines.[7]

23.     The idea that by vaccinating Defendants' employees they will curtail the spread of COVID is false. The CDC Director has acknowledged that the COVID vaccines do not prevent infection or transmission of COVID. In one interview, she admitted, "[W]hat the vaccines can't do anymore is prevent transmission."[8]

24.     BioNTech's annual report filed with the SEC (Securities and Exchange Commission) admitted that the mRNA technology in its COVID vaccine product

---

[5] https://doi.org/10.1101/2021.08.24.21262415
[6] https://www.nejm.org/doi/full/10.1056/NEJMoa2114583
[7] https://www.fda.gov/media/143557/download (see slide 16).
[8] https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html

is "gene therapy" which has never been approved by the FDA before.[9]

25.     Mandating COVID vaccines violates the fundamental right of bodily integrity protected by the United States Constitution as stated in *Planned Parenthood v. Casey,* 505 U.S. 833 (1992), which cited and largely overturned *Jacobson v Massachusetts,* 197 U.S. 11 (1905). Even the Emergency Use Authorization statutes which were used to distribute the vaccines nationwide, recognize the right to accept or refuse medical intervention for products allowed under an EUA.[10]

26.     Products allowed to market under an EUA are therefore, investigational and experimental. Clinical trials in all COVID vaccines are still ongoing. The only COVID vaccine to have received FDA "approval" is not available in the United States, therefore, all COVID vaccines available here are experimental.[11]

27.     The Vaccine Adverse Event Reporting System (VAERS) which is co-managed by the FDA and the CDC, reports significantly higher incidence of injuries, serious adverse reactions, and deaths following COVID vaccination as compared to all prior widely distributed vaccines. The very real risk of vaccine

---

[9] BioNTech SEC Form 20-F https://www.sec.gov/Archives/edgar/data/1776985/000156459020014536/bntx-20f_20191231.htm, pps 15-16

[10] See 21 U.S.C. § 360bbb-3; see also the Ninth Amendment, which protects unenumerated rights, such as the right not to be forced to accept medical treatments on the basis of executive orders issued by the president, an unprecedented claim to power unsupported by any enumerated power given to the president.

[11] Although the "Comirnaty" vaccine was approved on December 11, 2020, it is not available in the USA. The U.S. District Court for the Northern District of Florida found that the two versions of the vaccine are distinct. *See* JOHN DOE #1et al., v. LLOYD AUSTIN, III, et al. Case No. 3:21-cv-1211-AW-HTC.

injury makes the Plaintiffs' right to decide whether to accept this medical treatment imperative.

28.     The Presidential Executive Order 14042 upon which the Defendants' mandates are based, are without legal basis, and are therefore, illegal and unenforceable, as held by several recent federal courts.

## IV.   PLAINTIFFS' CONSTITUTIONAL RIGHTS OF BODILY INTEGRITY ARE BEING VIOLATED BY VACCINE MANDATES

29.     Amendment V of the U.S. Constitution provides, in relevant part, that "No person (shall) … be deprived of life, liberty or property without due process of law...." The Due Process Clause of the Fourteenth Amendment to the United States Constitution similarly provides that no state shall "deprive any person of life, liberty, or property, without due process of law...." In a long line of cases, the Court has held that:

> In addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); to use contraception, *ibid.*; *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); **to bodily integrity,** *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and to abortion, [*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). **We have also assumed, and strongly suggested, that the Due Process Clause protects the**

> **traditional right to refuse unwanted lifesaving medical treatment.**
> *Cruzan [ex rel. Cruzan] v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278–79, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (emphasis added)

30.     Defendants' mandating of vaccines, PCR tests and face masks is a violation of Plaintiffs' due process right to life and liberty under the Constitution.

31.     Similarly, all people "shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures . . ." Amendment IV, U.S. Constitution. As well, every person shall:

> have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.

TX Const. art. I, § 6.

32.     Further, the Texas Constitution states that:

> To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

TX Const. art. I, § 29.

33.     The Defendants are also in violation of Amendment XIV, Due process; equal protection: "No person shall be deprived of life, liberty or property without due

process of law; nor shall any person be denied equal protection of the laws" and

Amendment IX: Reserved rights. "The enumeration in this Constitution of certain

rights shall not be construed to deny, impair or disparage others retained by the

people."

34.     Defendants' actions are an invasion of the zone of privacy and right to bodily

integrity which have been held to emanate from various Bill of Rights amendments

in the United States constitution and their corollaries in the Texas constitution.

These rights have been articulated in many U.S. Supreme Court cases, including

*Mapp v. Ohio*, 367 U.S. 643 (1961), *Griswold v. State of Connecticut*, 381 U.S.

479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); and *Roe v. Wade*, 410 US 113 (1973).

35.     In *Griswold, supra*, the Court struck down a law which impacted a woman's

right to use contraceptives. The Court Justice Douglas writing for the majority said:

> The foregoing cases suggest that specific guarantees in the Bill of Rights
> have penumbras, formed by emanations from those guarantees that help
> give them life and substance. See Poe v. Ullman, 367 U.S. 497, 516—
> 522, 81 S.Ct. 1752, 6 L.Ed.2d 989 (dissenting opinion). **Various
> guarantees create zones of privacy.** The right of association contained
> in the penumbra of the First Amendment is one, as we have seen. The
> Third Amendment in its prohibition against the quartering of soldiers 'in
> any house' in time of peace without the consent of the owner is another
> facet of that privacy. The Fourth Amendment explicitly affirms the 'right
> of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures.' The Fifth Amendment in its
> Self-Incrimination Clause enables the citizen to create a zone of privacy
> which government may not force him to surrender to his detriment. The
> Ninth Amendment provides: 'The enumeration in the Constitution, of
> certain rights, shall not be construed to deny or disparage others retained
> by the people.'

The Fourth and Fifth Amendments were described in Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, as **protection against all governmental invasions 'of the sanctity of a man's home and the privacies of life.'** We recently referred in Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684 1692, 6 L.Ed.2d 1081, to the Fourth Amendment as creating a **'right to privacy, no less important than any other right carefully and particularly reserved to the people.'**

*Griswold* at pp 484-485 (emphasis added).

36.     More recently in *Planned Parenthood v. Casey*, 505 U.S. 833(1992),

referencing the *Roe v. Wade* decision the Court stated:

…but as a rule (whether or not mistaken) of personal autonomy and bodily integrity, **with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection. If so, our cases since Roe accord with Roe's view that a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims.** *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990); cf., e. g., *Riggins v. Nevada*, 504 U.S. 127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992); *Washington v. Harper*, 494 U.S. 210, 108 L. Ed. 2D 178, 110 S. Ct. 1028 (1990); see also, e. g., *Rochin v. California*, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952); *Jacobson v. Massachusetts*, 197 U.S. 11, 24-30, 49 L. Ed. 643, 25 S. Ct. 358 (1905). (emphasis added)

*Id.*

37.     The "principle that a competent person has a constitutionally protected liberty interest in refusing **unwanted medical treatment** may be inferred from our prior decisions." *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990). "[T]he liberty guaranteed by the Due Process Clause must protect, if it protects anything, an individual's **deeply personal**

**decision to reject medical treatment….**" [N]otions of liberty are inextricably

entwined with our idea of physical freedom and self-determination. …. the Court

has often deemed state incursions into the body repugnant to the interests protected

by the Due Process Clause." *See Cruzan, supra,* (Justice O'Connor's concurrence).

The Court said:

> At common law, even the touching of one person by another without
> consent and without legal justification was a battery. See W. Keeton, D.
> Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 9,
> pp. 39-42 (5th ed. 1984). Before the turn of the century, this Court
> observed that "[n]o right is held more sacred, or is more carefully
> guarded, by the common law, than the right of every individual to the
> possession and control of his own person, free from all restraint or
> interference of others, unless by clear and unquestionable authority of
> law." Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000
> 1001, 35 L.Ed. 734 (1891)...This notion of bodily integrity has been
> embodied in the requirement that informed consent is generally required
> for medical treatment. Justice Cardozo, while on the Court of Appeals of
> New York, aptly described this doctrine: "*Every human being of adult
> years and sound mind has a right to determine what shall be done with
> his own body … The logical corollary of the doctrine of informed
> consent is that the patient generally possesses the right not to consent,
> that is, to refuse treatment*." (emphasis added)

*Cruzan, supra* at pps. 269-270.

38.   In *Planned Parenthood, supra*, the Court includes *Jacobson   v.*

*Massachusetts,* 197 U.S. 11 (1905), as a case "recognizing limits on governmental

power to mandate medical treatment *or to bar its rejection*" (emphasis added). This

is worth noting because *Jacobsen* has often been cited in recent lower court COVID

related judicial opinions for the proposition that government lockdown measures or

mandated vaccinations are not unlawful. However, the Jacobsen court said:

> "Before closing this opinion, we deem it appropriate, in order to prevent misapprehension as to our views, to observe -- perhaps to repeat a thought already sufficiently expressed, namely — that the police power of a State, whether exercised by the legislature or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to **justify the interference of the courts to prevent wrong and oppression."**

*Jacobson,* 197 US at 38.

39.     Though state actors are quick to cite *Jacobson*, they often neglect the court's careful emphasize that that "if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Id*. at 31. And adding to that exception, the court stated "the police power of a State, whether exercised by the legislature, or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression." *Id.* at 38.

40.     In addition, Supreme Court Justice Gorsuch has recently cast doubt on the continuing validity of *Jacobsen.* In his concurrence in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 208 L. Ed. 2d 206, 207 (U.S. 2020), he said,

> **"Why have some mistaken this Court's modest decision in Jacobson for a towering authority that overshadows the Constitution during a**

> **pandemic?** In the end, I can only surmise that much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack. Things never go well when we do."

*Id.* (emphasis added.)

40.     Referring to *South Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) which had given much leeway to the lockdown measures instituted by California's governor, Justice Gorsuch went on to say: "(T)hat opinion was mistaken from the start. To justify its result, the concurrence reached back 100 years in the U. S. Reports to grab hold of our decision in Jacobson v. Massachusetts, 197 U. S. 11 (1905). ***But Jacobson hardly supports cutting the Constitution loose during a pandemic...".*** (emphasis added)

41.     Moreover, *Jacobsen* was decided 116 years ago when many of our most sacred and fundamental rights were still being sorted out. Suffrage had not yet occurred, civil rights barely existed, critical cases on fundamental rights such as interstate travel and bodily privacy had not been adjudicated and the administrative state that we live in today simply did not exist.

42.     Since *Jacobsen*, the Supreme Court has decided many critical cases which expanded the conceptual and practical reach of the Bill of Rights as outlined in the preceding paragraphs. *See generally, Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (invasive medical procedure of sterilization performed without the consent

of the patient, "forever deprived [the individual] of a basic liberty."); *Rochin v. California*, 342 U.S. 165 (1952)(forced stomach pumping of an arrested person to obtain evidence of illegal drug possession violated the Due Process Clause); *Winston v. Lee,* 470 U.S. 753, 755 (1985); *Washington v. Harper,* 494 U.S. 210, 221-222 (1990) ("respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."); *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278 (1990) ("competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"); *Albright v. Oliver*, 510 U.S. 266, 272 (1994) ("[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."); *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997) ("the 'liberty' protected by the Due Process Clause [of the Fourteenth Amendment] includes the right[] . . . to bodily integrity"); *Missouri v. McNeely,* 569 U.S. 141, 148 (2013) ("We have never retreated, however, from our recognition that any compelled intrusion into the human body implicates common law and based in the concepts of bodily integrity and patient autonomy."); *Minnesota v. Brown*, 932 N.W.2d 283 (Minn. 2019) ("forcing appellant * * * to undergo an anoscopy against his will and under sedation in the presence of nonmedical personnel is a serious invasion of Brown's dignitary interests in personal privacy and bodily integrity that

outweighs the State's need to retrieve relevant evidence of drug possession.");

*Guertin v. Michigan,* 912 F.3d 907 (6th Cir. 2019) ("invasion of one's body 'is an

indignity, an assault, and a trespass' prohibited at common law….. involuntarily

subjecting nonconsenting individuals to foreign substances with no known

therapeutic value — often under false pretenses and with deceptive practices hiding

the nature of the interference — is a classic example of invading the core of the

bodily integrity protection."

43.    Plaintiffs contend, as emphatically as words will allow, that a person has

every right to decide whether something is going to be injected into his body which

will have an effect on his body and even more so where it will actually change the

way his body functions. This is all the more so when this injection has caused death

and serious disability to a not insignificant percentage of those who have taken it.

44.    The importance of Plaintiffs' right to decline the COVID injection is further

supported by the following: 1) the efficacy of the injections are still in question with

new corona virus variants being apparently immune to the vaccines and calls for

boosters; 2) the shots are effective to reduce symptoms in the event of being

infected with COVID, as opposed to preventing infection and transmission; 3) the

risk of death from COVID is very low for most of the working-age population and

is miniscule (i.e. statistically close to zero) for some of the younger Plaintiffs, 4)

persons who have had COVID have a superior natural immunity, but they are also

more likely to have an adverse reaction from the vaccines, and 5) there have been numerous serious adverse reactions and deaths following the injection.

45.     In addition, the high "case" numbers broadcast daily by the media are based on positive PCR test results, a test which is not intended to and cannot diagnose any disease. Manufacturer inserts furnished with PCR test products include disclaimers stating that the PCR tests should NOT be used to diagnose COVID.[12] This is consistent with the warning issued by the Nobel Prize winning inventor of the PCR test that such tests are not appropriate for diagnosing disease.[13] The test is simply an amplification method for detecting small bits of DNA or RNA. The "case" numbers are further skewed by mandating frequent testing of healthy people, a useless and discriminatory practice.

46.     A ruling by this Court that Plaintiffs have no right to decline the injection of an insufficiently tested chemical concoction into their bodies without the threat of loss of employment, would fly in the face of the rights enshrined in the United States and Texas constitutions, as well as God-given human rights.

47.     A court may be tempted to avoid the issues raised herein or decide them by deferring to the familiar narrative that COVID is so deadline that all measures

---

[12] For example, the OPTI SARS-CoV-2 RT-PCR Test instructions state, "Positive results are indicative of the presence of SARS-CoV-2 RNA; clinical correlation with patient history and other diagnostic information is necessary to determine patient infection status. Positive results do not rule out bacterial infection or co-infection with other viruses. The agent detected may not be the definite cause of disease." https://www.fda.gov/media/137739/download
[13] Kary Mullis, PhD received a Nobel Prize in chemistry for his invention of the polymerase chain reaction (PCR) technique. He explains why PCR is not a diagnostic test here: https://www.youtube.com/watch?v=rXm9kAhNj-4

imposed to prevent its spread should be given a liberal reading in terms of their legality.[14] However, it is just this sort of acceptance of the popular zeitgeist that a court must be on guard against when important constitutional rights are at stake. Justice Gorsuch made this point very forcefully in his concurrence in a recent decision striking down New York state's COVID restrictions on churches, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 208 L. Ed. 2d 206, 207 (U.S. 2020) where he discussed an early 2020 Supreme Court decision from California:

> At that time, COVID had been with us, in earnest, for just three months. Now, as we round out 2020 and face the prospect of entering a second calendar year living in the pandemic's shadow, that rationale has expired according to its own terms. ***Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical***……Why have some mistaken this Court's modest decision in Jacobson for a towering authority that overshadows the Constitution during a pandemic? In the end, ***I can only surmise that much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack.*** Things never go well when we do.

*Id.* (emphasis added).

---

[14] This narrative, though widespread, is not universally accepted and has been losing adherents as time goes on. In fact, very serious questions have come to the fore about the efficacy of the PCR COVID-19 test on which the Covid case and death counts are based rendering much of the data doubtful. Prominent scientists and doctors have stated that the test, as it is being used, results in a very large percent of false positives, making it a completely inaccurate test for COVID-19. See Mandavilli, Apoorva. "Your Coronavirus Test Is Positive. Maybe It Shouldn't Be." New York Times, (August 29, 2020), https://www.nytimes.com/2020/08/29/health/coronavirus-testing.html

48.    Other noteworthy Supreme Court justices have made similar statements:

Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 479 (1928) (Brandeis, J., dissenting) (overruled in part on other grounds by Katz v. United States, 389 U.S. 347 (1967)).

History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure.... [W]hen we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it."

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 635 (1989)

(Marshall, J., dissenting).

## V.    THE DEFENDANTS, ALTHOUGH OSTENSIBLY PRIVATE COMPANIES, HAVE CONSTITUTIONAL OBLIGATIONS

49.    While Defendants are private companies, they are nevertheless acting at the behest of and as agents of the National Nuclear Security Administration, a subagency of the Department of Energy, which department is the real principal directing what goes on at SNL.

50.    In the context of a contractor managing federal prisons, in the case of *Correctional Services Corporation v. Malesko*, 534 U.S. 61 (2001), the Supreme Court held that although the inmate did not have a Bivens damage claim against employees of the private contractor, Correctional Services Corporation, he nevertheless *could have sought injunctive relief against the private company for*

*constitutional deprivations.* The Court said: "Inmates in respondent's position also have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief — *long recognized as the proper means for preventing entities from acting unconstitutionally"* (emphasis added). *Id.* at 62. *Malesko* is direct controlling authority for the availability of injunctive relief against constitutional violations by government contractors such as Defendants. *See also, Agyeman v. Corrections Corp. of America,* 390 F.3d 1101 (9th Cir. 2004).

51.    A second basis for finding the Defendants responsible for following constitutional strictures, is that they are "state actors" for purposes of federal constitutional obligations rights by virtue of Defendants' relationship with the government of the state of New Mexico. The United States Supreme Court has consistently found that a private entity may be characterized as a state actor for purposes of Fourteenth Amendment analysis where the private party jointly participated with the state or its agents in the challenged action. *Lugar v. Edmondson Oil Co.*, 102 S. Ct. 2744, 2755 (1982). *See also LaBalbo v. Hymes,* 115 N.M. 314, 320 (N.M. Ct. App. 1993).

52.    New Mexico, in particular Governor Grisham, has made great efforts to ensure New Mexicans are vaccinated, offering millions of dollars in prizes among other programs. As early as January of 2021 the state of New Mexico authorized

SNL, specifically its Employee Health Services, to be a vaccination clinic.[15]  The vaccines are offered on-site in accordance with state priorities and direction. SNL has also worked with the New Mexico Dept. of Health (NMDOH) to create the contact tracing program implemented by New Mexico. *See* **Exhibit 2. Contact Tracing SafeGraph DOH.**

53.    Another fact supporting the allegation that SNL is a "state actor" is that SNL has collected personal health information from its own employees (without their knowledge) through the use and development of SafeGraph program, which is essentially a contact tracing program.

54.    Private parties are state actors, "if the State creates the legal framework governing the conduct, if it delegates its authority to the private actor, or sometimes if it knowingly accepts the benefits derived from unconstitutional behavior." *Nat'l Collegiate Athletic Ass'n v. Tarkanian,* 109 S.Ct. 454, 461-62 (1988) (citations omitted). Summarizing, a court must ask whether the State provided a mantle of authority that enhanced the power of the harm causing individual. *Id.*

55.    The Court in *Tarkanian* also later stated:

> "*It is, of course, true that a State may delegate authority to a private party and thereby make that party a state actor.* Thus, we recently held that a private physician who had contracted with a state prison to attend to the inmates' medical needs was a state actor. (emphasis added)

*Tarkanian*, 109 S.Ct. at 463-64 (citing *West v. Atkins*, 108 S.Ct. 2250 (1988)).

---

[15] https://www.sandia.gov/labnews/2021/02/12/covid-19-vaccination-underway/

56.     Here, New Mexico has created a legal framework for the vaccination of New Mexicans and has delegated the authority to vaccinate to the Defendants. SNL is also working with the state of New Mexico and setting up their contact tracing program. On information and belief, SNL has received COVID funding for these and other programs.

57.     In *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) the Court discussed different factors for determining whether conduct of a private actor was state action, which included: "the state provides significant encouragement, either overt or covert....when the private actor is a "willful participant" in joint activity with the state or its agents..... when the private actor has been delegated a public function by the state.... or when the government is "entwined" in the private actor's management or control."

58.     Plaintiffs believe that discovery will reveal many other ways the state of New Mexico and SNL are intertwined on the subject of COVID. SNL's "sister lab" in New Mexico, which also does substantial work on nuclear weapon science for the DOE, Los Alamos National Laboratory (LANL), has a very close relationship with the state. During the whole COVID "pandemic", New Mexico employed LANL "to develop an ongoing epidemiological modeling for weekly updates on the virus trajectory in New Mexico." *Hernandez v. Grisham* No. CIV 20-0942 JBÄGBW..."(D. N.M.2020). The N.M. Public Education Department looks to

LANL's modeling to justify its school policies. LANL was tasked with the duty to recommend policies and procedures in responding to the pandemic, such as masking, testing, social distancing and isolation, to be carried out throughout the State of New Mexico. LANL accepted New Mexico COVID relief funds from the Governor, and also partnered with the State of New Mexico to do COVID testing on the community and to distribute COVID vaccines to the N.M. community. It seems likely that SNL whose laboratory is greater in size than LANL's has had similar relations with the State of New Mexico's COVID response.

## VI.   UNCONSTITUTIONAL CONDITIONS

59.    Where government actors condition the granting of benefits on the renunciation of constitutional rights by the recipient, Courts have held this to be a particular constitutional violation described as *unconstitutional conditions*. One such benefit which governments may not condition on renunciation of constitutional rights is employment. *O'Hare Truck Serv. v. City of Northlake*, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996).

60.    The Supreme Court has recognized a variety of benefits which cannot be denied solely because of the exercise of constitutional rights. *See, e.g., Rutan v. Republican Party*, 110 S.Ct. at 2735-36 (promotion or transfer in a government job); *Shapiro v. Thompson,* 89 S.Ct. 1322, 1327 n. 6 (1969) (welfare benefits); *Sherbert v. Verner,* 83 S.Ct. 1790, 1794 (1963) (unemployment benefits); *Speiser*

*v. Randall,* 78 S.Ct. 1332, 1341-42 (1958) (tax exemptions); *Andersen v. McCotter*, 100 F.3d 723, 727 (10th Cir. 1996).

61.     New Mexico recognizes, "the unconstitutional conditions doctrine, "which vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up. *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S.Ct. 2586 (2013), *Rodriguez v. Ford Motor Co.*, 458 P.3d 569, 578 (N.M. Ct. App. 2018). In *Moongate Water Co. v. City of Las Cruces,* 329 P.3d 727, 733 (N.M. Ct. App. 2014), the court quoted *Koontz v. St. Johns,* "[R]egardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them*."*

## VII.   THE EXECUTIVE ORDER IS WITHOUT AUTHORITY

62.     On September 9, 2021, President Joe Biden issued Executive Order 14042 which mandated the Safer Federal Workforce Task Force (SFWTF) to provide "guidance" for "adequate COVID–19 safeguards" by September 24, 2021, that would apply to all federal contractors and subcontractors. Defendants here are federal contractors, and it is this Executive Order and its subsequent administrative promulgation on which Defendants have based their vaccine mandates. They have stated as much in several communications to employees. *See,* **Exhibit 3, attached.**

63.    The President claimed 3 U.S.C. § 301 as one statutory authority to issue

Executive Order 14042. This section provides as follows:

> The President of the United States is authorized to designate and
> empower the head of any department or agency in the executive branch,
> or any official thereof who is required to be appointed by and with the
> advice and consent of the Senate, to perform without approval,
> ratification, or other action by the President (1) any function which is
> vested in the President by law, or (2) any function which such officer is
> required or authorized by law to perform only with or subject to the
> approval, ratification, or other action of the President: Provided, That
> nothing contained herein shall relieve the President of his responsibility
> in office for the acts of any such head or other official designated by him
> to perform such functions. Such designation and authorization shall be in
> writing, shall be published in the Federal Register, shall be subject to
> such terms, conditions, and limitations as the President may deem
> advisable, and shall be revocable at any time by the President in whole
> or in part.

64.    The President also claimed provisions of the Federal Property and

Administrative Services Act, 40 U.S.C. § 101, *et seq.,* as statutory authority to issue

Executive Order 14042. This section provides as follows:

> The purpose of this subtitle is to provide the Federal Government with
> an economical and efficient system for the following activities:
> (1) Procuring and supplying property and nonpersonal services, and
> performing related functions including contracting, inspection, storage,
> issue, setting specifications, identification and classification,
> transportation and traffic management, establishment of pools or systems
> for transportation of Government personnel and property by motor
> vehicle within specific areas, management of public utility services,
> repairing and converting, establishment of inventory levels,
> establishment of forms and procedures, and representation before federal
> and state regulatory bodies.
> (2) Using available property.
> (3) Disposing of surplus property.
> (4) Records management.

63.     The subsequent provisions of the Federal Property and Administrative Services Act are no broader than the purpose of this Act as set forth in § 101.

64.     The simple truth is these statutes do not provide the President with authority to impose vaccine mandates, and thus he lacks the statutory as well as constitutional authority to impose these mandates. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)[16] addressed an executive order by the then president aimed at averting a nation-wide strike of steel workers in April 1952, which the president believed would jeopardize national defense. He issued an Executive Order directing the Secretary of Commerce to seize and operate most of the country's steel mills. The Supreme Court held that:

> The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself. There is no statute that expressly authorizes the President to take possession of property as he did here. Nor is there any act of Congress to which our attention has been directed from which such a power can fairly be implied.

65.     Executive Order 14042 states that it applies to, "any new contract; new contract-like instrument; new solicitation for a contract or contract-like instrument; extension or renewal." 66.     The Defendants' contract with the federal government is in existence now and has been since 2016. It is not a future contract. It is an extant contract. Therefore, Executive Order 14042 and the subsequent

---

[16] See also Schaezlein v. Cabaniss, 135 Cal. 466, 471, 67 P. 755 (1902); State v. Marana Plantations, 75 Ariz. 111, 115, 252 P.2d 87 (1953); and Boreali v. Axelrod, 71 N.Y.2d 1, 6, 517 N.E.2d 1350 (1987).

promulgation by SFWTF (Safer Federal Workforce Task Force) are inapplicable to the Defendants.

65.     Defendants may claim that the 2016 contract was modified in 2020 to add COVID provisions, and then in October, 2021, incorporating the Safe Workplace Task Force Guidance into the contract. Plaintiffs contend that this is not a "new contract" within the meaning of Executive Order 14042.

66.     The revised contract, amended in 2021 which incorporates these provisions is not re-signed by the parties to the 2016 contract, but was digitally modified by adding additional provisions; it is not a new contract at all. And even if Defendants did recently enter a new contract with the federal government or modify their old one such that it might be considered "new", Biden's Executive order and the subsequent administrative promulgation are constitutionally violative. Addressing Executive Order 14042, the Court in *Kentucky, et al.,v. Biden, 3:21-cv-00055-GFVT,* explained the President's purported authority for 14042 as follows:

> "President Biden issued Executive Order 14042 pursuant to the U.S. Constitution, 3 U.S.C § 301, which provides the president with general delegation authority, and 40 U.S.C. 101 et seq., also known as the Federal Property and Administrative Services Act (FPASA). See 86 Fed. Reg. 50,985–88 (Sept. 9, 2021). Congress delegated to the president the authority to manage federal procurement through FPASA. 40 U.S.C. 101 et seq. The President also claimed provisions of the Federal Property and Administrative Services Act (FPASA), 40 U.S.C. § 101, et seq., as statutory authority to issue Executive Order 14042."

*Kentucky v. Biden, supra, p. 11.*

67.     Plaintiffs contend that the President's attempt to base authority to mandate

vaccination for tens of millions of American workers, (which treads on the

fundamental constitutional rights of bodily integrity and medical choice) on what

is essentially a procurement of goods and services statutory scheme is unlawful.

68.     This is not a new argument. In *Kentucky v. Biden*, No. 3:21-cv-00055-GFVT,

2021 U.S. Dist. LEXIS 228316, at *19-20 (E.D. Ky. Nov. 30, 2021), the D.C.

Circuit Court cited *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir.

1996) the Court stated:

> The District of Columbia Circuit cautioned that the FPASA does not
> provide authority to "write a blank check for the President to fill in at his
> will. The procurement power must be exercised consistently with the
> structure and purposes of the statute that delegates that power." *Id.*
> (quoting *Kahn*, 618 F.2d at 793). Furthermore, the FPASA "does not
> allow the President to exercise powers that reach beyond the Act's
> express provisions, *Kahn*, 618 F.2d. at 797 (Tamm, J., concurring), and
> there must be a "close nexus between the Order and the objectives of the
> Procurement Act." *Id.* (Bazelon, J., concurring) .....
>
> ........ If a vaccination mandate has a close enough nexus to economy and
> efficiency in federal procurement, then the statute could be used to enact
> virtually any measure at the president's whim under the guise of
> economy and efficiency. *Cf. Ala. Ass'n of Realtors v. Dept. of Health and
> Human Servs.*, 141 S. Ct. 2485, 2488–89 (2021) (finding the federal
> government's interpretation of § 361 would grant the CDC a
> "breathtaking amount of authority" ......... The vaccine mandate applies
> to employees of federal contractors and subcontractors who work entirely
> from home and are not at risk of spreading COVID-19 to others. [R. 12
> at 6 (citing Task Force   Guidance).] Under the same logic employed by
> the Defendants regarding the vaccine mandate, what would stop FPASA
> from being used to permit federal agencies to refuse to contract with
> contractors and subcontractors who employ individuals over a certain
> BMI for the sake of economy and efficiency during the pandemic? After

all, the CDC has declared that "obesity worsens the outcomes from COVID-19." Centers for Disease Control and Prevention, *Obesity, Race/Ethnicity,                    and                    COVID-19*, https://www.cdc.gov/obesity/data/obesity-and-covid-   19.html   (last visited Nov. 22, 2021).

69.    President Biden also issued Executive Order 14043 on September 9, 2021 which was a vaccine mandate for employees of federal agencies. Plaintiffs are federal employees as such, being employees of federal "agents" who are the Defendant contractors acting at the direction of federal agencies. Moreover, the authority of the President to make sweeping pronouncements as to mandatory health protocols for millions of workers either federal per se or working for federal contractors, has been successfully challenged for both Executive Orders 14042 and 14043 and there is overlap in the reasoning which courts have applied.

70.    For example, in *BST Holdings, LLC v. Occupational Safety and Health Administration*, No. 21-60845, 2021 U.S. App. LEXIS 33698, at *16 (5th Cir. Nov. 12, 2021), the Court held that the OSHA mandate pursuant to Executive Order 14043 was "staggeringly overbroad".[17] The reasons it gave are equally true for the Safer Federal Workforce Task Force mandate pursuant to EO14042 the Defendants are carrying out.

---

[17]Though the 6th Circuit's subsequent decision has at least temporarily overruled BST Holdings in part, the Supreme Court is in the process of considering the matter. See https://www.opn.ca6.uscourts.gov/opinions.pdf/21a0287p-06.pdf and https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/21a248.html.

71.     In *BST Holdings, LLC, supra,* the Fifth Circuit addressed a request for a stay of the OSHA vaccine mandate which was put into place by way of an Emergency Temporary Standard (ETS) on November 5, 2021, and which required employees of federal contractors to undergo a COVID vaccination or to take weekly COVID tests and wear a mask.

72.     The Court initially stayed the OSHA Mandate pending briefing and an expedited judicial review because of what it characterized as "grave statutory and Constitutional issues". After conducting the expedited judicial review, the Court reaffirmed the initial stay finding that OSHA had gone beyond the agency's authority. It first noted at p. 13, "in its fifty-year history, OSHA has issued just ten ETSs. Six were challenged in court; only one survived" and stated that Congress had not, in creating OSHA, "intended to authorize a workplace safety administration in the deep recesses of the federal bureaucracy to make sweeping pronouncements on matters of public health affecting every member of society in the profoundest of ways." *BST Holdings, L.L.C. v. OSHA*, No. 21-60845, 2021 U.S. App. LEXIS 33698, at *7-8 (5th Cir. Nov. 12, 2021).

73.     The *BST* Court found persuasive the state of Texas's argument that an air borne virus was not the sort of "substances or agents" which are "toxic or physically harmful" that was in the purview of OSHA, stating, "Here, OSHA's attempt to shoehorn an airborne virus that is both widely present in society (and thus not

particular to any workplace) and non-life-threatening to a vast majority of employees into a neighboring phrase connoting *toxicity* and *poisonousness* is yet another transparent stretch." The court also stated:

> "We next consider the necessity of the Mandate. The Mandate is staggeringly overbroad. Applying to 2 out of 3 private-sector employees in America, in workplaces as diverse as the country itself, the Mandate fails to consider what is perhaps the most salient fact of all: the ongoing threat of COVID-19 is more dangerous to some employees than to other employees. All else equal, a 28 year-old trucker spending the bulk of his workday in the solitude of his cab is simply less vulnerable to COVID-19 than a 62 year-old prison janitor. Likewise, a naturally immune unvaccinated worker is presumably at less risk than an unvaccinated worker who has never had the virus. The list goes on, but one constant remains—the Mandate fails almost completely to address, or even respond to, much of this reality and common sense."

*BST Holdings,* 2021 U.S. App. LEXIS 33698, at *16.

74.    In footnote 10, the *BST Holdings* Court noted:

> As Justice Gorsuch recently observed, society's interest in slowing the spread of COVID- 19 "cannot qualify as [compelling] forever," for "[i]f human nature and history teach anything, it is that civil liberties face grave risks when governments proclaim indefinite states of emergency." *Does 1–3 v. Mills*, --- S. Ct. ---, 2021 WL 5027177, at *3 (Oct. 29, 2021) (Gorsuch, J., dissenting); *see also Fla. Peach Growers*, 489 F.2d at 131 (situation ongoing for "last several years . . . fail[ed] to qualify for [OSHA] emergency measures").

75.    The courts in *Kentucky v. Biden* and *BST Holdings'* objections to the vaccine mandate's scope requires even those who work from home to be vaccinated is applicable to the case at bar, as Plaintiffs David Peterson and John Doe #1, both residents of Texas, work from home. Yet, Defendants insist they be vaccinated.

76.     Other recent decisions support granting the relief Plaintiffs are requesting. In *Louisiana v. Xavier Becerra et al*., case no. 3:21-CV-03970, Louisiana was joined by attorneys general in 12 other states in its effort to block an emergency regulation issued on November 4th by the Centers for Medicare and Medicaid Services that required vaccines for nearly every full-time employee, part-time employee, volunteer, and contractor working at a wide range of healthcare facilities receiving Medicaid or Medicaid funding. District Judge Terry Doughty found that the Government Defendants did not have the statutory or constitutional authority to implement the CMS Mandate and granted a preliminary injunction against it. *Louisiana v. Becerra*, No. 3:21-CV-03970, 2021 U.S. Dist. LEXIS 229949, at *2-3 (W.D. La. Nov. 30, 2021).

77.     The *Louisiana v. Xavier Becerra* court found persuasive the *BST Holdings* decision*,* stating:

> The "serious Constitutional concerns" noted by the Court in *BST Holdings* were:
>      (a) that the OSHA Mandate exceeded the federal government's authority under the Commerce Clause because it regulated noneconomic inactivity (person's choice to remain unvaccinated) that falls squarely within the State's police power;
>      (b) that separation of powers principles ("the major questions doctrine") casts doubt over the OSHA Mandate's assertion of virtually unlimited power to control individual conduct under the guise of a workplace regulation.

> Additionally, the Court found "irreparable harm" to the petitioners' liberty interests of having to choose between their jobs and the vaccine. The Court noted that the loss of constitutional freedoms for even minimal periods of time constitutes irreparable injury.
>
> The Court also found a stay of the OSHA Mandate to be in the public interest in maintaining the country's constitutional structure and maintaining the liberty of individuals and to make intensely personal decisions, even when those decisions frustrate government officials."

*Becerra*, 2021 U.S. Dist. LEXIS 229949, at *18 (footnotes omitted).

78.    As many courts have concluded, the court in *Louisiana v. Xavier Becerra* also held that the loss of constitutional freedoms for even minimal periods of time constitutes irreparable injury and found a stay of the OSHA Mandate to be in the public interest in maintaining the country's constitutional structure and maintaining the liberty of individuals and to make intensely personal decisions, even when those decisions frustrate government officials. *Id.*

## VIII.  E.O. 14042 AS PROMULGATED BY THE SFWTF AND OMB DOES NOT COMPLY WITH THE ADMINISTRATIVE PROCEDURES ACT.

79.    The Court in *State of Louisiana et al, v. Joseph R. Biden, supra* found another fatal illegality in the mandate for vaccination of federal contractors - the promulgation of the order by the Safer Federal Workforce Task Force (SFWTF) and the Office of Management and Budget (OMB) did not comply with the Administrative Procedures Act. The Court found that "Procedural compliance by the rule making agency is an indispensable component of the Administrative Procedures Act ("APA")". . . and that the agency action taken was "final agency

action" for purposes of review by the Court. The Court then held that the

administrative procedure utilized by the SFWTF and the OMB to promulgate EO

14042 failed to provide for an adequate comment period as required by § 1707 of

the APA and stated that:

> A regulation's comment period is critical for affected citizens to assert
> their rights and for the cooperative development of regulations that
> balance the needs of the government and the rights of the public.
> Because compliance requires significant action on the part of
> employees well before the effective date, these purposes were not
> preserved by the OMB's calendaring of the comment period. While we
> do not like to rely on the spirit of the law when the letter is clear, the
> actions of the OMB circumvent the protections envisioned under the
> APA by manipulating the letter.

*Louisiana v. Biden*, No. 21-cv-3867, 2021 U.S. Dist. LEXIS 240865, at *28-29

(W.D. La. Dec. 15, 2021), referring to 5 USC § 706(2)(D).

## IX.   EO 14042 UNLAWFULLY IMPOSES ON STATE'S RIGHTS

80.    Another reason that both the *Kentucky v. Biden* and *BST Holdings* found

President Biden's mandate unlawful and so should this Court is that:

> [T]he Mandate likely exceeds the federal government's authority under
> the Commerce Clause because it regulates noneconomic inactivity that
> falls squarely within the States' police power. A person's choice to
> remain unvaccinated and forgo regular testing is noneconomic
> inactivity. And t*o mandate that a person receive a vaccine or undergo
> testing falls squarely within the States' police power…The Commerce
> Clause power may be expansive, but it does not grant Congress the
> power to regulate noneconomic inactivity traditionally within the
> States' police power.* In sum, the Mandate would far exceed current
> constitutional authority.

*BST Holdings, LLC,* 2021 U.S. App. LEXIS 33698, at *21-23 (emphasis added).

81.    It is black letter constitutional law that the "police power" to make laws for the public health and safety of citizens belongs to the states and not the federal government. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States are reserved to the States respectively, or to the people." 10th Amendment to the U.S. Constitution.

82.    In *Wilkerson v. Rahrer,* 140 U.S. 545, 554 (1891) the Court held that the police power "is a power originally and always belonging to the States, not surrendered to them by the general government, nor directly restrained by the constitution of the United States, and ***essentially exclusiv*e.**" (Emphasis added.) It is well-recognized that the Constitution's framers were intent on limiting the power of the federal government for which they were creating the parameters.

83.    The police power of the States forms "a portion of that immense mass of legislation which embraces everything within the territory of a State not surrendered to the General Government; all which can be most advantageously exercised by the States themselves. Inspection laws, ***quarantine laws, health laws of every description***, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, are component parts of this mass." *Gibbons v. Ogden*, 22 U.S. 1, 203 (1824) (emphasis added).

84.    The police power under the American constitutional system has been left to the states. It has always belonged to them and was not surrendered by them to the

general government, nor directly restrained by the constitution of the United States. * * * Congress has no general power to enact police regulations operative within the territorial limits of a state. *Shealey v. Southern Ry. Co*., 127 S.C. 15, 120 S.E. 561, 562 (1924); *see also, Bohon's Assignee v. Brown*, 101 Ky. 354, 41 S.W.273 (1897); *John Woods & Sons v. Carl*, 75 Ark. 328, 87 S.W. 621, 623 (1905); *Southern Express Co. v. Whittle,* 194 Ala. 406, 69 So.2d 652, 655 (1915).

85.    The President's mandating of vaccination is undeniably a foray into the area of public health and medicine which is and has always been within the police powers of the states. *See Linder v. United States,* 268 U.S. 5, 18 (1925) ("Obviously, direct control of medical practice in the states is beyond the power of the federal government"); *Lambert v. Yellowley*, 272 U.S. 581, 598 (1926) ("It is important also to bear in mind that 'direct control of medical practice in the States is beyond the power of the Federal Government.' * * * Congress, therefore, cannot directly restrict the professional judgment of the physician or interfere with its free exercise in the treatment of disease. Whatever power exists in that respect belongs to the states exclusively".)

86.    In the recent decision in *Louisiana v. Biden*, No. 21-cv-3867, 2021 U.S. Dist. LEXIS 240865, at *28-29 (W.D. La. Dec. 15, 2021), *supra*, the Court found that Biden's EO 14042 and its administrative promulgation exceeded the authority of the federal government. The Court said:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people. U.S. Const. amend. X. "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.' *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (citing *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). Against this constitutional reservation of delegated authority, the President has on more than one occasion publicly announced his disappointment regarding the country's supposedly low COVID-19 vaccination rate and expressed his intent to increase the vaccination rate by using Executive authority. Thus, EO 14042, although supported upon a nexus of economy and efficiency, was clearly and unequivocally motivated by public health policy first and foremost. See *Reich*, 74 F.3d at 1337 ("The President has, of course, acted to set procurement policy rather than labor policy. But the former is quite explicitly based—and would have to be based—on his views of the latter."). "Whatever one's views on the [vaccine mandate's ability to increase economy and efficiency in procurement], [EO 14042] surely goes to the heart of [the Tenth Amendment]." *Id. See Kentucky*, 2021 WL 5587446, at *10 ("The Court is also concerned that the vaccine mandate intrudes on an area that is traditionally reserved to the States."); Cf. *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab*., 17 F.4th 604, 617 (5th Cir. 2021) ("[T]he [OSHA] Mandate likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power.").

*Louisiana v. Biden*, 2021 U.S. Dist. LEXIS 240865, at *25.

## X.    THE RISKS OF THE SHOTS OUTWEIGH THE RISKS

### A.    THE VACCINES ARE NOT AS EFFECTIVE IN PREVENTING COVID-19 AS REPRESENTED.

87.    Many countries with the highest rates of vaccine injection are facing a surge

of COVID deaths and infections. Israel is the country which vaccinated more of its

citizens than almost any other. It is estimated as much as 85% of the country has

been fully vaccinated with primarily the Pfizer vaccine. Due to this high number, Pfizer considered Israel a source of data for the performance of its vaccine. Yet despite this the number of daily new cases of COVID in the first part of September, 2021 was more than it had ever been before during the "pandemic".[18] In early September Israel had more new COVID cases per capita than any country in the world. Israel is now talking about, not a third, but a fourth booster.[19]

88.     An article in the Vermont Daily reported that 76% of September COVID-19 deaths in Vermont were from vaccinated persons.[20] The CDC has admitted that 80% of Americans who have gotten the Omicron variant of COVID-19 are vaccinated and 33% of those have had a booster.[21]

89.     What is frequently reported is that the Pfizer and Moderna vaccines are approximately "95% effective." This is misleading. In the Pfizer trial of approximately 21,726 unvaccinated participants, 0.75% were deemed to have been infected with COVID. The vaccinated group infection rate was 0.04% (21,720 participants).[22] The effect of the vaccine was therefore a 0.71% reduction in risk (.75%-.04%) — that's it, less than one percent! This is the absolute risk reduction (ARR). The "95% effective" claim comes from dividing 0.71% (the difference

---

[18] https://graphics.reuters.com/world-coronavirus-tracker-and-maps/countries-and-territories/israel/

[19] https://www.bloomberg.com/news/articles/2021-09-12/israel-preparing-for-possible-fourth-covid-vaccine-dose

[20] https://vermontdailychronicle.com/2021/09/30/76-of-september-covid-19-deaths-are-vaxxed-breakthroughs/

[21] https://www.thegatewaypundit.com/2021/12/cdc-confirms-80-covid-19-cases-caused-omicron-variant-us-fully-vaccinated-individuals-33-booster-shots/

[22] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7996517/

between infection rates of the two groups) and 0.75% (the infection rate of the unvaccinated group): 0.71%/0.75% = 95% (this is the *relative* risk reduction). For the general population, that number is not particularly useful since the infection rates were so low in both groups. Therefore, given the low death rate of infected people, the actual value of the vaccine to the public would appear to be very low — even disregarding the many adverse vaccine events.

90.     From the Absolute Risk Reduction ARR, one can calculate the Number Needed to Vaccinate ("NNV"), which signifies the number of people that must be injected before even one person benefits from the vaccine.[23] The NNV for the Pfizer vaccine is 119, meaning that 119 people must be injected in order to observe the reduction of a single COVID case (not death). The reputed journal the *Lancet* reports data indicating that the NNV may be as high as 217.[24] The NNV to avoid hospitalization exceeds 4,000. The NNV to avoid death exceeds 25,000.

### B.     THOSE WHO HAVE ALREADY HAD COVID-19 HAVE NATURAL IMMUNITY SUPERIOR TO VACCINE IMMUNITY

91.     A study from Israel comparing natural immunity, gained through previous SARS-CoV-2 infection demonstrated that "natural immunity confers longer lasting and stronger protection against infection (then vaccines)" [25] In fact, it was found

---

[23] NNV is 1/ARR.

[24] https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(21)00069-0/fulltext

[25] Sivan Gazit, et al, "Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections." medRxiv 2021.08.24.21262415; doi: https://doi.org/10.1101/2021.08.24.21262415

that the "Delta variant" had a 27-fold higher chance of breaking through vaccine protection as compared to natural immunity. Additionally, a study published by the renown Cleveland Clinic in Ohio indicates that vaccination is unnecessary for those previously infected.[26]

92.   Not only would the vaccine be unnecessary in people who have recovered from the disease, the vaccine actually puts them at risk for Antibody Dependent Enhancement, a potentially lethal adverse effect.

93.   Antibody Dependent Enhancement ("ADE") occurs when SARS-CoV-2 antibodies, created by a person's body in response to the mRNA "vaccine", instead of protecting the vaccinated person, cause a more severe or lethal case of the COVID disease when the person is later exposed to SARS-CoV-2.[27] The vaccine *amplifies* the infection rather than *preventing* damage. A person who previously had SARS-CoV-2, and then receives a vaccine, mounts an antibody response to the vaccine that is between 10 and 20 times stronger than the response of a previously uninfected person.[28] The antibody response is far too strong and overwhelms the vaccine subject.

94.   Scientists have noted an immediately higher death rate worldwide upon receiving a vaccine. According to VAERS, as of June 18, 2021, 36% of all deaths

---

[26] Nabin K. Shrestha, et al, "Necessity of COVID-19 vaccination in previously infected individuals," medRxiv 2021.06.01.21258176; doi: https://doi.org/10.1101/2021.06.01.21258176

[27] https://www.nature.com/articles/s41564-020-00789-5

[28] https://www.medrxiv.org/content/10.1101/2021.01.29.21250653v1.full.pdf

following COVID injections occurred within three days of the injection.[29] **Such deaths are not counted as "deaths following vaccination" by VAERS as now the definition of "fully vaccinated" requires a waiting time of two weeks after the last shot of a series**.[30]

95.    Groups of scientists are demanding improved pre-assessment due to vaccine-driven disease enhancement in the previously infected. Despite this known risk, the CDC still recommends that even COVID-recovered people receive the vaccine.[31]

        C.     THE KNOWN AND POTENTIAL RISKS OF THE VACCINES OUTWEIGH THE KNOWN AND POTENTIAL BENEFITS

          The "Pfizer-BioNTech COVID-19 Vaccine" and "Moderna COVID-19 Vaccine" are Novel Gene Therapy Technology, Not Vaccines

96.    The "Pfizer-BioNTech COVID-19 Vaccine" and the "Moderna COVID-19 Vaccine" do not meet any of CDC's definitions of vaccine or immunity - they do not stimulate the body to produce immunity from a disease. The injected solution consists of a synthetic fragment of nucleic acid embedded in a fat (lipid) carrier that is introduced into human cells, not to block further transmission of the virus, but to lessen the symptoms of COVID.[32]

---

[29] https://www.ronjohnson.senate.gov/services/files/A4A76F9A-9B29-4CF9-B987-F9097A3F4CB7

[30] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html

[31] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html

[32] CNN, *Supra*, note 8

97.    No published, peer-reviewed studies prove that the "Pfizer-BioNTech COVID Vaccine" and the "Moderna COVID Vaccine" confer immunity or stop transmission.

98.    No dead or attenuated virus is used as in traditional vaccines. Rather, instructions, via a piece of genetic code ("mRNA") are injected into the body that tell the DNA how to make a certain "spike protein," a toxin, to cause the body to then mount a defense against this toxic protein. Because spike protein is one component of the SARS-CoV-2, the theory is that this mechanism will be purportedly useful in attacking the SARS-CoV-2 virus. However, it is this spike protein which appears to be what causes many serious adverse effects and deaths.

99.    A group of international scientists has recently obtained the "biodistribution study" for the mRNA Vaccines from Japanese regulators.[33] The study reveals that unlike traditional vaccines, this spike protein enters the bloodstream and circulates throughout the body over several days post-vaccination. It accumulates in several tissues, such as the spleen, bone marrow, liver, adrenal glands and ovaries.

100.   Salk Institute for Biological Studies researchers in collaboration with the University of San Diego, published in the journal *Circulation Research* that the spike proteins themselves damage vascular cells, causing strokes and many other

---

[33] Summary of Pfizer Pharmacokinetic Study https://pandemictimeline.com/wp-content/uploads/2021/08/Pfizer-bio-distribution-confidential-document-translated-to-english.pdf

vascular problems.[34] The spike proteins are known to cause clotting that the body cannot fix, such as brain thrombosis and thrombocytopenia. It is well documented that the vaccinated have excessive bleeding and clotting disorders including vaginal bleeding, miscarriages, gastrointestinal bleeding, and immune thrombocytopenia.[35]

Increased Risk of Death from Vaccines

101.   The government-operated VAERS database functions as an "early warning" system for potential health risks caused by vaccines. It is broadcasting a red alert. In about one year, the VAERS system has recorded 19,532 deaths from the COVID injections. During that time all other vaccines killed 426 people. In fact, all other vaccines required 31 years to reach 47% of the death toll of the COVID injections (9,137 deaths).[36] The injections would have been halted long ago if our regulators followed historical standards. For example, the LA Times reported that during the 1976 "Swine Flu" pandemic "more than 500 people are thought to have developed Guillain-Barre syndrome after receiving the vaccine; 25 died."[37] In the end, "more than 40 million Americans — almost 25% of the population — received the swine flu vaccine before the program was halted in December after 10 weeks."

---

[34] Salk News, "Salk researchers and collaborators show how the protein damages cells, confirming COVID-19 as a primarily vascular disease." https://www.salk.edu/news-release/the-novel-coronavirus-spike-protein-plays-additional-key-role-in-illness/

[35] https://www.bmj.com/content/373/bmj.n958/rr-2

[36] Vaccine Adverse Event Reporting System (VAERS) 1990 - 11/26/2021, CDC WONDER On-line Database. Accessed at http://wonder.cdc.gov/vaers.html on Dec 4, 2021 11:40:42 PM

[37] https://www.latimes.com/archives/la-xpm-2009-apr-27-sci-swine-history27-story.html

102.   It is estimated that VAERS only captures 1% to 10% of all vaccine adverse events. A study commissioned by the Agency for Healthcare Research and Quality of the U.S. Department of Health and Human Services found that "fewer than 1% of vaccine adverse events are reported" to VAERS.[38] HHS has argued that the level of reporting is generally higher for more serious events. Given the pressure on health care providers to maintain the "safe and effective" narrative, one could reasonably conclude that such higher levels of reporting is not likely the case for COVID injections.

There is no asymptomatic transmission of the disease

103.   The specter of "asymptomatic spread" — the notion that fundamentally healthy people could cause COVID in others —has been used to justify mandatory vaccination, mask wearing and PCR tests on healthy people. But there is *no credible scientific evidence* that demonstrates that the phenomenon of "asymptomatic spread" is real. On the contrary, on June 7, 2020, Dr. Maria Von Kerkhov, head of the WHO's Emerging Diseases and Zoonosis Unit, told a press conference that from the known research, asymptomatic spread was "very rare." "From the data we have, it still seems to be rare that an asymptomatic person actually transmits onward to a secondary individual." She added for emphasis: "it's very rare."[39] Researchers

---

[38] Lazarus, R., et.al, "Electronic Support for Public Health–Vaccine Adverse Event Reporting System (ESP:VAERS)", Submitted to U.S. Dept of Health and Human Services, Grant ID: R18 HS 017045. https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf
[39] https://www.cnn.com/2020/06/08/health/coronavirus-asymptomatic-spread-who-bn/index.html

from Southern Medical University in Guangzhou, China, published a study in August 2020 concluding that asymptomatic transmission of COVID is *almost non-existent*. "Asymptomatic cases were least likely to infect their close contacts," the researchers found.[40] A more recent study involving nearly 10 million residents of Wuhan, China found that there were no, zero, positive COVID tests amongst 1,174 close contacts of asymptomatic cases, *indicating the complete absence of asymptomatic transmission*.[41]

104.   On September 9, 2020, Dr. Fauci, discussing asymptomatic transmission, was forced to admit in an official press conference:

> [E]ven if there is some asymptomatic transmission, ***in all the history of respiratory borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks.*** The driver of outbreaks is always a symptomatic person*, even if there is a rare asymptomatic person that might transmit, an epidemic is not driven by asymptomatic carriers.[42]

---

[40] Lei Luo, Dan Liu, Xinlong Liao, et al. Contact Settings and Risk for Transmission in 3410 Close Contacts of Patients With COVID-19 in Guangzhou, China: A Prospective Cohort Study. Ann Intern Med.2020;173:879-887. [Epub ahead of print 13 August 2020]. doi:10.7326/M20-2671

[41] Cao S, Gan Y, Wang C, Bachmann M, Wei S, Gong J, Huang Y, Wang T, Li L, Lu K, Jiang H, Gong Y, Xu H, Shen X, Tian Q, Lv C, Song F, Yin X, Lu Z. Post-lockdown SARS-CoV-2 nucleic acid screening in nearly ten million residents of Wuhan, China. Nat Commun. 2020 Nov 20;11(1):5917. doi: 10.1038/s41467-020-19802-w. PMID: 33219229; PMCID: PMC7679396.

[42] See, starting at minute 44: https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2638s

## XI.  INJUNCTIVE RELIEF

105.  The requirements for a preliminary injunction were set forth with clarity in

*Louisiana v. Xavier Becerra et al*., *supra, at p. 11,12,* as follows:

> A preliminary injunction is an extraordinary remedy never awarded of right. *Benisek v. Lamone,* 138 S. Ct. 1942, 1943, 201 L. Ed. 2d 398 (2018). In each case, the claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d  249 (2008). The standard for a preliminary injunction requires a movant to show (1) the substantial likelihood of success on the merits, (2) that he is likely to suffer irreparable harm in the absence of a preliminary injunction, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Benisek*, 138 S. Ct. at 1944. The party seeking relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). None of the four prerequisites has a quantitative value. *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975).

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

106.  The element of likelihood of success on the merits is problematic for two

reasons. First, it puts a court in the position of, deciding to a large extent, the merits

of a case before having seen all the evidence. Second, it ignores that injunctive

relief may be needed to avert serious harm to the plaintiff and may not significantly

harm the defendant at all such that a balance of equities clearly warrants granting

relief, even if there is not a substantial likelihood of success or the Court simply

cannot really judge the likelihood of success without a trial. Therefore, many courts

have eschewed a strict application of the "substantial likelihood" prong.

107.   In *Greater Yellowstone Coalition v. Flowers,* 321 F.3d 1250, 1256 (10th Cir. 2003), the court held that if the movant can show "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation," and the remaining three elements "tip strongly" in the movant's favor, the court will grant the preliminary injunction.

108.   In *Cooper v. Salazar,*196 F.3d 809, 813 (7th Cir.1999) (quoting *Boucher v. School Bd. of Greenfield,*134 F.3d 821, 824 (7th Cir.1998)), the Court held that to show a likelihood of success on the merits at the preliminary injunction stage, a plaintiff need only show " 'a better than negligible chance of succeeding.' " *Cooper v. Salazar,* 196 F.3d 809, 813 (7th Cir.1999).

109.   Other courts have implied that a showing well below 50% likelihood of success will suffice. *Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir. 1984) (explaining that plaintiff must show that she has a "better than negligible" chance of succeeding in order to obtain a preliminary injunction). *See generally*, Morton Denlow, The Motion for a Preliminary Injunction: Time for a Uniform Federal Standard, 22 REV. LITIG. 495 (2003) (discussing the various standards).

110.   If one reviews the cases, it appears that if a Plaintiff can show a reasonable possibility of success on the merits, it is sufficient for the "likelihood" prong.

## B. IRREPARABLE HARM

111.   While there is a general rule that loss of employment in and of itself is not irreparable harm some courts have held otherwise particularly if constitutional rights are involved. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (holding county sheriff's office could not fire or threaten dismissal of employees for failure to affiliate with a political party).

112.   In *BST Holdings, LLC supra,* the court, quoting *Elrod v. Burns,* stated:

> It is clear that a denial of the petitioners' proposed stay would do them irreparable harm. For one, *the Mandate threatens to substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)*. For the individual petitioners, the loss of constitutional freedoms "for even minimal periods of time . . . unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976) . . . . Not to mention the free religious exercise of certain employees. See U.S. Const. amend. I; cf. *Holt v. Hobbs*, 574 U.S. 352, 361 (2015)." (emphasis added)

113.   Similarly in *Kentucky v. Biden*, *supra*, the Court found irreparable harm. The Court said: "Furthermore, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance." *Id.* (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016))." Id. at p. 27.

> Although irreparable injury is an essential element to obtaining injunctive relief, most federal circuit courts have held that irreparable injury should be presumed in constitutional cases. A Farewell To Harms: Against Presuming Irreparable Injury In Constitutional Litigation, Anthony Disarro, *Harvard Journal of Law & Public Policy,* Vol. 35, No. 2, p. 744.

114.    In *Overstreet v. Lexington-Fayette Urban County*, 305 F.3d 566, 578-79 (6th

Cir. 2002), the Court stated:

> Courts have also held that a plaintiff can demonstrate that a denial of an
> injunction will cause irreparable harm if the claim is based upon a
> violation of the plaintiff's constitutional rights. *See, e.g., Connection
> Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998) (recognizing that
> the loss of First Amendment rights, for even a minimal period of time,
> constitutes irreparable harm) (citations omitted); *Covino v. Patrissi,* 967
> F.2d 73, 77 (2d Cir. 1992) (holding that plaintiffs may establish
> irreparable harm based  on an alleged violation of their Fourth
> Amendment rights); *McDonell v. Hunter,* 746 F.2d 785, 787 (8th Cir.
> 1984) (finding that a violation of privacy constitutes an irreparable
> harm).

115.    Some judicial decisions state that constitutional privacy rights and first

amendment rights are those for which irreparable harm may be presumed.

*Community Communications Co., Inc. v. City of Boulder, Colo.,* 660 F.2d 1370

(10th Cir. 1981): *See McDonell v. Hunter,* 746 F.2d 785, 787 (8th Cir. 1984).

> It is well settled that the loss of First Amendment freedoms for even
> minimal periods of time constitutes irreparable injury justifying the grant
> of a preliminary injunction." *Deerfield Medical Center v. City of
> Deerfield Beach,* 661 F.2d 328, 338 (5th  Cir. Unit B 1981), *citing Elrod
> v. Burns,* 427 U.S. at 373, 96 S.Ct. at 2689. So too, direct penalization,
> as opposed to incidental inhibition, of First Amendment rights constitutes
> irreparable injury. *Johnson v. Bergland,* 586 F.2d 993, 995 (4th Cir. 1978)
> (transfer of employee allegedly for exercise of First Amendment rights;
> "[v]iolations of first amendment rights constitute per se irreparable
> injury"); *Citizens for a Better Environment v. City of Park Ridge,* 567
> F.2d 689 (7th Cir. 1975).

*Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983).

116.   Both religious freedom (First Amendment rights) and privacy rights are at issue in the case at bar. The Defendant has denied some religious exemption requests and privacy rights are implicated by an invasion of bodily integrity with coerced vaccination.

117.   The case *McDonell v. Hunter,* 746 F.2d 785, 787 (8th Cir. 1984) has factual similarities with this case. The Plaintiffs were female guards at Iowa Correctional Institution for Women who were told by prison officials that the Department planned to conduct strip searches, blood tests, and urinalyses on Department employees and were asked to sign a form consenting to such searches. The Court held: "The violation of privacy in being subjected to the searches and tests in question is an irreparable harm that could reasonably be found to outweigh whatever increase in security the enforcement of the Department's policies might produce."

118.   In *Northeastern Florida Chapter v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990), the court stated:

> (The) area of constitutional jurisprudence where we have said that an ongoing violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence. *See, e.g., Cate v. Oldham,* 707 F.2d 1176, 1189 (11th Cir. 1983); *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. 1981). The rationale behind these decisions was that chilled free speech and invasions of privacy, because of their intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole.

119.   While some courts have taken the position that loss of a job or income is not irreparable harm, Plaintiffs here argue that the mass layoff of large numbers of skilled employees all at once on the basis of an illegal executive order merits closer inspection than a cavalier rejection of such a substantial impact to individuals and a local economy as irreparable harm.

120.   The factual circumstances of many Plaintiffs are such that loss of employment is different than for most persons who might lose a job. Many plaintiffs are highly trained in specialized work which is unique to weapons laboratories and nuclear facilities and even unique to the Sandia National Laboratory. It will be a great challenge for them to find similar employment at all or with similar compensation. One plaintiff has stated to the undersigned attorneys, "If terminated, my income would be reduced by 25-50% based on market wages in the Albuquerque area for my career. I might be forced to leave the state to find a comparable wage, but then I would face moving costs and a forced sale of my house. Loss of my job and insurance would cause a reduction in my health and my wife's."

121.   Older employees of SNL are not going to be able to find work outside SNL. Plaintiff Anna Burns is a 67-year-old woman with numerous autoimmune conditions, who needs her health insurance. She moved from Texas where she had

lived all her life, to accept employment from SNL, intending this would be where she would work the rest of her working life. She was glad to obtain work with SNL, as they were not discriminating against older workers.

122.   Loss of employment will mean, for many of the plaintiffs, being uprooted, having to sell homes, move from the area, and since many Plaintiffs have worked at SNL and lived in the area for many years, the loss of a community and close personal relationships. Most, if not all, of the plaintiffs enjoy high level national security clearances, of level Q and above, including critical SAPs Special Access Programs. According to Plaintiffs, this level of security clearance is equivalent to Dept. of Defense "Top Secret" level. These security clearances will be lost if employees are away from their position over a certain period. This can impact and jeopardize future employment as a stigma upon their reputations for having lost their security clearance. Once lost, these clearances can take years to recover.

### C.  BALANCING OF EQUITIES

123.   Enjoining Defendants would save Plaintiffs from loss of employment and security clearances, and from punishment for their exercise of protected constitutional freedoms, as well as from being discriminated against based on their religious beliefs and/or medical conditions. Loss of security clearances is serious and cannot be addressed simply by monetary compensation. There is a stigma that follows an employee who loses such high-level clearance. The consequence to the

Plaintiffs of not obtaining injunctive relief is discussed in the prior section on Irreparable Harm. A potential harm to some plaintiffs is that they will, in fear of losing their career or source of income, submit to the vaccination. This is a serious harm either from the perspective of the very real serious adverse side effects the vaccines can cause and from the perspective that they will have been coerced into sacrificing their right to make their own medical choices.

124.   What is the injury to Defendants by granting injunctive relief? If their concern is that their workforce will be depleted because many people will become sick with COVID, this may be an understandable, albeit false, assumption. However, it is not scientifically supportable for several reasons. First of all, it simply is not true that only those who are unvaccinated spread COVID. The mRNA vaccines being injected in Americans do not prevent the recipient from getting or transmitting the SarsCoV-2 virus. Rather, the shot purportedly reduces the severity of symptoms should someone get sick with COVID. What this means is that it is just as likely that vaccinated employees will be transmitting the virus as the unvaccinated. It could even be said that the vaccinated are more likely to spread it since they will have milder symptoms, and therefore, would be likely to go to work. Whereas the unvaccinated without natural immunity who get the disease would most likely have symptoms and stay home.

125.   Moreover, the vaccinated are getting COVID as much as the unvaccinated. (See the statistics from Israel and Vermont in paragraphs 95 and 91 above). An employee of SNL (not a plaintiff) who is familiar with the health records of the workforce will testify that the majority of recent COVID cases at the Lab are of the vaccinated, not the other way around.

### D.  THE PUBLIC INTEREST

126.   It is in the public interest that Plaintiffs remain in their positions at SNL. Many of them are educated, highly skilled and have very specialized skills and training required by SNL. Losing their services to the nation and its military defense needs is contrary to the public interest. Hundreds of citizens losing their jobs and potentially their careers is contrary to the public interest. Since many Plaintiffs have top secret security clearances, firing many persons with top secret weapon information could be a risk for national security which certainly would be contrary to the public interest.

127.   It is also in the public interest to uphold the public rights and policies ensconced in the United States Constitution for bodily integrity, freedom to consent to medical treatment and for religious freedom. Due to the large number of plaintiffs, vindicating that many people's constitutional rights is in the public interest.

## XII. CLAIMS

### COUNT I - INJUNCTIVE RELIEF BARRING VACCINE MANDATES
**The fundamental right to bodily integrity bars mandates. (All Defendants)**

128.   There exists a fundamental right to bodily integrity in which the Supreme Court has recognized places "limits on governmental power to mandate medical treatment or to bar its rejection." *Planned Parenthood v. Casey,* 505 U.S. 833, 835 (1992). These limits stand so strongly that "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims." *Planned Parenthood v. Casey,* at p. 835. This high standard indicates that ANY governmental intrusion on decisions related to bodily integrity should be reviewed under the strictest of scrutiny.

129.   *Planned Parenthood v. Casey* upheld rights related to abortion, which results in the death of a child most of the time and cannot be considered a trivial surgery. This stands in stark contrast to the COVID vaccines which carry unknown long-term risks (there have been no long-term studies), have the highest risk of side-effects, including death, of any vaccine in history, and are being mandated for a disease that has well over a 99% recovery rate for a vast majority of the population.

130.   As such, Plaintiffs request injunctive relief enjoining the Defendants from taking any negative action against the Plaintiffs for exercising their fundamental right to refuse the vaccine.

## <u>COUNT II – DECLARATORY JUDGMENT</u>

131.   Plaintiffs request that this Court make the following declarations to ensure that government entities recognize the limits of their authority:

a) EO 14042 is invalid to authorize compulsory EUA vaccinations of American Citizens; and

b) The constitutional right to bodily integrity permits an American citizen to refuse without adverse consequences any EUA vaccine.

**WHEREFORE**, Plaintiffs ask relief from the Court as described above, and for all other relief as the Court deems just and proper.

Respectfully submitted,
NORRED LAW, PLLC
/s/ Warren V. Norred
Warren V. Norred, Texas Bar No. 24045094, wnorred@norredlaw.com
515 E. Border St., Arlington, Texas 76010
T (817) 704-3984, F (817) 524-6686
Attorney for Plaintiffs

/S/ N. Ana Garner                                    /s/ Jonathan Diener
N. Ana Garner, NM Bar No. 921                         Jonathan Diener
Attorney for Plaintiffs                               Attorney for Plaintiffs
206 W. Main St.                                       P.O. Box 27, Mule Creek, NM 88051
Farmington, NM 87401                                  (575) 535-2760
(505) 930-5170/(505)235-3302                          jonmdiener@gmail.com
Garnerlaw@yahoo.com                                   *Pro Hac Vice App. to be submitted*
*Pro Hac Vice App. to be submitted*