**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

| | |
|---|---|
| **SNL WORKFORCE FREEDOM ALLIANCE,** ) | |
| **DAVID PETERSON, JON BROOKS, ANNA** ) | |
| **BURNS, JOHN DOE #1, JANE DOE #2,** ) | |
| **RICKY ALLEN FERGUSON,** ) | **Case No. 1:22-cv-00001-DHU-SCY** |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| **NATIONAL TECHNOLOGY AND** ) | |
| **ENGINEERING SOLUTIONS OF SANDIA,** ) | |
| **LLC** d/b/a **SANDIA NAT'L LABORATORIES,** ) | |
| **HONEYWELL INTERNAT'L, INC.** ) | |
| Defendants. **)** | |

**AMENDED COMPLAINT and REQUEST FOR INJUNCTIVE RELIEF**

## I.      INTRODUCTION

Plaintiffs file this Amended Complaint as a matter of course, pursuant to Rule 15(a) Fed.R.Civ.Pro. Plaintiffs are employees of the Sandia National Laboratory facing a covid vaccine mandate based on Executive Orders of President Biden. Some Plaintiffs have already been terminated over refusal to provide legally protected medical information concerning their health status pertaining to the shot mandate. (Plaintiffs are cognizant of the universally misused term "vaccine" and "vaccination" in connection with the novel and experimental injectable medical intervention, and throughout this Amended Complaint, will use the term "shot" or "injection" to denominate the covid shots).  The Amended Complaint is a legal challenge to the mandates and will establish that the covid shot mandates are unlawful and unconstitutional, and seek declaratory and injunctive relief to protect those who are or would suffer damage from forced vaccinations.

## II.      PARTIES, JURISDICTION, VENUE, STANDING

A.      PLAINTIFFS

1.      As particularly alleged below, the named Plaintiffs are employed or were recently employed at Sandia National Laboratory (SNL), which employs thousands of employees. The plaintiffs have or are submitting EEOC claims based on discrimination against them for refusing to accept experimental vaccinations, the discrimination being based on a medical condition of not being injected. None of these claims have been adjudicated.

2.      Plaintiff Sandia Workforce Freedom Alliance (SWFA) is an unincorporated association of several hundred employees whose purpose is to advocate for the constitutional rights and freedoms concerning bodily autonomy, self-determination, privacy, and religious freedom, as it relates to mandates at SNL requiring covid injections, mask wearing and medical testing. The exact number is not known as people continue to express desire to join this lawsuit. The interests at stake in this case are pertinent to SWFA's purpose, and neither the claims asserted, nor the relief requested requires the individual participation of all its members. The named plaintiffs are SWFA members who can adequately represent the group's interests.

3.      All plaintiffs object to being coerced to take a medical intervention, especially one that is experimental and have no long-term supporting studies. While they assert the constitutional right to bodily integrity, most have made requests for medical, religious, or both types of exemptions from the mandate. Some stand on their rights to bodily integrity and to choose medical treatment with no exemptions requested. Others are concerned about the lack of adequate testing of the injections, and that clinical trials are still ongoing. Many have witnessed first-hand serious adverse effects and even death, on others (employees and family members) receiving these drugs, and some claim exemptions based on having recovered from covid, and therefore have natural immunity. For those persons with natural immunity, not only would the shots be unnecessary to accomplish any purpose, but the shots could also endanger their health by putting them at risk for

a potentially lethal condition, Antibody Dependent Enhancement (ADE).

4.    Plaintiff David Peterson resides in the County of Hopkins, Texas, and has been affiliated with SNL/NTESS as an employee or contractor for almost twenty years. He recently found other employment, after working at SNL as Senior Member of Technical Staff (Analyst). He was a full-time, *100% virtual employee*, who met the needs of his SNL position from his home state of Texas. Mr. Peterson had religious and medical safety concerns that compel him to oppose submitting to a covid injection.

5.    Plaintiff Jon Brooks resided in the County of Bernalillo, New Mexico, while he was affiliated with SNL/NTESS as an employee or contractor for two years. His position at SNL, prior to his termination on October 8, 2021, was Electrical Engineer. He did not file any exemption request prior to being fired. He was terminated for refusal to complete the "Attestation Form", also known as the "Certification of Vaccine" form. *See* **Exhibit 1**, **Termination Letter and Form Questions.** In addition to his religious objections to the experimental medical treatment, Mr. Brooks also has objections due to previous vaccine injuries.

6.    Plaintiff Anna Burns is a 67-year-old employee who opposes the mandated experimental medical treatment. She will suffer irreparable harm if injunctive relief is not granted. At her age, she is unlikely to be able to obtain other employment. She has health issues that require expensive medical treatment currently covered under her health insurance plan through SNL. She does not have enough money in savings to survive until she can draw her pension.

7.    Plaintiff John Doe #1 is a resident of Smith County, Texas who has been affiliated with SNL/NTESS and/or its contractors for a period of four years. He has been threatened with termination of his employment unless he complies with the covid injection mandate even though he is a virtual employee who lives in another state and does not work on-site at the Lab. Mr. Doe

has religious beliefs that prevent him from receiving the covid injections. He has submitted a religious exemption, but he has not yet received a definitive response. He prefers to be unnamed due to fear of retaliation and discrimination at the workplace.

8.      Plaintiff Jane Doe #2 has a primary residence in Harris County, Texas with a second home in Sandoval County, New Mexico and has been a SNL/NTESS employee for three years. This Plaintiff's decision to not be "vaccinated" is informed by moral and spiritual beliefs as well as her own research. J. Doe #2 has filed a religious exemption with SNL, which is unresolved as of this date. Doe #2 prefers to be unnamed due to fear of retaliation and discrimination at the workplace.

9.      Plaintiff Ricky Allen Ferguson, a resident of Albuquerque, New Mexico, county of Bernalillo, is a member of the Plaintiff association, SNL Workforce for Medical Freedom. Although he has been a plaintiff since the original filing of this lawsuit, he was formerly undisclosed as a named plaintiff to maintain his anonymity. However, he is now willing to be identified as a Plaintiff, knowing full well that he may be terminated very soon due to his refusal to engage in the choice of "the jab or the job". Mr. Ferguson is a 55 year old employed at SNL for the past 18 months as Senior Engineering Support Technologist with a high level security clearance. He started working at SNL April 1, 2019 as a contract employee with Akima and was hired by SNL in July, 2020 doing the same work, but now as an employee of SNL. As an employee who is faced with the real possibility of being terminated for not consenting to either the experimental gene therapy injection, or to the lack of reasonable accommodations for his religious and medical exemptions, he will face irreparable harm upon being terminated from SNL. He is required to work for a total of 3 years to become fully vested in his pension, which requires another 1 ½ years of employment with SNL. Further, being terminated will result in the loss of his high level security clearance, with the loss alone impeding his ability to regain it. The loss of security

clearance is looked at by employers requiring such clearances as being a "black mark" which would make the likelihood of being hired far less.  Losing one's security clearance is an injury to reputation,  which is irreparable, and not remedied by financial compensation alone.  Mr. Ferguson has given his life and career to working for the Department of Defense as a 22 year veteran of the United States Air Force reserves and considers himself a patriotic American.

Mr. Ferguson applied for and received a religious exemption to the shot, with the accommodation that he undergo differential treatment in the workforce, such as serial testing and completion of daily Health Check app, which those who have received the shot are not required to do. Mr. Ferguson holds the sincere and deep belief in God, and consulted with his pastor about the decision concerning the mandated shot. He spent much time in prayer and talking with his pastor and family about the shots and concluded under the guidance and prompting of the Holy Spirit that the shot, as a gene therapy, would be a modification of his body that is abhorrent to what God has designed.  He trusts God and the body's natural immune system to fight this disease which the shots are supposed to prevent. He sincerely believes that taking the shot would alter his body which is a temple unto the Holy Spirit in a way that would interfere with his relationship with God.

Mr. Ferguson has submitted a medical exemption letter from his own physician documenting his inability to safely wear a mask at work, however, SNL will not provide reasonable accommodation to him based on his pre-existing and permanent medical conditions of sinusitis and sleep apnea, which are aggravated by mask-wearing. Despite management requesting he consult with an ENT specialist, which he did, SNL ignored the physician's recommendation, instead substituting their own medical judgment when they are not his doctor. He does not want or have any doctor-patient relationship with any doctors or nurses who work at SNL. They do not know his situation as well as his own doctor, yet they disregard the opinion of

his own doctor.

As a result of not wearing a facemask when SNL engaged in the mask discrimination in June of 2021, allowing only "fully vaccinated" employees to go without the mask, and only required it for those who relied upon natural God-given immunity, Mr. Ferguson received an adverse work review, based solely on that incident, and despite having performed admirably in his career with SNL. He faces a hostile work environment with snide and hostile comments against him, and discriminatory practices applied to him and those plaintiffs who share his beliefs who are members of the Plaintiff association.

10. At least three plaintiffs have been terminated over refusing the mandated shot and refusing to comply with invasive questioning into their religious beliefs upon which they base their refusal.

B. DEFENDANTS

11. Sandia National Laboratories is operated and managed by National Technology and Engineering Solutions of Sandia, LLC, a wholly owned subsidiary of Honeywell International, Inc. NTESS, dba as the Sandia National Laboratories, manages and operates the lab as a contractor with the U.S. Department of Energy's National Nuclear Security Administration (NNSA) and works with numerous federal, state, and local government agencies, companies, and organizations.

12. Honeywell International, Inc. is a corporation organized in the State of Delaware, and authorized to, and doing business in New Mexico. Defendant Honeywell, as parent corporation of NTESS dba SNL, is vicariously liable for the actions of NTESS. "SNL" will be used throughout the complaint interchangeably with "the Defendants".

C. JURISDICTION

13. This Court exercises subject matter jurisdiction under 28 U.S.C. § 1331, which

confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States.

14.    This Court also exercises subject matter jurisdiction in accordance with 28 U.S.C. § 1361, which grants to the district court's original jurisdiction "of any action to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Defendants, as agents of the United States government through their federal contracts with DOE, owe a duty to Plaintiffs to comply faithfully with 21 U.S.C. § 360bbb-3, the provisions of which are intended to protect them.

15.    This Court has the authority to grant the requested declaratory relief under 28 U.S.C. § 2201, and the requested injunctive relief under 28 U.S.C. § 1343(a).

16.    This Court has Jurisdiction under the Constitution of the United States and Authority under its own equitable powers.

D.    VENUE

17.    Venue is appropriate in the New Mexico Federal District Court because NTESS, d/b/a Sandia National Labs, operates primarily in Albuquerque, New Mexico.

E.    STANDING

18.    Plaintiffs satisfy the "case-or-controversy" requirement of Article III of the Constitution and have standing to sue because they:

(1) [have] suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
(2) the injury is fairly traceable to the challenged action of the defendant; and
(3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Fla Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011)

(citing *Lujan v. Defs. of Wildlife*, 112 S. Ct. 2130, 2136 (1992)).

## III.     GENERAL ALLEGATIONS

19.     Over 99.8%[1] of all those infected with covid survive, with the number being far higher in a vast majority of the population. Even the highest risk population has approximately a 95% recovery rate which is substantially higher than many other diseases we have lived with for centuries with no emergency measures taken. The infection fatality rate (IFR) has been steadily dropping, like other influenza-like illnesses. Currently, the IFR is estimated to be approximately 0.15% — in line with seasonal influenza.[2]

20.     Merriam-Webster defines an emergency as: an unexpected and usually dangerous situation that calls for immediate action.[3] Covid began in China in late fall of 2019, and there are no signs of it disappearing any time soon. Government officials have claimed it will remain with us forever; thus this is not an emergency but rather the "new normal". If we allow emergency measures indefinitely, we are constructively amending the Constitution and rewriting legislation through the use of the emergency declaration.

21.     Those who survive covid or its variants obtain robust and durable natural immunity.[4] The natural immunity so obtained is superior to covid injection-induced immunity. [5]

22.     At its Vaccines and Related Biological Products Advisory Committee meeting on October 22, 2020, the FDA disclosed to attendees 22 serious and life-threatening "adverse event outcomes" of covid injections.[6]

23.     The idea that by injecting Defendants' employees they will curtail the spread of covid is false. The CDC Director has acknowledged that the covid shots do not prevent infection

---

[1] https://www.who.int/bulletin/volumes/99/1/20-265892.pdf
[2] https://onlinelibrary.wiley.com/doi/epdf/10.1111/eci.13554
[3] https://www.merriam-webster.com/dictionary/emergency
[4] https://doi.org/10.1101/2021.08.24.21262415
[5] https://www.nejm.org/doi/full/10.1056/NEJMoa2114583
[6] https://www.fda.gov/media/143557/download (see slide 16).

or transmission of covid. In one interview, she admitted, "(W)hat the vaccines can't do anymore is prevent transmission."[7]

24.     BioNTech's annual report filed with the SEC (Securities and Exchange Commission) admitted that the mRNA technology in its covid injection product is "gene therapy" which has never been approved by the FDA before.[8]

25.     Mandating covid injections violates the fundamental right of bodily integrity protected by the United States Constitution as stated in *Planned Parenthood v. Casey,* 505 U.S. 833 (1992), which cited and largely overturned *Jacobson v Massachusetts,* 197 U.S. 11 (1905). Even the Emergency Use Authorization statutes which were used to distribute the shots nationwide, recognize the right to accept or refuse medical intervention for products allowed under an EUA.[9]

26.     Products allowed to market under an EUA are therefore, investigational and experimental. Clinical trials in all covid injections are still ongoing. The only covid shot to have received FDA "approval" is not available in the United States, therefore, all covid "vaccines" available here are experimental.[10]

27.     The Vaccine Adverse Event Reporting System (VAERS) which is co-managed by the FDA and the CDC, reports significantly higher incidence of injuries, serious adverse reactions, and deaths following covid injections as compared to all prior widely distributed

---

[7] https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html

[8] BioNTech SEC Form 20-F https://www.sec.gov/Archives/edgar/data/1776985/000156459020014536/bntx-20f_20191231.htm, pps 15-16

[9] See 21 U.S.C. § 360bbb-3; see also the Ninth Amendment, which protects unenumerated rights, such as the right not to be forced to accept medical treatments on the basis of executive orders issued by the president, an unprecedented claim to power unsupported by any enumerated power given to the president.

[10] Although the "Comirnaty" injection was approved on December 11, 2020, it is not available in the USA. The U.S. District Court for the Northern District of Florida found that the two versions of the "vaccine" are distinct. *See* JOHN DOE #1et al., v. LLOYD AUSTIN, III, et al. Case No. 3:21-cv-1211-AW-HTC. Judge Winsor noted that "defense counsel could not even say whether vaccines labeled 'Comirnaty' exist at all."

vaccines. The very real risk of injection injury makes the Plaintiffs' right to decide whether to accept this medical treatment imperative.

28.     The Presidential Executive Order 14042 upon which the Defendants' mandates are based, are without legal basis, and are therefore, illegal and unenforceable, as held by several recent federal courts, one being the Eastern District of Kentucky and one in the Southern District of Georgia.

## IV.     THE RISKS OF THE SHOTS OUTWEIGH THE RISKS OF THE DEFENDANTS' COVID POLICY VIOLATES EQUAL PROTECTION

A.     THE INJECTIONS ARE NOT AS EFFECTIVE IN PREVENTING COVID-19 AS REPRESENTED.

29.     Many countries with the highest rates of covid injections are facing a surge of covid deaths and infections. Israel is a country which vaccinated more of its citizens than almost any other. It is estimated that more than 90% of the country has been fully "vaccinated" with primarily the Pfizer shot. Due to this high number, Pfizer considered Israel a source of data for the performance of its injection. Yet despite this the number of daily new cases of covid in the first part of September, 2021 was more than it had ever been before during the "pandemic".[11] In early September Israel had more new covid cases per capita than any country in the world. Israel is now talking about, not a third, but a fourth booster.[12]

30.     An article in the Vermont Daily reported that 76% of September covid-19 deaths in Vermont were from "vaccinated" persons.[13] The CDC has admitted that 80% of Americans who have gotten the Omicron variant of covid-19 are "vaccinated" and 33% of those have had a

---

[11] https://graphics.reuters.com/world-coronavirus-tracker-and-maps/countries-and-territories/israel/

[12] https://www.bloomberg.com/news/articles/2021-09-12/israel-preparing-for-possible-fourth-covid-vaccine-dose

[13] https://vermontdailychronicle.com/2021/09/30/76-of-september-covid-19-deaths-are-vaxxed-breakthroughs/

booster.[14]

31.    What is frequently reported is that the Pfizer and Moderna shots are approximately "95% effective." This is misleading. In the Pfizer trial of approximately 21,726 "unvaccinated" participants, 0.75% were deemed to have been infected with covid. The "vaccinated" group infection rate was 0.04% (21,720 participants).[15] The effect of the injection was therefore a 0.71% reduction in risk (.75%-.04%) — that's it, less than one percent! This is the absolute risk reduction (ARR). The "95% effective" claim comes from dividing 0.71% (the difference between infection rates of the two groups) and 0.75% (the infection rate of the "unvaccinated" group): 0.71%/0.75% = 95% (this is the *relative* risk reduction). For the general population, that number is not particularly useful since the infection rates were so low in both groups. Therefore, given the low death rate of infected people, the actual value of the injection to the public would appear to be very low — even disregarding the many adverse "vaccine" events.

32.    From the Absolute Risk Reduction ARR, one can calculate the Number Needed to Vaccinate ("NNV"), which signifies the number of people that must be injected before even one person benefits from the injection.[16] The NNV for the Pfizer shot is 119, meaning that 119 people must be injected in order to observe the reduction of a single covid case (not death). The reputed journal the *Lancet* reports data indicating that the NNV may be as high as 217.[17] The NNV to avoid hospitalization exceeds 4,000. The NNV to avoid death exceeds 25,000.

B.    THOSE WHO HAVE ALREADY HAD COVID-19 HAVE NATURAL IMMUNITY SUPERIOR TO INJECTION IMMUNITY

---

[14] https://www.thegatewaypundit.com/2021/12/cdc-confirms-80-covid-19-cases-caused-omicron-variant-us-fully-vaccinated-individuals-33-booster-shots/

[15] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7996517/

[16] NNV is 1/ARR.

[17] https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(21)00069-0/fulltext

33.     A study from Israel comparing natural immunity, gained through previous SARS-CoV-2 infection demonstrated that "natural immunity confers longer lasting and stronger protection against infection (then vaccines)" [18] In fact, it was found that the "Delta variant" had a 27-fold higher chance of breaking through "vaccine" protection as compared to natural immunity. Additionally, a study published by the renowned Cleveland Clinic in Ohio indicates that "vaccination" is unnecessary for those previously infected.[19] Not only would the injection be unnecessary in people who have recovered from the disease, the injection actually puts them at risk for Antibody Dependent Enhancement, a potentially lethal adverse effect.

34.     Antibody Dependent Enhancement ("ADE") occurs when SARS-CoV-2 antibodies, created by a person's body in response to the mRNA "vaccine", instead of protecting the vaccinated person, cause a more severe or lethal case of the covid disease when the person is later exposed to SARS-CoV-2.[20] The injection *amplifies* the infection rather than *preventing* damage. A person who previously had SARS-CoV-2, and then receives a shot, mounts an antibody response to the shot that is between 10 and 20 times stronger than the response of a previously uninfected person.[21] The antibody response is far too strong and overwhelms the "vaccine" subject.

35.     Scientists have noted an immediately higher death rate worldwide upon receiving an injection. According to VAERS, as of June 18, 2021, 36% of all deaths following covid injections occurred within three days of the injection.[22] Such deaths are not counted as "deaths

---

[18] Sivan Gazit, et al, "Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections." medRxiv 2021.08.24.21262415; doi: https://doi.org/10.1101/2021.08.24.21262415

[19] Nabin K. Shrestha, et al, "Necessity of COVID-19 vaccination in previously infected individuals," medRxiv 2021.06.01.21258176; doi: https://doi.org/10.1101/2021.06.01.21258176

[20] https://www.nature.com/articles/s41564-020-00789-5

[21] https://www.medrxiv.org/content/10.1101/2021.01.29.21250653v1.full.pdf

[22] https://www.ronjohnson.senate.gov/services/files/A4A76F9A-9B29-4CF9-B987-F9097A3F4CB7

following vaccination" by VAERS as now the definition of "fully vaccinated" requires a waiting time of two weeks after the last shot of a series.[23]

36.     Groups of scientists are demanding improved pre-assessment due to injection-driven disease enhancement in the previously infected. Despite this known risk, the CDC still recommends that even covid-recovered people receive the shot.[24]

C.     **THE "PFIZER-BIONTECH COVID-19 VACCINE" AND "MODERNA COVID-19 VACCINE" ARE NOVEL GENE THERAPY TECHNOLOGY, NOT VACCINES**

1.   **Gene Therapy not Vaccines**

37.     The "Pfizer-BioNTech COVID-19 Vaccine" and the "Moderna COVID-19 Vaccine" do not meet any of CDC's previous definitions of a vaccine or immunity - they do not "stimulate a person's immune system to produce immunity to a specific disease, protecting the person from that disease."[25] The injected solution consists of a synthetic fragment of nucleic acid embedded in a fat (lipid) carrier that is introduced into human cells, not to block further transmission of the virus, but to lessen the symptoms of covid.[26] No published, peer-reviewed studies prove that the "Pfizer-BioNTech COVID Vaccine" and the "Moderna COVID Vaccine" confer immunity or stop transmission.

38.     No dead or attenuated virus is used as in traditional vaccines. Rather, instructions, via a piece of genetic code ("mRNA") are injected into the body that tell the DNA how to make a certain "spike protein," a toxin, to cause the body to then mount a defense against this toxic protein. The J&J/Janssen injection uses a different approach (via a "viral vector") but yields the

---

[23] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html

[24] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html

[25] https://web.archive.org/web/20210826113846/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm

[26] https://www.cnbc.com/2021/09/16/booster-debate-covid-vaccine-not-meant-to-prevent-infection-symptoms.html

same result. Therefore, all covid "vaccines" currently available in the USA turn the human body into a spike protein factory.  Because spike protein is one component of the SARS-CoV-2, the theory is that this mechanism will be purportedly useful in attacking the SARS-CoV-2 virus. However, it is this spike protein which appears to be what causes many serious adverse effects and deaths.

39.     A group of international scientists has recently obtained the "biodistribution study" for the mRNA "vaccines" from Japanese regulators.[27] The study reveals that unlike traditional vaccines, this spike protein enters the bloodstream and circulates throughout the body over several days post-vaccination. It accumulates in several tissues, such as the spleen, bone marrow, liver, adrenal glands and ovaries.

40.     Salk Institute for Biological Studies researchers in collaboration with the University of San Diego, published in the journal *Circulation Research* that the spike proteins themselves damage vascular cells, causing strokes and many other vascular problems.[28] The spike proteins are known to cause clotting that the body cannot fix, such as brain thrombosis and thrombocytopenia. It is well documented that the vaccinated have excessive bleeding and clotting disorders including vaginal bleeding, miscarriages, gastrointestinal bleeding, and immune thrombocytopenia.[29]

## 2.  Increased Risk of Death from Covid Injections

41.     The government-operated VAERS database functions as an "early warning" system for potential health risks caused by vaccines. It is broadcasting a red alert. In about one

---

[27] Summary of Pfizer Pharmacokinetic Study https://pandemictimeline.com/wp-content/uploads/2021/08/Pfizer-bio-distribution-confidential-document-translated-to-english.pdf

[28] Salk News, "Salk researchers and collaborators show how the protein damages cells, confirming COVID-19 as a primarily vascular disease." https://www.salk.edu/news-release/the-novel-coronavirus-spike-protein-plays-additional-key-role-in-illness/

[29] https://www.bmj.com/content/373/bmj.n958/rr-2

year, the VAERS system has recorded 19,532 deaths from the covid injections. During that time all other vaccines killed 426 people. In fact, all other vaccines required 31 years to reach 47% of the death toll of the covid injections (9,137 deaths).[30] The injections would have been halted long ago if our regulators followed historical standards. For example, the LA Times reported that during the 1976 "Swine Flu" pandemic "more than 500 people are thought to have developed Guillain-Barre syndrome after receiving the vaccine; 25 died."[31] In the end, "more than 40 million Americans — almost 25% of the population — received the swine flu vaccine before the program was halted in December after 10 weeks."

42.     It is estimated that VAERS only captures 1% to 10% of all vaccine adverse events. A study commissioned by the Agency for Healthcare Research and Quality of the U.S. Department of Health and Human Services found that "fewer than 1% of vaccine adverse events are reported" to VAERS.[32] HHS has argued that the level of reporting is generally higher for more serious events. Given the pressure on health care providers to maintain the "safe and effective" narrative, one could reasonably conclude that such higher levels of reporting is not likely the case for covid injections.

43.     A study published in October 2021 by a Columbia University scientist supports the historical evidence that VAERS is vastly underreporting deaths: "Comparing our estimate with the CDC-reported VFR (0.002%) suggests VAERS deaths are underreported by a factor of 20, consistent with known VAERS under-ascertainment bias." That factor indicates that injection-induced deaths are at least 400,000 within the VAERS reporting universe - and rising

---

[30] Vaccine Adverse Event Reporting System (VAERS) 1990 - 11/26/2021, CDC WONDER On-line Database. Accessed at http://wonder.cdc.gov/vaers.html on Dec 4, 2021 11:40:42 PM

[31] https://www.latimes.com/archives/la-xpm-2009-apr-27-sci-swine-history27-story.html

[32] Lazarus, R., et.al, "Electronic Support for Public Health–Vaccine Adverse Event Reporting System (ESP:VAERS)", Submitted to U.S. Dept of Health and Human Services, Grant ID: R18 HS 017045. https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf

as the population continues to get injected.[33]

44.     A study published in Toxicology Reports looked at the cost/benefit ratio of the "vaccine," where the cost is defined as the number of deaths resulting from the inoculations and the benefits are the lives saved by the inoculations.  The results of the study are shocking. They show:

> conservatively that there are five times the number of deaths truly   attributable to each inoculation vs those truly attributable to COVID-19 in the 65+ demographic. ... the long-term cost-benefit ratio under the best-case scenario could well be on the order of 10/1, 20/1, or more for all the demographics, increasing with decreasing age, and an order-of-magnitude higher under real-world scenarios![34]

The study further notes that "Intermediate and long-term deaths remain to be identified, and are possible from ADE, autoimmune effects, further clotting and vascular diseases, etc., that take time to develop."

### 3.   There is no asymptomatic transmission of the disease

45.     The specter of "asymptomatic spread" — the notion that fundamentally healthy people could cause covid in others —has been used to justify mandatory injections, mask wearing and PCR tests on healthy people. But there is *no credible scientific evidence* that demonstrates that the phenomenon of "asymptomatic spread" is real. On the contrary, on June 7, 2020, Dr. Maria Von Kerkhov, head of the WHO's Emerging Diseases and Zoonosis Unit, told a press conference that from the known research, asymptomatic spread was "very rare." "From the data we have, it still seems to be rare that an asymptomatic person actually transmits onward to a secondary individual." She added for emphasis: "it's very rare."[35] Researchers from Southern

---

[33] https://www.researchgate.net/publication/355581860_COVID_vaccination_and_age-stratified_all-cause_mortality_risk  Data scientists, such as Steve Kirsch and others, have suggested an under-reporting factor exceeding 40. See, https://stevekirsch.substack.com/p/latest-vaers-estimate-388000-americans

[34] https://www.sciencedirect.com/science/article/pii/S221475002100161X?via%3Dihub

[35] https://www.cnn.com/2020/06/08/health/coronavirus-asymptomatic-spread-who-bn/index.html

Medical University in Guangzhou, China, published a study in August 2020 concluding that asymptomatic transmission of covid is *almost non-existent*. "Asymptomatic cases were least likely to infect their close contacts," the researchers found.[36] A more recent study involving nearly 10 million residents of Wuhan, China found that there were no, zero, positive covid tests amongst 1,174 close contacts of asymptomatic cases, *indicating the complete absence of asymptomatic transmission*.[37]

46.     On January 28, 2020, Dr. Fauci, at an official press conference, stated that asymptomatic transmission of respiratory viruses is rare and not a significant factor in epidemics:

> [E]ven if there is some asymptomatic transmission, ***in all the history of respiratory borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks.*** The driver of outbreaks is always a symptomatic person, even if there is a rare asymptomatic person that might transmit, an epidemic is not driven by asymptomatic carriers.[38]

47.     Even though public health officials have walked back their former position on asymptomatic transmission,[39] the science remains. For example, a study published in Clinical Microbiology and Infection, April 2021, found "secondary attack rates [infection transmitted to household or close contacts] from those who remain asymptomatic throughout their course of infection are low, suggesting limited infectiousness."[40]

---

[36] Lei Luo, Dan Liu, Xinlong Liao, et al. Contact Settings and Risk for Transmission in 3410 Close Contacts of Patients With COVID-19 in Guangzhou, China: A Prospective Cohort Study. Ann Intern Med.2020;173:879-887. https://www.ncbi.nlm.nih.gov/labs/pmc/articles/PMC7506769/

[37] Cao S, Gan Y, Wang C, Bachmann M, Wei S, Gong J, Huang Y, Wang T, Li L, Lu K, Jiang H, Gong Y, Xu H, Shen X, Tian Q, Lv C, Song F, Yin X, Lu Z. Post-lockdown SARS-CoV-2 nucleic acid screening in nearly ten million residents of Wuhan, China. Nat Commun. 2020 Nov 20;11(1):5917. https://www.ncbi.nlm.nih.gov/labs/pmc/articles/PMC7679396/

[38] See, starting at minute 44: https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2638s

[39] https://www.nbcnews.com/health/health-news/cdc-reverses-course-testing-asymptomatic-people-covid-19-again-n1240442

[40] https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(21)00038-0/fulltext

48.     Another study published in Nature Reviews Immunology, October 2021, titled ,
The Immunology of Asymptomatic SARS-CoV-2 Infection: What are the Key Questions?,
admitted that "The case is strongly made for moving on, returning to normal and learning to live
with this virus 'in confidence' as a threat no worse than flu."[41]

**4.      The "unvaccinated" are not more of a threat to health than the "vaccinated"**

49.     In issuing the Executive Orders, the President asserted it was the "unvaccinated,"
not the "vaccinated," who were the sole source of covid-19 spread. Scientific studies suggest
otherwise. On September 29, 2021, a preliminary report from a study conducted by the Genome
Center, University of California, Davis, stated that "clinicians and public health practitioners
should consider vaccinated persons who become infected with SARS-CoV-2 to be no less
infectious than unvaccinated persons."[42]

50.     As the Omicron variant has spread, it is increasingly reported that the majority of
those becoming infected with the variant are "vaccinated," as opposed to "unvaccinated."[43]

**V.      PLAINTIFFS' CONSTITUTIONAL RIGHTS OF BODILY INTEGRITY ARE BEING VIOLATED BY INJECTION MANDATES, TESTING MANDATES AND MASK MANDATES**

51.     Amendment V of the U.S. Constitution provides, in relevant part, that "No person
(shall) … be deprived of life, liberty or property without due process of law ..." The Due Process
Clause of the Fourteenth Amendment to the United States Constitution similarly provides that no
state shall "deprive any person of life, liberty, or property, without due process of law ..." In a

---

[41] https://www.nature.com/articles/s41577-021-00631-x

[42] https://www.medrxiv.org/content/10.1101/2021.11.12.21265796v1

[43] Examples include: https://www.npr.org/sections/goatsandsoda/2021/12/31/1067702355/omicron-is-spreading-like-wildfire-scientists-are-trying-to-figure-out-why , https://www.reuters.com/world/us/most-reported-us-omicron-cases-have-hit-fully-vaccinated-cdc-2021-12-10/

long line of cases, the Court has held that:

> In addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); to use contraception, *ibid.*; *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); **to bodily integrity,** *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and to abortion, [*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). **We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment.** *Cruzan* [*ex rel. Cruzan] v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278–79, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (emphasis added)

52.     Defendants' mandating of injections, antigen tests, PCR tests and face masks is a violation of Plaintiffs' due process right to life and liberty under the Constitution. Similarly, all people "shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures . . ." Amendment IV, U.S. Constitution.

53.     The Defendants are also in violation of Amendment XIV, Due process; equal protection: "No person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws" and Amendment IX: Reserved rights. "The enumeration in this Constitution of certain rights shall not be construed to deny, impair or disparage others retained by the people."

54.     Defendants' actions are an invasion of the zone of privacy and right to bodily integrity which have been held to emanate from various Bill of Rights amendments in the United States constitution and their corollaries in the New Mexico constitution. These rights have been articulated in many U.S. Supreme Court cases, including *Mapp v. Ohio*, 367 U.S. 643 (1961), *Griswold v. State of Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); and *Roe*

*v. Wade*, 410 US 113 (1973).

55.     In *Griswold, supra*, the Court struck down a law which impacted a woman's right

to use contraceptives. The Court, Justice Douglas writing for the majority, said:

> The foregoing cases suggest that specific guarantees in the Bill of Rights have
> penumbras, formed by emanations from those guarantees that help give them life and
> substance. See Poe v. Ullman, 367 U.S. 497, 516—522, 81 S.Ct. 1752, 6 L.Ed.2d 989
> (dissenting opinion). **Various guarantees create zones of privacy.** The right of
> association contained in the penumbra of the First Amendment is one, as we have
> seen. The Third Amendment in its prohibition against the quartering of soldiers 'in
> any house' in time of peace without the consent of the owner is another facet of that
> privacy. The Fourth Amendment explicitly affirms the 'right of the people to be
> secure in their persons, houses, papers, and effects, against unreasonable searches and
> seizures.'        The Fifth Amendment in its Self-Incrimination Clause enables the
> citizen to create a zone of privacy which government may not force him to surrender
> to his detriment. The Ninth Amendment provides: 'The enumeration in the
> Constitution, of certain rights, shall not be construed to deny or disparage others
> retained by the people.'
>
> The Fourth and Fifth Amendments were described in Boyd v. United States, 116 U.S.
> 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, as **protection against all governmental
> invasions 'of the sanctity of a man's home and the privacies of life.'** We recently
> referred in Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684 1692, 6 L.Ed.2d 1081, to
> the Fourth Amendment as creating a **'right to privacy, no less important than any
> other right carefully and particularly reserved to the people.'**

*Griswold* at pp 484-485 (emphasis added).

56.     More recently in *Planned Parenthood v. Casey*, 505 U.S. 833(1992), referencing

the *Roe v. Wade* decision the Court stated:

> …but as a rule (whether or not mistaken) of personal autonomy and bodily
> integrity, **with doctrinal affinity to cases recognizing limits on
> governmental power to mandate medical treatment or to bar its
> rejection. If so, our cases since Roe accord with Roe's view that a State's
> interest in the protection of life falls short of justifying any plenary
> override of individual liberty claims.** *Cruzan v. Director, Mo. Dept. of
> Health*, 497 U.S. 261, 278, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990); cf., e.
> g., *Riggins v. Nevada*, 504 U.S. 127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810
> (1992); *Washington v. Harper*, 494 U.S. 210, 108 L. Ed. 2D 178, 110 S. Ct.
> 1028 (1990); see also, e. g., *Rochin v. California*, 342 U.S. 165, 96 L. Ed.
> 183, 72 S. Ct. 205 (1952); *Jacobson v. Massachusetts*, 197 U.S. 11, 24-30, 49
> L. Ed. 643, 25 S. Ct. 358 (1905). (emphasis added)

*Id.*

57.     The "principle that a competent person has a constitutionally protected liberty interest in refusing **unwanted medical treatment** may be inferred from our prior decisions." *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990). "[T]he liberty guaranteed by the Due Process Clause must protect, if it protects anything**,** an individual's **deeply personal decision to reject medical treatment…."** [N]otions of liberty are inextricably entwined with our idea of physical freedom and self-determination. …. the Court has often deemed state incursions into the body repugnant to the interests protected by the Due Process Clause." *See Cruzan, supra,* (Justice O'Connor's concurrence). The Court said:

> At common law, even the touching of one person by another without consent and without legal justification was a battery. See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 9, pp. 39-42 (5th ed. 1984). Before the turn of the century, this Court observed that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000 1001, 35 L.Ed. 734 (1891)...This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment. Justice Cardozo, while on the Court of Appeals of New York, aptly described this doctrine: "***Every human being of adult years and sound mind has a right to determine what shall be done with his own body … The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment***." (emphasis added)

*Cruzan, supra* at pps. 269-270.

58.     In *Planned Parenthood, supra*, the Court includes *Jacobson v. Massachusetts,* 197 U.S. 11 (1905), as a case "recognizing limits on governmental power to mandate medical treatment *or to bar its rejection*" (emphasis added). This is worth noting because *Jacobsen* has often been cited in recent lower court covid related judicial opinions for the proposition that government lockdown measures or mandated vaccinations are not unlawful. However, the

Jacobsen court said:

> "Before closing this opinion, we deem it appropriate, in order to prevent misapprehension as to our views, to observe -- perhaps to repeat a thought already sufficiently expressed, namely — that the police power of a State, whether exercised by the legislature or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to **justify the interference of the courts to prevent wrong and oppression."**

*Jacobson,* 197 US at 38.

59.     Though state actors are quick to cite *Jacobson*, they often neglect the court's careful emphasize that that "if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Id.* at 31. And adding to that exception, the court stated "the police power of a State, whether exercised by the legislature, or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression." *Id.* at 38.

60.     In addition, Supreme Court Justice Gorsuch has recently cast doubt on the continuing validity of *Jacobsen.* In his concurrence in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 208 L. Ed. 2d 206, 207 (U.S. 2020), he said,

> **"Why have some mistaken this Court's modest decision in Jacobson for a towering authority that overshadows the Constitution during a pandemic?** In the end, I can only surmise that much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack. Things never go well when we do."

*Id.* (emphasis added.)

61.     Referring to *South Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020)

which had given much leeway to the lockdown measures instituted by California's governor, Justice Gorsuch went on to say: "(T)hat opinion was mistaken from the start. To justify its result, the concurrence reached back 100 years in the U. S. Reports to grab hold of our decision in Jacobson v. Massachusetts, 197 U. S. 11 (1905). ***But Jacobson hardly supports cutting the Constitution loose during a pandemic...***". (emphasis added)

62.     Moreover, *Jacobsen* was decided 116 years ago when many of our most sacred and fundamental rights were still being sorted out. Suffrage had not yet occurred, civil rights barely existed, critical cases on fundamental rights such as interstate travel and bodily privacy had not been adjudicated and the administrative state that we live in today simply did not exist.

63.     Since *Jacobsen*, the Supreme Court has decided many critical cases which expanded the conceptual and practical reach of the Bill of Rights as outlined in the preceding paragraphs. *See generally, Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (invasive medical procedure of sterilization performed without the consent of the patient, "forever deprived [the individual] of a basic liberty."); *Rochin v. California*, 342 U.S. 165 (1952) (forced stomach pumping of an arrested person to obtain evidence of illegal drug possession violated the Due Process Clause); *Winston v. Lee,* 470 U.S. 753, 755 (1985); *Washington v. Harper,* 494 U.S. 210, 221-222 (1990) ("respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."); *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278 (1990) ("competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"); *Albright v. Oliver*, 510 U.S. 266, 272 (1994) ("[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."); *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997) ("the 'liberty' protected by the Due Process Clause [of the Fourteenth Amendment] includes the right[]

. . . to bodily integrity"); *Missouri v. McNeely,* 569 U.S. 141, 148 (2013) ("We have never retreated, however, from our recognition that any compelled intrusion into the human body implicates common law and based in the concepts of bodily integrity and patient autonomy."); *Minnesota v. Brown*, 932 N.W.2d 283 (Minn. 2019) ("forcing appellant * * * to undergo an anoscopy against his will and under sedation in the presence of nonmedical personnel is a serious invasion of Brown's dignitary interests in personal privacy and bodily integrity that outweighs the State's need to retrieve relevant evidence of drug possession.")*; Guertin v. Michigan,* 912 F.3d 907 (6th Cir. 2019) ("invasion of one's body 'is an indignity, an assault, and a trespass' prohibited at common law ... involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value — often under false pretenses and with deceptive practices hiding the nature of the interference — is a classic example of invading the core of the bodily integrity protection."

64.     Plaintiffs contend, as emphatically as words will allow, that a person has every right to decide whether something is going to be injected into his body which will have an effect on his body and even more so where it will actually change the way his body functions. This is all the more so when this injection has caused death and serious disability to a not insignificant percentage of those who have taken it.

65.     The importance of Plaintiffs' right to decline the covid injection is further supported by the following: 1) the efficacy of the injections are still in question with new corona virus variants being apparently immune to the injection and calls for boosters; 2) the shots are effective to reduce symptoms in the event of being infected with covid, as opposed to preventing infection and transmission; 3) the risk of death from covid is very low for most of the working-age population and is miniscule (i.e. statistically close to zero) for some of the younger Plaintiffs, 4) persons who have had covid have a superior natural immunity, but they are also more likely

to have an adverse reaction from the injections, and 5) there have been numerous serious adverse reactions and deaths following the injection.

66.     A ruling by this Court that Plaintiffs have no right to decline the injection of an insufficiently tested chemical concoction into their bodies without the threat of loss of employment, would fly in the face of the rights enshrined in the United States and New Mexico constitutions, as well as God-given human rights.

67.     A court may be tempted to avoid the issues raised herein or decide them by deferring to the familiar narrative that covid is so deadly that all measures imposed to prevent its spread should be given a liberal reading in terms of their legality.[44] However, it is just this sort of acceptance of the popular zeitgeist that a court must be on guard against when important constitutional rights are at stake. Justice Gorsuch made this point very forcefully in his concurrence in a recent decision striking down New York state's covid restrictions on churches, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 208 L. Ed. 2d 206, 207 (U.S. 2020) where he discussed an early 2020 Supreme Court decision from California:

> At that time, COVID had been with us, in earnest, for just three months. Now, as we round out 2020 and face the prospect of entering a second calendar year living in the pandemic's shadow, that rationale has expired according to its own terms. ***Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical***……Why have some mistaken this Court's modest decision in Jacobson for a towering authority that overshadows the Constitution during a pandemic? In the end, ***I can only surmise that much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable***

---

[44] This narrative, though widespread, is not universally accepted and has been losing adherents as time goes on. In fact, very serious questions have come to the fore about the efficacy of the PCR covid-19 test on which the Covid case and death counts are based rendering much of the data doubtful. Prominent scientists and doctors have stated that the test, as it is being used, results in a very large percent of false positives, making it a completely inaccurate test for covid-19. See Mandavilli, Apoorva. "Your Coronavirus Test Is Positive. Maybe It Shouldn't Be." New York Times, (August 29, 2020), https://cnas.ucr.edu/media/2020/08/29/your-coronavirus-test-positive-maybe-it-shouldnt-be

> *or even admirable in other circumstances, we may not shelter in place when*
> *the Constitution is under attack.* Things never go well when we do.

*Id.* (emphasis added).

68.     Other noteworthy Supreme Court justices have made similar statements:

> Experience should teach us to be most on our guard to protect liberty when
> the Government's purposes are beneficent. Men born to freedom are naturally
> alert to repel invasion of their liberty by evil-minded rulers. The greatest
> dangers to liberty lurk in insidious encroachment by men of zeal, well-
> meaning but without understanding." *Olmstead v. United States*, 277 U.S.
> 438, 479 (1928) (Brandeis, J., dissenting) (overruled in part on other grounds
> by Katz v. United States, 389 U.S. 347 (1967)).

> History teaches that grave threats to liberty often come in times of urgency,
> when constitutional rights seem too extravagant to endure.... [W]hen we allow
> fundamental freedoms to be sacrificed in the name of real or perceived
> exigency, we invariably come to regret it."

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 635 (1989) (Marshall, J.,

dissenting).

## VI.  THE DEFENDANTS, ALTHOUGH OSTENSIBLY PRIVATE COMPANIES, HAVE CONSTITUTIONAL OBLIGATIONS

69.     While Defendants are private companies, they are nevertheless acting at the behest

of and as agents of the National Nuclear Security Administration, a subagency of the Department

of Energy, which department is the real principal directing what goes on at SNL.

70.     In the context of a contractor managing federal prisons, in the case of *Correctional*

*Services Corporation v. Malesko*, 534 U.S. 61 (2001), the Supreme Court held that although the

inmate did not have a Bivens damage claim against employees of the private contractor,

Correctional Services Corporation, he nevertheless *could have sought injunctive relief against*

*the private company for constitutional deprivations.* The Court said: "Inmates in respondent's

position also have full access to remedial mechanisms established by the BOP, including suits in

federal court for injunctive relief — *long recognized as the proper means for preventing entities*

*from acting unconstitutionally"* (emphasis added). *Id.* at 62. *Malesko* is direct controlling authority for the availability of injunctive relief against constitutional violations by government contractors such as Defendants. *Cf. Agyeman v. Corrections Corp. of America,* 390 F.3d 1101 (9th Cir. 2004).

71.     Other courts have made exceptions holding damages for constitutional violations *can* be sought against employees of private contractors. In *Ginn v. Mathews,* 533 F.2d 477 (9th Cir.1976) the Court held a private company operating a federal Head Start program could be sued for constitutional violations when acting as a de facto *arm of the state.* Defendants here are clearly acting at the behest of the Department of Energy for whom all of NTESS and SNL's activities are done.   In *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328 (9th Cir. 1987) a private security company provided services to a U.S. naval industrial base. The Court reversed a dismissal of a suit for damages against the company for the violation of his constitutional rights by searching his desk, stating, *"*the private status of the defendant will not serve to defeat a Bivens claim, provided that the defendant engaged in federal action.*" Schowengerdt* at 1337-1338*.* The Court went on to cite and quote from the case, *Reuber v. United States,* 750 F.2d 1039, 1058 (D.C.Cir.1984) stating that "a private person whose conduct is allegedly instigated and directed by federal officers should be treated as a federal agent" and "be subject to Bivens liability". The Fifth and Sixth Circuits are in accord. See, Dobyns v. E-Systems, Inc., 667 *F.2d 1219 (5th Cir.1982);* Yiamouyiannis v. Chemical Abstracts Serv., 521 F.2d 1392 (6th Cir.1975)(per curiam)*."*

72.     *Malesko* was cited in a holding by the Court in *Williams v. Klien*, 20 F. Supp.3d 1171 (D. Colo. 2014) where it was said, "Conceivably, the Court has not recognized such claims (Bivens) in the context of claims by prison inmates because prisoners may pursue claims for injunctive relief based on an alleged violation of the First Amendment" and "The fact that Mr.

Williams may not assert a Bivens claim for damages based on a violation of the First Amendment does not preclude him from seeking declaratory and injunctive relief." *Id.*

73.     In *Garvin v. Corr. Corp. of America, Inc.*, No. 4:11CV02054, at *6 (N.D. Ohio Jan. 27, 2012) another case where the defendant was a contractor running a federal prison, the Court dismissed damage claims but not an injunctive relief claim. *See also*, *Peoples v. CCA Detention Center,* Civil Action No. 03-3129-KHV (D. Kan. 1/15/2004) (D. Kan. 2004)

74.     Another distinct basis for finding the Defendants responsible for following constitutional strictures, is that they are "state actors" for purposes of federal constitutional obligations rights by virtue of Defendants' relationship with the government of the state of New Mexico. The United States Supreme Court has consistently found that a private entity may be characterized as a state actor for purposes of Fourteenth Amendment analysis where the private party jointly participated with the state or its agents in the challenged action. *Lugar v. Edmondson Oil Co.*, 102 S. Ct. 2744, 2755 (1982). *See also LaBalbo v. Hymes,* 115 N.M. 314, 320 (N.M. Ct. App. 1993).

75.     New Mexico, in particular Governor Grisham, has made great efforts to ensure New Mexicans are vaccinated, offering millions of dollars in prizes among other programs. As early as January of 2021 the state of New Mexico authorized SNL, specifically its Employee Health Services, to be a vaccination clinic.[45]  The injections are offered on-site in accordance with state priorities and direction. SNL has also worked with the New Mexico Dept. of Health (NMDOH) to create the contact tracing program implemented by New Mexico. *See* Exhibit 2. Contact Tracing SafeGraph DOH.

76.     Another fact supporting the allegation that SNL is a "state actor" is that SNL has

---

[45] https://www.sandia.gov/labnews/2021/02/12/covid-19-vaccination-underway/

collected personal health information from its own employees (without their knowledge) through the use and development of SafeGraph program, which is essentially a contact tracing program.

77.     Private parties are state actors, "if the State creates the legal framework governing the conduct, if it delegates its authority to the private actor, or sometimes if it knowingly accepts the benefits derived from unconstitutional behavior." *Nat'l Collegiate Athletic Ass'n v. Tarkanian,* 109 S.Ct. 454, 461-62 (1988) (citations omitted). Summarizing, a court must ask whether the State provided a mantle of authority that enhanced the power of the harm causing individual. *Id.*

78.     The Court in *Tarkanian* also later stated:

> "*It is, of course, true that a State may delegate authority to a private party and thereby make that party a state actor.* Thus, we recently held that a private physician who had contracted with a state prison to attend to the inmates' medical needs was a state actor. (emphasis added)

*Tarkanian*, 109 S.Ct. at 463-64 (citing *West v. Atkins*, 108 S.Ct. 2250 (1988)).

79.     Here, New Mexico has created a legal framework for the injection of New Mexicans and has delegated the authority to inject to the Defendants. SNL is also working with the state of New Mexico and setting up their contact tracing program. On information and belief, SNL has received covid funding for these and other programs.     In *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) the Court discussed different factors for determining whether conduct of a private actor was state action, which included: "the state provides significant encouragement, either overt or covert....when the private actor is a "willful participant" in joint activity with the state or its agents..... when the private actor has been delegated a public function by the state.... or when the government is "entwined" in the private actor's management or control."

80.     Plaintiffs believe that discovery will reveal many other ways the state of New

Mexico and SNL are intertwined on the subject of covid. SNL's "sister lab" in New Mexico, which also does substantial work on nuclear weapon science for the DOE, Los Alamos National Laboratory (LANL), has a very close relationship with the state. During the whole covid "pandemic", New Mexico employed LANL "to develop an ongoing epidemiological modeling for weekly updates on the virus trajectory in New Mexico." *Hernandez v. Grisham* No. CIV 20-0942 JBÄGBW..."(D. N.M.2020). The N.M. Public Education Department looks to LANL's modeling to justify its school policies. LANL was tasked with the duty to recommend policies and procedures in responding to the pandemic, such as masking, testing, social distancing and isolation, to be carried out throughout the State of New Mexico. LANL accepted New Mexico covid relief funds from the Governor, and also partnered with the State of New Mexico to do covid testing on the community and to distribute covid injections to the N.M. community. It seems likely that SNL whose laboratory is greater in size than LANL's has had similar relations with the State of New Mexico's covid response.

## VII.   UNCONSTITUTIONAL CONDITIONS

81.   Where government actors condition the granting of benefits on the renunciation of constitutional rights by the recipient, Courts have held this to be a particular constitutional violation described as *unconstitutional conditions*. One such benefit which governments may not condition on renunciation of constitutional rights is employment. *O'Hare Truck Serv. v. City of Northlake*, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996).

82.   The Supreme Court has recognized a variety of benefits which cannot be denied solely because of the exercise of constitutional rights. *See, e.g., Rutan v. Republican Party*, 110 S.Ct. at 2735-36 (promotion or transfer in a government job); *Shapiro v. Thompson,* 89 S.Ct. 1322, 1327 n. 6 (1969) (welfare benefits); *Sherbert v. Verner,* 83 S.Ct. 1790, 1794 (1963)

(unemployment benefits); *Speiser v. Randall,* 78 S.Ct. 1332, 1341-42 (1958) (tax exemptions); *Andersen v. McCotter*, 100 F.3d 723, 727 (10th Cir. 1996).

83.     New Mexico recognizes, "the unconstitutional conditions doctrine, "which vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up. *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S.Ct. 2586 (2013), *Rodriguez v. Ford Motor Co.*, 458 P.3d 569, 578 (N.M. Ct. App. 2018). In *Moongate Water Co. v. City of Las Cruces,* 329 P.3d 727, 733 (N.M. Ct. App. 2014), the court quoted *Koontz v. St. Johns,* "[R]egardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them*."*

## VIII.   THE EXECUTIVE ORDER IS WITHOUT AUTHORITY

84.     On September 9, 2021, President Joe Biden issued Executive Order 14042 which mandated the Safer Federal Workforce Task Force (SFWTF) to provide "guidance" for "adequate COVID–19 safeguards" by September 24, 2021, that would apply to all federal contractors and subcontractors. Defendants here are federal contractors, and it is this Executive Order and its subsequent administrative promulgation on which Defendants have based their injection mandates. They have stated as much in several communications to employees. ***See,* Exhibit 3, attached.**

85.     The President claimed 3 U.S.C. § 301 as one statutory authority to issue Executive Order 14042. This section provides as follows:

> The President of the United States is authorized to designate and empower the head of any department or agency in the executive branch, or any official thereof who is required to be appointed by and with the advice and consent of the Senate, to perform without approval, ratification, or other action by the

President (1) any function which is vested in the President by law, or (2) any function which such officer is required or authorized by law to perform only with or subject to the approval, ratification, or other action of the President: Provided, That nothing contained herein shall relieve the President of his responsibility in office for the acts of any such head or other official designated by him to perform such functions. Such designation and authorization shall be in writing, shall be published in the Federal Register, shall be subject to such terms, conditions, and limitations as the President may deem advisable, and shall be revocable at any time by the President in whole or in part.

86.    The President also claimed provisions of the Federal Property and Administrative Services Act, 40 U.S.C. § 101, *et seq.,* as statutory authority to issue Executive Order 14042. This section provides as follows:

The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:
(1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.
(2) Using available property.
(3) Disposing of surplus property.
(4) Records management.

87.    The subsequent provisions of the Federal Property and Administrative Services Act are no broader than the purpose of this Act as set forth in § 101.

88.    The simple truth is these statutes do not provide the President with authority to impose vaccine mandates, and thus he lacks the statutory as well as constitutional authority to impose these mandates. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)[46] addressed

---

[46] See also <u>Schaezlein v. Cabaniss</u>, 135 Cal. 466, 471, 67 P. 755 (1902); <u>State v. Marana Plantations</u>, 75 Ariz. 111, 115, 252 P.2d 87 (1953); and <u>Boreali v. Axelrod</u>, 71 N.Y.2d 1, 6, 517 N.E.2d 1350 (1987).

an executive order by the then president aimed at averting a nation-wide strike of steel workers in April 1952, which the president believed would jeopardize national defense. He issued an Executive Order directing the Secretary of Commerce to seize and operate most of the country's steel mills. The Supreme Court held that:

> The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself. There is no statute that expressly authorizes the President to take possession of property as he did here. Nor is there any act of Congress to which our attention has been directed from which such a power can fairly be implied.

89.    Executive Order 14042 states that it applies to, "any new contract; new contract-like instrument; new solicitation for a contract or contract-like instrument; extension or renewal."

90.    The Defendants' contract with the federal government is in existence now and has been since 2016. It is not a future contract. It is an extant contract. Therefore, Executive Order 14042 and the subsequent promulgation by SFWTF (Safer Federal Workforce Task Force) are inapplicable to the Defendants.

91.    Defendants may claim that the 2016 contract was modified in 2020 to add covid provisions, and then in October, 2021, incorporating the Safe Workplace Task Force Guidance into the contract. Plaintiffs contend that this is not a "new contract" within the meaning of Executive Order 14042.

92.    The revised contract, amended in 2021 which incorporates these provisions is not re-signed by the parties to the 2016 contract, but was digitally modified by adding additional provisions; it is not a new contract at all. And even if Defendants did recently enter a new contract with the federal government or modify their old one such that it might be considered "new", Biden's Executive order and the subsequent administrative promulgation are constitutionally violative. Addressing Executive Order 14042, the Court in *Kentucky, et al.,v.*

*Biden, 3:21-cv-00055-GFVT,* explained the President's purported authority for 14042 as follows:

> President Biden issued Executive Order 14042 pursuant to the U.S. Constitution, 3 U.S.C § 301, which provides the president with general delegation authority, and 40 U.S.C. 101 et seq., also known as the Federal Property and Administrative Services Act (FPASA). See 86 Fed. Reg. 50,985–88 (Sept. 9, 2021). Congress delegated to the president the authority to manage federal procurement through FPASA. 40 U.S.C. 101 et seq. The President also claimed provisions of the Federal Property and Administrative Services Act (FPASA), 40 U.S.C. § 101, et seq., as statutory authority to issue Executive Order 14042.

*Kentucky v. Biden, supra, p. 11.*

93.     Plaintiffs contend that the President's attempt to base authority to mandate vaccination for tens of millions of American workers, (which treads on the fundamental constitutional rights of bodily integrity and medical choice) on what is essentially a procurement of goods and services statutory scheme, is unlawful.

94.     This is not a new argument. In *Kentucky v. Biden*, No. 3:21-cv-00055-GFVT, 2021 U.S. Dist. LEXIS 228316, at *19-20 (E.D. Ky. Nov. 30, 2021), the D.C. Circuit Court cited *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996) the Court stated:

> The District of Columbia Circuit cautioned that the FPASA does not provide authority to "write a blank check for the President to fill in at his will. The procurement power must be exercised consistently with the structure and purposes of the statute that delegates that power." *Id.* (quoting *Kahn*, 618 F.2d at 793). Furthermore, the FPASA "does not allow the President to exercise powers that reach beyond the Act's express provisions, *Kahn*, 618 F.2d. at 797 (Tamm, J., concurring), and there must be a "close nexus between the Order and the objectives of the Procurement Act." *Id.* (Bazelon, J., concurring) .....

> … If a vaccination mandate has a close enough nexus to economy and efficiency in federal procurement, then the statute could be used to enact virtually any measure at the president's whim under the guise of economy and efficiency. *Cf. Ala. Ass'n of Realtors v. Dept. of Health and Human Servs.*, 141 S. Ct. 2485, 2488–89 (2021) (finding the federal government's interpretation of § 361 would grant the CDC a "breathtaking amount of authority" … The vaccine mandate applies to employees of federal contractors and subcontractors who work entirely from home and are not at

risk of spreading COVID-19 to others. [R. 12 at 6 (citing Task Force Guidance).] Under the same logic employed by the Defendants regarding the vaccine mandate, what would stop FPASA from being used to permit federal agencies to refuse to contract with contractors and subcontractors who employ individuals over a certain BMI for the sake of economy and efficiency during the pandemic? After all, the CDC has declared that "obesity worsens the outcomes from COVID-19." Centers for Disease Control and Prevention, *Obesity, Race/Ethnicity, and COVID-19*, https://www.cdc.gov/obesity/data/obesity-and-covid- 19.html (last visited Nov. 22, 2021).

95.     President Biden also issued Executive Order 14043 on September 9, 2021 which was a "vaccine" mandate for employees of federal agencies. Plaintiffs are federal employees as such, being employees of federal "agents" who are the Defendant contractors acting at the direction of federal agencies. Moreover, the authority of the President to make sweeping pronouncements as to mandatory health protocols for millions of workers either federal per se or working for federal contractors, has been successfully challenged for both Executive Orders 14042 and 14043 and there is overlap in the reasoning which courts have applied.

96.     For example, in *BST Holdings, LLC v. Occupational Safety and Health Administration*, No. 21-60845, 2021 U.S. App. LEXIS 33698, at *16 (5th Cir. Nov. 12, 2021), the Court held that the OSHA mandate pursuant to Executive Order 14043 was "staggeringly overbroad".[47] The reasons it gave are equally true for the Safer Federal Workforce Task Force mandate pursuant to EO14042 the Defendants are carrying out.

97.     In *BST Holdings, LLC, supra,* the Fifth Circuit addressed a request for a stay of

---

[47]Though the 6th Circuit's subsequent decision has at least temporarily overruled BST Holdings in part, the Supreme Court is in the process of considering the matter. See https://www.opn.ca6.uscourts.gov/opinions.pdf/21a0287p-06.pdf and https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/21a248.html.

the OSHA "vaccine" mandate which was put into place by way of an Emergency Temporary Standard (ETS) on November 5, 2021, and which required employees of federal contractors to undergo a covid "vaccination" or to take weekly covid tests and wear a mask.

98.    The Court initially stayed the OSHA Mandate pending briefing and an expedited judicial review because of what it characterized as "grave statutory and Constitutional issues." After conducting the expedited judicial review, the Court reaffirmed the initial stay finding that OSHA had gone beyond the agency's authority. It first noted at p. 13, "in its fifty-year history, OSHA has issued just ten ETSs. Six were challenged in court; only one survived" and stated that Congress had not, in creating OSHA, "intended to authorize a workplace safety administration in the deep recesses of the federal bureaucracy to make sweeping pronouncements on matters of public health affecting every member of society in the profoundest of ways." *BST Holdings, L.L.C. v. OSHA*, No. 21-60845, 2021 U.S. App. LEXIS 33698, at *7-8 (5th Cir. Nov. 12, 2021).

99.    The *BST* Court found persuasive the state of Texas's argument that an airborne virus was not the sort of "substances or agents" which are "toxic or physically harmful" that was in the purview of OSHA, stating, "Here, OSHA's attempt to shoehorn an airborne virus that is both widely present in society (and thus not particular to any workplace) and non-life-threatening to a vast majority of employees into a neighboring phrase connoting *toxicity* and *poisonousness* is yet another transparent stretch." The court also stated:

> We next consider the necessity of the Mandate. The Mandate is staggeringly overbroad. Applying to 2 out of 3 private-sector employees in America, in workplaces as diverse as the country itself, the Mandate fails to consider what is perhaps the most salient fact of all: the ongoing threat of COVID-19 is more dangerous to some employees than to other employees. All else equal, a 28 year-old trucker spending the bulk of his workday in the solitude of his cab is simply less vulnerable to COVID-19 than a 62 year-old prison janitor. Likewise, a naturally immune unvaccinated worker is presumably at less risk than an unvaccinated worker who has never had the virus. The list goes on,

> but one constant remains—the Mandate fails almost completely to address, or
> even respond to, much of this reality and common sense.

*BST Holdings,* 2021 U.S. App. LEXIS 33698, at \*16.

100.    In footnote 10, the *BST Holdings* Court noted:

> As Justice Gorsuch recently observed, society's interest in slowing the spread
> of COVID- 19 "cannot qualify as [compelling] forever," for "[i]f human
> nature and history teach anything, it is that civil liberties face grave risks when
> governments proclaim indefinite states of emergency." *Does 1–3 v. Mills,* ---
> S. Ct. ---, 2021 WL 5027177, at \*3 (Oct. 29,  2021) (Gorsuch, J., dissenting);
> *see also Fla. Peach Growers*, 489 F.2d at 131 (situation  ongoing for "last
> several years . . . fail[ed] to qualify for [OSHA] emergency measures").

101.    The courts in *Kentucky v. Biden* and *BST Holdings'* objections to the injection

mandate's scope requires even those who work from home to be injection is applicable to the

case at bar, as Plaintiffs David Peterson and John Doe #1, both residents of Texas, work from

home. Yet, Defendants insist they be injected.

102.    Other recent decisions support granting the relief Plaintiffs are requesting. In

*Louisiana v. Xavier Becerra et al*., case no. 3:21-CV-03970, Louisiana was joined by attorneys

general in 12 other states in its effort to block an emergency regulation issued on November 4th

by the Centers for Medicare and Medicaid Services that required injections for nearly every full-

time employee, part-time employee, volunteer, and contractor working at a wide range of

healthcare facilities receiving Medicaid or Medicaid funding. District Judge Terry Doughty found

that the Government Defendants did not have the statutory or constitutional authority to

implement the CMS Mandate and granted a preliminary injunction against it. *Louisiana v.*

*Becerra*, No. 3:21-CV-03970, 2021 U.S. Dist. LEXIS 229949, at \*2-3 (W.D. La. Nov. 30, 2021).

103.    The *Louisiana v. Xavier Becerra* court found persuasive the *BST Holdings*

decision*,* stating:

The "serious Constitutional concerns" noted by the Court in *BST Holdings* were:

    (a) that the OSHA Mandate exceeded the federal government's authority under the Commerce Clause because it regulated noneconomic inactivity (person's choice to remain unvaccinated) that falls squarely within the State's police power;

    (b) that separation of powers principles ("the major questions doctrine") casts doubt over the OSHA Mandate's assertion of virtually unlimited power to control individual conduct under the guise of a workplace regulation.

Additionally, the Court found "irreparable harm" to the petitioners' liberty interests of having to choose between their jobs and the vaccine. The Court noted that the loss of constitutional freedoms for even minimal periods of time constitutes irreparable injury.

The Court also found a stay of the OSHA Mandate to be in the public interest in maintaining the country's constitutional structure and maintaining the liberty of individuals and to make intensely personal decisions, even when those decisions frustrate government officials.

*Becerra*, 2021 U.S. Dist. LEXIS 229949, at *18 (footnotes omitted).

104.    As many courts have concluded, the court in *Louisiana v. Xavier Becerra* also held that the loss of constitutional freedoms for even minimal periods of time constitutes irreparable injury and found a stay of the OSHA Mandate to be in the public interest in maintaining the country's constitutional structure and maintaining the liberty of individuals and to make intensely personal decisions, even when those decisions frustrate government officials. *Id.*

## IX.    E.O. 14042 AS PROMULGATED BY THE SFWTF AND OMB DOES NOT COMPLY WITH THE ADMINISTRATIVE PROCEDURES ACT.

105.    The Court in *State of Louisiana et al, v. Joseph R. Biden, supra* found another fatal illegality in the mandate for "vaccination" of federal contractors - the promulgation of the order by the Safer Federal Workforce Task Force (SFWTF) and the Office of Management and Budget (OMB) did not comply with the Administrative Procedures Act. The Court found that "Procedural compliance by the rule making agency is an indispensable component of the Administrative

Procedures Act ("APA")". . . and that the agency action taken was "final agency action" for purposes of review by the Court. The Court then held that the administrative procedure utilized by the SFWTF and the OMB to promulgate EO 14042 failed to provide for an adequate comment period as required by § 1707 of the APA and stated that:

> A regulation's comment period is critical for affected citizens to assert their rights and for the cooperative development of regulations that balance the needs of the government and the rights of the public. Because compliance requires significant action on the part of employees well before the effective date, these purposes were not preserved by the OMB's calendaring of the comment period. While we do not like to rely on the spirit of the law when the letter is clear, the actions of the OMB circumvent the protections envisioned under the APA by manipulating the letter.

*Louisiana v. Biden*, No. 21-cv-3867, 2021 U.S. Dist. LEXIS 240865, at *28-29 (W.D. La. Dec. 15, 2021), referring to 5 USC § 706(2)(D).

## X.    EO 14042 UNLAWFULLY IMPOSES ON STATE'S RIGHTS

106.    Another reason that both the *Kentucky v. Biden* and *BST Holdings* found President Biden's mandate unlawful and so should this Court is that:

> [T]he Mandate likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power. A person's choice to remain unvaccinated and forego regular testing is noneconomic inactivity. And to ***mandate that a person receive a vaccine or undergo testing falls squarely within the States' police power…The Commerce Clause power may be expansive, but it does not grant Congress the power to regulate noneconomic inactivity traditionally within the States' police power.*** In sum, the Mandate would far exceed current constitutional authority.

*BST Holdings, LLC,* 2021 U.S. App. LEXIS 33698, at *21-23 (emphasis added).

107.    It is black letter constitutional law that the "police power" to make laws for the public health and safety of citizens belongs to the states and not the federal government. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States

are reserved to the States respectively, or to the people." 10th Amendment to the U.S. Constitution.

108.     In *Wilkerson v. Rahrer,* 140 U.S. 545, 554 (1891) the Court held that the police power "is a power originally and always belonging to the States, not surrendered to them by the general government, nor directly restrained by the constitution of the United States, and ***essentially exclusiv*e.**" (Emphasis added.) It is well-recognized that the Constitution's framers were intent on limiting the power of the federal government for which they were creating the parameters.

109.     The police power of the States forms "a portion of that immense mass of legislation which embraces everything within the territory of a State not surrendered to the General Government; all which can be most advantageously exercised by the States themselves. Inspection laws, ***quarantine laws, health laws of every description***, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, are component parts of this mass." *Gibbons v. Ogden*, 22 U.S. 1, 203 (1824) (emphasis added).

110.     The police power under the American constitutional system has been left to the states. It has always belonged to them and was not surrendered by them to the general government, nor directly restrained by the constitution of the United States. Congress has no general power to enact police regulations operative within the territorial limits of a state. *Shealey v. Southern Ry. Co*., 127 S.C. 15, 120 S.E. 561, 562 (1924); *see also, Bohon's Assignee v. Brown*, 101 Ky. 354, 41 S.W.273 (1897); *John Woods & Sons v. Carl*, 75 Ark. 328, 87 S.W. 621, 623 (1905); *Southern Express Co. v. Whittle,* 194 Ala. 406, 69 So.2d 652, 655 (1915).

111.     The President's mandating of vaccination is undeniably a foray into the area of public health and medicine which is and has always been within the police powers of the states.

*See Linder v. United States,* 268 U.S. 5, 18 (1925) ("Obviously, direct control of medical practice in the states is beyond the power of the federal government"); *Lambert v. Yellowley*, 272 U.S. 581, 598 (1926) ("It is important also to bear in mind that 'direct control of medical practice in the States is beyond the power of the Federal Government.' …Congress, therefore, cannot directly restrict the professional judgment of the physician or interfere with its free exercise in the treatment of disease. Whatever power exists in that respect belongs to the states exclusively".)

112.   In the recent decision in *Louisiana v. Biden*, No. 21-cv-3867, 2021 U.S. Dist. LEXIS 240865, at *28-29 (W.D. La. Dec. 15, 2021), *supra*, the Court found that Biden's EO 14042 and its administrative promulgation exceeded the authority of the federal government. The Court said:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people. U.S. Const. amend. X. "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.' *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (citing *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). Against this constitutional reservation of delegated authority, the President has on more than one occasion publicly announced his disappointment regarding the country's supposedly low COVID-19 vaccination rate and expressed his intent to increase the vaccination rate by using Executive authority. Thus, EO 14042, although supported upon a nexus of economy and efficiency, was clearly and unequivocally motivated by public health policy first and foremost. See *Reich*, 74 F.3d at 1337 ("The President has, of course, acted to set procurement policy rather than labor policy. But the former is quite explicitly based—and would have to be based—on his views of the latter."). "Whatever one's views on the [vaccine mandate's ability to increase economy and efficiency in procurement], [EO 14042] surely goes to the heart of [the Tenth Amendment]." *Id. See Kentucky*, 2021 WL 5587446, at *10 ("The Court is also concerned that the vaccine mandate intrudes on an area that is traditionally reserved to the States."); Cf. *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 617 (5th Cir. 2021) ("[T]he [OSHA] Mandate likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power.").

*Louisiana v. Biden*, 2021 U.S. Dist. LEXIS 240865, at *25.

## XI. THE DEFENDANTS' INJECTION, MASK AND TESTING MANDATES ARE IN VIOLATION OF THE ADA

113.    The Americans with Disability Act (ADA) precludes employers from discriminating against employees on the basis of an actual or perceived disability. The ADA further precludes employers from conducting disability-related inquiries of employees that are not shown to be "job-related and consistent with business necessity".

114.    "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature and severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 29 C.F.R. § 1630.14(c).  "Covered entity" means an employer, employment agency, labor organization, or joint labor management committee. 29 C.F.R. §1630.2(b)(1998)

115.    An inquiry is determined to be job related and consistent with business necessity when the employer has a reasonable belief, based on objective evidence, that the employee will pose a direct threat due to a medical condition.[48]

116.    "The determination that an employee poses a direct threat must be based on an individualized assessment of the employee's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r).

117.    "This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.*

118.    Factors for this consideration include:

(1) The duration of the risk;

---

[48] https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

*Id.*

119.    A disability-related inquiry is one that seeks to determine if the individual has a disability. Communicable diseases are considered disabilities. *School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 289 (1987).

120.    The Defendants inquire of employees whether they are "vaccinated" and if not, they require the medical examination in the form of a covid-19 test. Plaintiffs contend that there is no business necessity to inquire whether they are injected because injected persons spread the virus just as do the uninjected and because asymptomatic persons do not spread covid-19. The covid test is required of all "asymptomatic" uninjected employees. *See section* IV(C)(3). For the same reasons Plaintiffs further contend that there is no business necessity for covid-19 tests which are clearly medical exams that are being mandated as a condition of employment.

121.    Plaintiffs further contend that Defendants have failed to do individual assessments of employees, including Plaintiffs, as required by the ADA. These assessments are particularly necessary in this case because some uninjected Plaintiffs have already had covid-19, have superior natural immunity, therefore, don't need "vaccination" and importantly, have a greater risk of harm from the injection. The rigidity of the "vaccination" mandate—i.e., receive the injection or face termination or endless serial testing—violates the ADA's requirement for individualized assessment.

122.    Because Defendants' covid-19 tests are clearly medical exams that are being mandated as a condition of employment, the ADA's rules for such medical exams apply. Those

rules are not limited to medical exams specifically related to disabilities or impacting persons

with disabilities. It covers all medical exams for all employees. (ADA regulations confirm this

fact, compare 29 CFR § 1630.14(b)(3) with (c)).[49]

## XII.  COMPELLED TESTING VIOLATES FUNDAMENTAL CONSTITUTIONAL RIGHTS

123.    While Defendants appear to have put the injection mandate on "pause", at least

for the time being, they require uninjected employees, including Plaintiffs, to submit to an

antigen covid test weekly. Since antigen tests are not as accurate as the traditional PCR test

(whose accuracy itself is very weak, see below), employees who get a positive test on the antigen

then are required to take a traditional PCR nasopharyngeal swab test.

124.    Being compelled to have medical testing without consent is an infringement on

the same constitutional rights of bodily integrity, consent to medical treatment and the zone of

privacy which protect Plaintiffs from mandatory "vaccination."

125.    Although "vaccination," the injection of a chemical concoction into the

bloodstream, is a more egregious violation of the aforementioned right, nasopharyngeal nasal

swabs used in PCR test specimen collection are extremely invasive. The wooden swab is stuck

so far up the nasal passage that it is actually close to the brain. There are injuries associated with

this form of testing. Several plaintiffs in this case have been injured by the test, such as

experiencing bloody noses and pain.

126.    Many of the nasal swabs used in the United States with PCR testing are

manufactured in China and treated with Ethylene Oxide, a well-known carcinogen.[50] The acute

---

[49] https://eppc.org/publication/how-bidens-covid-testing-mandate-violates-civil-rights/  Authored by the former Civil Rights Director of the U.S. Dept. of Health and Human Services.
[50] https://www.gasdetection.com/gas-detection-knowledge-base/interesting-applications/covid-19-swabs-ethylene-oxide-and-warehouses/

(short-term) effects of ethylene oxide in humans consist mainly of central nervous system depression and irritation of the eyes and mucous membranes. Chronic (long-term) exposure to ethylene oxide in humans can cause damage to the brain and nervous system. The EPA has concluded that ethylene oxide is carcinogenic to humans by the inhalation route of exposure.

127.     The fact that only uninjected employees are subjected to these tests is totally unscientific since the injected can be infected and transmit the virus as much as the uninjected.

128.     The CDC has stated on their website: "It is unethical and illegal to test someone who does not want to be tested, including students whose parents or guardians do not want them to be tested." As of May 2021, that text has been removed from the CDC's website and replaced with this:

> Testing should not be conducted without informed consent from the individual being tested (if an adult) or the individual's parent or guardian (if a minor). Informed consent requires disclosure, understanding, and free choice and is necessary for teachers and staff (who are employees of a school) and students' families to act independently and make choices according to their values, goals, and preferences."[51]

129.     CDC has also denounced as 'unethical and illegal' mandatory coronavirus testing in schools.[52]

130.     The right to bodily integrity and a zone of privacy are fundamental rights. *Washington v. Glucks*berg, 521 U.S. 702, 720 (1997); *Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 303 (1990). Thus, any violation of these rights requires strict scrutiny. However, Plaintiffs contend that even under a rational basis test, compelled PCR testing is not rational. That is because the PCR test as it has been commonly used has been determined to be a largely useless test for diagnosing covid-19 with numerous false positives. Despite the fact that top

---

[51] https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html
[52] https://www.politico.com/news/2020/10/15/cdc-mandatory-school-testing-429667

scientists have acknowledged this (see below), Defendants continue to require employees to take the test.

131.    The FDA's instructions for the Real-Time RT-PCR Diagnostic Panel state that the intended use is for testing specimens "collected from individuals suspected of covid-19 by their healthcare provider."[53]  It was not intended for indiscriminate mass screening of the general healthy population. The PCR test is not suitable as a diagnostic tool.

132.    The inventor of the PCR test, Kary Mullis, Ph.D., who won a Nobel Prize in chemistry for the invention in 1993, developed the test for use in laboratory research, and said that the test was never designed to diagnose disease.[54]  That is because, while covid-19 PCR tests identify the presence of viral fragments in DNA, the tests do not provide accurate information about the presence of infectious, live virus as opposed to non-infectious (dead) viral fragments.[55] These limitations are essentially repeated in the FDA's instruction manual for the test: "Detection of viral RNA may not indicate the presence of infectious virus or that 2019-nCoV is the causative agent for clinical symptoms."[56]

133.    It is or should be by now well-known that the "positive" results from the high amplification cycles used in the PCR test are essentially meaningless. The CDC's own calculations suggest that it is extremely difficult to detect any live virus in a sample above a threshold of 33 cycles.[57]  Dr. Anthony Fauci has said that PCR is useless and unreliable for

---

[53] Real-Time RT-PCR Diagnostic Panel https://www.fda.gov/media/134922/download
[54] "Mullis explains why his PCR test is not a diagnostic test." https://www.youtube.com/watch?v=rXm9kAhNj-4
[55] Australian National Review, August 1, 2020, https://australiannationalreview.com/health/the-inventor-kary-mullis-of-method-used-to-test-for-covid-19-said-it-cant-be-used-in-virus-detection/
[56] Real-Time RT-PCR Diagnostic Panel, *supra* note 53.
[57] https://web.archive.org/web/20200719025659/https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-Isolation.html

diagnosing covid-19 when run at 35 cycles or higher.[58] There is evidence that PCR tests using 35 cycles and above yield 97% false positives.[59] The WHO issued a recent warning about high cycle thresholds leading to false positives.[60] Since most PCR tests used today perform 37 or more cycles,[61] the requirement that employees submit to PCR tests is both unlawful and essentially meaningless from a medical standpoint.

134.    Despite this, a majority of the PCR tests for covid-19 deployed under EUAs in the United States are run at cycles seemingly guaranteed to produce false positive results. Under the EUAs issued by the FDA, there is no flexibility to depart from the manufacturer's instructions and change the way in which the test is administered or interpreted. The table below shows that all major PCR tests in use in the United States are run at cycles of 35 or higher.

| Manufacturer | Manufacturer's Recommended Cycle Threshold |
| --- | --- |
| Xiamen Zeesan SARS-CoV-2 Test Kit (Real-time PCR) | 45 cycles |
| Opti Sars CoV-2 RT-PCR Test | 45 cycles |
| Quest SARS-CoV-2rRT-PCR Test | 40 cycles |
| CDC 2019-Novel Coronavirus Real Time (RT-PCR Diagnostic Panel) Test | 40 cycles |

---

[58]  COVID-19 with Dr. Anthony Fauci," This Week in Virology, (July 16, 2020), https://www.youtube.com/watch?v=a_Vy6fgaBPE&t=260s
[59] "Correlation Between 3790 Quantitative Polymerase Chain Reaction–Positives Samples and Positive Cell Cultures"  https://academic.oup.com/cid/article/72/11/e921/5912603
[60] https://www.who.int/docs/default-source/medicines/regulatory-updates/covid-19/24th-who-regulatory-update-on-covid-19_11dec2020.pdf?sfvrsn=1df78a5_3 See page 4.
[61] Mandavilli, *supra* note 44.

| Wren Labs COVID-19 PCR Test | 38 cycles |
|---|---|
| LabCorp COVID-19 RT-PCR Test | 35 cycles |

135.    Even if it is assumed that the PCR tests are accurate, the test still has no significant impact on the spread of covid in the workplace at SNL. The reason for this is that asymptomatic spread is exceedingly rare. And the tests are mandated by Defendants *only* on "asymptomatic" employees. *See* section IV(C)(3) hereinabove. With people's great fear of covid and instructions to stay home if you are at all sick or have covid symptoms, it can reasonably be assumed that symptomatic persons will not be coming into work at SNL. Since asymptomatic persons don't transmit covid-19 except in rare instances, testing Plaintiffs serves no real purpose in preventing spread.

136.    Deciding the issue of whether PCR tests may lawfully be mandated, this Court must take into account its FDA unapproved status, that it is Emergency Use Authorized only, that asymptomatic spread is not something that needs to be protected against and, of course, the constitutional rights being infringed.

137.    Counsel is aware of no U.S. case in which evidence was presented to a Court on the reliability of the PCR test. However, the Court may take judicial notice that a Portugal Court of Appeal on November 11, 2020 did have an evidentiary hearing on this issue and ruled that the test "is unable to determine, beyond reasonable doubt, that a positive result corresponds, in fact, to the infection of a person by the SARS-CoV-2 virus."[62] The Court released travelers who were quarantined in Portugal based on a positive PCR test.

138.    The current antigen test prescribed by SNL has this EUA disclaimer:

_____

[62] https://cognitive-liberty.online/portuguese-court-rules-pcr-test-as-unreliable/

Positive results are indicative of the presence of viral antigens, but clinical correlation with patient history and other diagnostic information is necessary to determine infection status. Positive results do not rule out bacterial infection or co-infection with other viruses.[63]

139.    Covid-19 PCR tests have EUA disclaimers essentially identical to those associated with antigen tests: "clinical correlation with patient history and other diagnostic information is necessary to determine patient infection status. … The agent detected may not be the definite cause of disease."[64]

140.    Since it is obvious that SNL is not individually evaluating employees' medical history with its mass, yet discriminatory, testing regime, which violates the ADA as explained above, it also has other problematic consequences. An uninjected person who tests positive on the PCR test will be told to go home, lose time at work, income and be seen as a less productive employee with less favorable performance evaluations. All this for a positive test which is meaningless as far as evidence of a disease.

## XIII.   COMPELLED MASK-WEARING SHOULD BE ENJOINED

141.    Inherent in the right to be free from interference with our bodies and the right to life itself is the right to breathe freely. Wearing a mask is a serious interference with the very act of breathing. It is through breath that God or the universe literally keeps humans alive. Interference with something so essential to life, to be lawful,  must have a very great benefit which, it will be shown below, mask-wearing does not.

142.    In addition, the interference with one's bodily integrity and zone of privacy that is entailed in compelled mask-wearing also inhibits self-expression, open and clear communication

---

[63] https://www.fda.gov/media/137886/download

[64] https://www.fda.gov/media/137739/download

between people, and the ability to understand clearly what a person is trying to express. Even if you have good ears and don't struggle to understand a masked person's words as many do, you will not be privy to the facial expressions that accompany the words, cues which are often as important as the words in determining the meaning of the speaker.

143.   However, the real elephant in the room with respect to compulsory mask-wearing is that *that they do not stop viral transmission*. It may be hard to accept this fact given the mania for mask-wearing throughout the world. However, it is simply not based in science. Almost all serious rigorous studies on the effectiveness of masks to stop viral transmission have concluded *they do not work*. The following are synopses of those studies.

Bundgaardet al 2020[65]  is the only Randomized Controlled Trial at this time that has examined SARS-CoV-2 infections in masked vs. non-masked civilian populations. 4,862 participants com-pleted the study (2,392 masked; 2,470 non-masked), and the study concluded that there was no statistically significant difference in SARS-CoV-2 infection rates between the masked and unmasked.

Al-Asmary et al 2007[66]   Evaluated the rate of respiratory infections for 250 healthcare workers. Important findings: "In our study regular use of facemasks offered no significant protection against ARI [Acute Respiratory Infections]." They also noted, "Furthermore, we found that intermittent use of surgical-type masks was actually associated with more than a 2.5-fold greater risk of infection.

Aiello et al 2010,[67] 2012,[68] Results of a series of trials of participants living in residence halls, 2,475 student participants. Important findings: No statistically significant differences between medical mask vs no mask for rates of influenza-like illness (ILI).

 Canini et al. 2010[69] was conducted on 306 households during the 2008-2009 influenza epidemic in France. Household members living with an influenza patient either wore masks or not for five days after the patient was diagnosed with influenza. No difference in transmission rate was found: "[W]e did not identify any trend in the results suggesting effectiveness of facemasks."

---

[65] https://www.acpjournals.org/doi/10.7326/M20-6817

[66] https://www.ijidonline.com/article/S1201-9712(06)00124-X/fulltext

[67] https://pubmed.ncbi.nlm.nih.gov/20092668/

[68] https://pubmed.ncbi.nlm.nih.gov/22295066/

[69] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2984432/

MacIntyre et al. 2016[70]  Compared mask-wearing and non-mask-wearing by household members of patients with influenza-like illness in Beijing, China. They found no significant difference in infection rates.

Oberg and Brosseau 2008[71]  measured both particle penetration and aerosol penetration of surgical masks and found that "None of these surgical masks exhibited adequate filter performance and facial fit characteristics to be considered respiratory protection devices.

Guerra et al 2021[72]  Mask mandate and use efficacy in state-level COVID-19 containment. "Randomized control trials have not clearly demonstrated mask efficacy against respiratory viruses, and observational studies conflict on whether mask use predicts lower infection rates." Results of the study: "Case growth was not significantly different between mandate and non-mandate states at low or high transmission rates, and surges were equivocal."

144.    The above represent individual studies on mask effectiveness. The following studies reviewed the findings across many mask studies:

Cowling et al. 2010[73] reviewed 12 studies, none of which found any significant effect of masks on transmission of disease, either to or from the wearers. Every study found "no significant differences." The authors concluded: "There is little evidence to support the effectiveness of face masks to reduce the risk of infection."

Dugré et al. 2020[74] studied masks for prevention of viral respiratory infections among health care workers and the public.  Data studied: "In total, 11 systematic reviews were included and 18 randomized control trials of 26,444 participants were found, 12 in the community and 6 in health care workers." Conclusion: "This systematic review found limited evidence that the use of masks might reduce the risk of viral respiratory infections."

Offedu et al. 2017[75] Effectiveness of Masks and Respirators Against Respiratory Infections in Healthcare Worker, reviewed 29 studies, and concluded: "The existing evidence is sparse and findings are inconsistent within and across studies."

---

[70] https://bmjopen.bmj.com/content/6/12/e012330

[71] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7115281/

[72] https://www.medrxiv.org/content/10.1101/2021.05.18.21257385v1

[73] https://www.cambridge.org/core/journals/epidemiology-and-infection/article/face-masks-to-prevent-transmission-of-influenza-virus-a-systematic-%20review/64D368496EBDE0AFCC6639CCC9D8BC05

[74] https://www.cfp.ca/content/66/7/509.long

[75] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7108111/

> Mahase et al. 2020[76] Covid-19: What is the evidence for cloth masks? "Very little good quality research exists on the use of cloth masks, especially in non-medical settings." One study highlighted in the review said healthcare workers "should not use cloth masks as protection against respiratory infection. Cloth masks resulted in significantly higher rates of infection than medical masks, and also performed worse than the control arm."
>
> bin-Reza et al. 2012[77] "The use of masks and respirators to prevent transmission of influenza: a systematic review of the scientific evidence," Influenza and Other Respiratory Viruses 6(4), 257–267. "There were 17 eligible studies. … None of the studies established a conclusive relationship between mask/respirator use and protection against influenza infection."
>
> Xiao et al. 2020[78] Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures. "Our systematic review found no significant effect of face masks on transmission of laboratory-confirmed influenza."

145. The Occupational Safety and Health Administration (OSHA) website plainly states that cloth face masks: "Will not protect the wearer against airborne transmissible infectious agents due to loose fit and lack of seal or inadequate filtration."[79] OSHA also states that the same is true of surgical facemasks.

146. The American Medical Association has stated: "Face masks should not be worn by healthy individuals to protect themselves from acquiring respiratory infection because there is no evidence to suggest that face masks worn by healthy individuals are effective in preventing people from becoming ill."[80]

147. Very recently a study from the esteemed Cato Institute was published[81] which reviewed a voluminous amount of data and prior studies on cloth face masks efficacy in

[76] https://www.bmj.com/content/369/bmj.m1422
[77] https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1750-2659.2011.00307.x
[78] https://wwwnc.cdc.gov/eid/article/26/5/19-0994_article
[79] https://web.archive.org/web/20201217061220/https://www.osha.gov/coronavirus/faqs#cloth-face-coverings
[80] https://jamanetwork.com/journals/jama/fullarticle/2762694
[81] https://www.cato.org/sites/cato.org/files/2021-11/working-paper-64.pdf

preventing viral transmission. The exhaustive study looked at not only the conclusions of prior studies but their methodology in reaching those conclusions. Dr. Jonathan Darrow, assistant professor of medicine at Harvard Medical School, one of the authors of the study, said in an interview: "The biggest takeaway is that more than 100 years of attempts to prove that masks are beneficial has produced a large volume of mostly low-quality evidence that has generally failed to demonstrate their value in most settings."[82] He added, "Based on the evidence currently available, masks are mostly a distraction from the important work of promoting the public health."

148.    Masks are not only ineffective for their intended purpose. They also present health risks to the wearer, both physical and psychological. Masks make it more difficult to breathe. In the following study, Rosner 2020, *Adverse Effects of Prolonged Mask Use among Healthcare Professionals during COVID-19,*[83] it was found that, "Prolonged use of N95 and surgical masks by healthcare professionals during covid-19 has caused adverse effects such as headaches, rash, acne, skin breakdown, and impaired cognition in the majority of those surveyed."

149.    In the following study, Kisielinksi et al. 2021, *Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?,*[84] it was stated:

> mask-related changes in respiratory physiology can have an adverse effect on the wearer's blood gasses sub-clinically and in some cases also clinically manifest and, therefore, have a negative effect on the basis of all aerobic life, external and internal respiration, with an influence on a wide variety of organ systems and metabolic processes with physical, psychological and social consequences for the individual human being.

---

[82] https://principia-scientific.com/little-evidence-supports-use-of-masks-to-limit-spread-of-coronavirus/
[83] https://clinicalnews.org/2020/09/23/adverse-effects-of-prolonged-mask-use-among-healthcare-professionals-during-covid-19/
[84] https://www.ncbi.nlm.nih.gov/labs/pmc/articles/PMC8072811/

150.     The specific negative effects from mask-wearing in the study included increase in blood carbon dioxide, decrease in blood oxygen saturation, increase in heart rate, increase in blood pressure, shortness of breath and difficulty breathing, headache, dizziness, exhaustion, and skin lesions.

151.     Kathleen M. Pike, PhD, Professor of Psychology and Director of the Global Mental Health WHO Collaborating Centre at Columbia University published in an article entitled, *Why a Mask is Not Just a Mask.*[85] She wrote:

> Masks block a lot more than COVID-19 droplets. We depend on non-verbal behavior, and particularly facial expression, to express ourselves and communicate to others. Those feelings above, and many more, get expressed on our faces. In some contexts, non-verbal communication accounts for the majority of what we understand in our social exchanges. With our faces half-covered, we lose key non-verbal information, and other information, like raised eyebrows and shoulder shrugs become highly ambiguous without cues from the mouth. This loss of information is like talking on your phone in a zone with weak cell service. ... The effect leaves us feeling less able to communicate and less able to understand each other.

## XIV.  DEFENDANTS' INJECTION, MASK AND TESTING MANDATES VIOLATE EQUAL PROTECTION

152.     Plaintiffs contend that Defendants' covid policy which separates the injected and uninjected for disparate treatment violates the equal protection clause.  In general, the "police power" allows a State or a "state actor" to adopt laws to protect the health, safety, and welfare. When exercising the police power, the State Legislature may, in making laws, create reasonable classes, distinctions between which must be rationally related to the purpose of the law. *Reed v. Reed,* 404 U.S. 71, 75-76 (1971) ("A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the

---

[85] https://www.cugmhp.org/five-on-friday-posts/why-a-mask-is-not-just-a-mask/

legislation'"); *Baxstrom v. Herold,* 383 U.S. 107, 111 (1966) ("Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made."); *Kramer v. Union Free School District*, 395 U.S. 621, 632 (1969)("(C)lassifications must be tailored so that the exclusion of … members of [a] class is necessary to achieve the articulated state goal"). In short, if classifications are not reasonably related to the purpose of the law, then equal protection is violated.

153.    Defendant's classification of "vaccinated" and "unvaccinated" for purposes of testing and mask-wearing (only "unvaccinated" employees at SNL must wear masks when outdoors in groups) are not rationally related to their purpose to prevent spread of covid- 19. There are several reasons for this. The first is that the injected transmit covid just as much as do the uninjected. Because the supposed necessity of injections for covid has been so vociferously promoted by government agencies, officeholders such as President Biden and Governor Grisham, as well as mainstream media, one would naturally assume that once fully injected you do not get the virus or spread the virus. There is no scientific consensus that this is true.

154.    The clinical trials which were done for the Pfizer/BioNTech and Moderna "vaccines" only demonstrated one thing – that the "vaccines" may be effective in reducing symptoms of someone who contracts covid-19. They did not show that the injection would prevent infection or transmission to others!

155.    What the covid-19 injections purportedly do is, rather than prevent infection, suppress the symptoms of the covid-19 disease. This has been widely acknowledged including by even the ardent supporters of mass injections such as Dr. Fauci and the WHO.[86] When asked

---

[86] https://thevaccinereaction.org/2021/01/who-fauci-warn-covid-19-vaccines-may-not-prevent-infection-and-disease-transmission/

whether people who get a covid-19 injection could still pass on SARS-CoV-2 to others, Dr.
Fauci stated: "That's a good question. We don't know that yet. We do not know if the vaccines
that prevent clinical disease also prevent infection."[87] The World Health Organization's chief
scientist said that "vaccinated" travelers should still quarantine, citing lack of evidence that
covid-19 "vaccines" prevent transmission.[88]

156.    The FDA has said: "Most vaccines that protect from viral illnesses also reduce
transmission of the virus that causes the disease by those who are vaccinated. While it is hoped
this will be the case, the scientific community does not yet know if the Pfizer-BioNTech
COVID-19 Vaccine will reduce such transmission."[89] Recall that the mRNA injections that are
being used for covid-19 are completely different from traditional vaccines.

157.    It was assumed that high "vaccination" rates would reduce the number of possible
sources for transmission and thereby reduce the burden of covid-19 disease on the population.
However, reports from the UK, Germany and Israel indicate that these injections do not reduce
the transmission rate. For example, one study in the UK found that household contacts exposed
to fully "vaccinated" people with covid-19 contracted the disease at a similar rate as those
households exposed to "unvaccinated" people with covid-19 (25% for "vaccinated" vs 23% for
"unvaccinated").[90] Another study of data from 68 countries and 2,947 counties in the USA found
that "the trend line suggests a marginally positive association such that countries with higher
percentage of population fully vaccinated have higher COVID-19 cases per 1 million people."[91]

---

[87] https://www.newsweek.com/coronavirus-anthony-fauci-covid-vaccine-passport-mandatory-vaccinations-travel-1558303
[88] https://www.businessinsider.com/who-says-no-evidence-coronavirus-vaccine-prevent-transmissions-2020-12?op=1
[89] https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions
[90] https://www.thelancet.com/journals/lanepe/article/PIIS2666-7762(21)00258-1/fulltext?s=08#seccesectitle0003
[91] https://www.ncbi.nlm.nih.gov/labs/pmc/articles/PMC8481107/

158.    If there is no real scientific proof that the mRNA injections prevent transmission and there is increasing evidence that they do not, then it is not rational to require the injected to be tested but not the uninjected. Moreover, since the injected, if they do get infected, may have little or no symptoms while the uninjected will have real symptoms and not come to work, it is equally if not more important to test the "vaccinated" rather than just the "unvaccinated." This renders Defendants' testing policy not rational.

159.    That the injections in no way guarantee a recipient from getting covid-19 is now well-established. *See* Section IV(A) hereinabove. In Israel more people were getting covid-19 after the country was "vaccinated" than before. The country is recommending not only a booster but a second booster, a 4th shot. Israel is not unique. Worldwide booster shots are being urged on people. If the Defendants are going to require testing without running afoul of the equal protection clause, they have to test all employees. While rationality is generally the touchstone for an equal protection claim, since fundamental bodily integrity and privacy rights are at stake, the Court must look at whether the testing and masking regime are the least restrictive means of furthering Defendants' interest in a healthy work environment.

## XV.    INJUNCTIVE RELIEF

160.    The requirements for a preliminary injunction were set forth with clarity in

*Louisiana v. Xavier Becerra et al*., *supra, at p. 11,12,* as follows:

> A preliminary injunction is an extraordinary remedy never awarded of right. *Benisek v. Lamone,* 138 S. Ct. 1942, 1943, 201 L. Ed. 2d 398 (2018). In each case, the claims of injury  must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d  249 (2008). The standard for a preliminary injunction requires a movant to show (1) the substantial likelihood of success on the merits, (2) that he is likely to suffer irreparable harm in the absence of a preliminary injunction, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Benisek*, 138 S. Ct. at 1944. The party seeking relief must satisfy a

cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). None of the four prerequisites has a quantitative value. *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975).

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

161.    The element of likelihood of success on the merits is problematic for two reasons. First, it puts a court in the position of, deciding to a large extent, the merits of a case before having seen all the evidence. Second, it ignores that injunctive relief may be needed to avert serious harm to the plaintiff and may not significantly harm the defendant at all such that a balance of equities clearly warrants granting relief, even if there is not a substantial likelihood of success or the Court simply cannot really judge the likelihood of success without a trial. Therefore, many courts have eschewed a strict application of the "substantial likelihood" prong.

162.    In *Greater Yellowstone Coalition v. Flowers,* 321 F.3d 1250, 1256 (10th Cir. 2003), the court held that if the movant can show "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation," and the remaining three elements "tip strongly" in the movant's favor, the court will grant the preliminary injunction.

163.    In *Cooper v. Salazar,*196 F.3d 809, 813 (7th Cir.1999) (quoting *Boucher v. School Bd. of Greenfield,*134 F.3d 821, 824 (7th Cir.1998)), the Court held that to show a likelihood of success on the merits at the preliminary injunction stage, a plaintiff need only show " 'a better than negligible chance of succeeding.' " *Cooper v. Salazar,* 196 F.3d 809, 813 (7th Cir.1999).

164.    Other courts have implied that a showing well below 50% likelihood of success will suffice. *Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir. 1984) (explaining that plaintiff must show that she has a "better than negligible" chance of succeeding in order to

obtain a preliminary injunction). *See generally*, Morton Denlow, The Motion for a Preliminary Injunction: Time for a Uniform Federal Standard, 22 REV. LITIG. 495 (2003) (discussing the various standards).

165.    If one reviews the cases, it appears that if a Plaintiff can show a reasonable possibility of success on the merits, it is sufficient for the "likelihood" prong.

## B.  IRREPARABLE HARM

166.    While there is a general rule that loss of employment in and of itself is not irreparable harm, some courts have held otherwise particularly if constitutional rights are involved. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (holding county sheriff's office could not fire or threaten dismissal of employees for failure to affiliate with a political party).

167.    In *BST Holdings, LLC supra,* the court, quoting *Elrod v. Burns,* stated:

> It is clear that a denial of the petitioners' proposed stay would do them irreparable harm. For one, *the Mandate threatens to substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s).* For the individual petitioners, the loss of constitutional freedoms "for even minimal periods of time . . . unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976) . . . . Not to mention the free religious exercise of certain employees. See U.S. Const. amend. I; cf. *Holt v. Hobbs*, 574 U.S. 352, 361 (2015)." (emphasis added)

168.    Similarly in *Kentucky v. Biden*, *supra*, the Court found irreparable harm. The Court said: "Furthermore, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance." *Id.* (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016))." Id. at p. 27.

> Although irreparable injury is an essential element to obtaining injunctive relief, most federal circuit courts have held that irreparable injury should be

presumed in constitutional cases. A Farewell To Harms: Against Presuming Irreparable Injury In Constitutional Litigation, Anthony Disarro, *Harvard Journal of Law & Public Policy,* Vol. 35, No. 2, p. 744.

160.    In *Overstreet v. Lexington-Fayette Urban County*, 305 F.3d 566, 578-79 (6th Cir. 2002), the Court stated:

> Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights. *See, e.g., Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998) (recognizing that the loss of First Amendment rights, for even a minimal period of time, constitutes irreparable harm) (citations omitted); *Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir. 1992) (holding that plaintiffs may establish irreparable harm based on an alleged violation of their Fourth Amendment rights); *McDonell v. Hunter,* 746 F.2d 785, 787 (8th Cir. 1984) (finding that a violation of privacy constitutes an irreparable harm).

170.    Some judicial decisions state that constitutional privacy rights and first amendment rights are those for which irreparable harm may be presumed. *Community Communications Co., Inc. v. City of Boulder, Colo.,* 660 F.2d 1370 (10th Cir. 1981): *See McDonell v. Hunter,* 746 F.2d 785, 787 (8th Cir. 1984).

> It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Unit B 1981), *citing Elrod v. Burns,* 427 U.S. at 373, 96 S.Ct. at 2689. So too, direct penalization, as opposed to incidental inhibition, of First Amendment rights constitutes irreparable injury. *Johnson v. Bergland,* 586 F.2d 993, 995 (4th Cir. 1978) (transfer of employee allegedly for exercise of First Amendment rights; "[v]iolations of first amendment rights constitute per se irreparable injury"); *Citizens for a Better Environment v. City of Park Ridge,* 567 F.2d 689 (7th Cir. 1975).

*Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983).

171.    Both religious freedom (First Amendment rights) and privacy rights are at issue in the case at bar. The Defendant has denied some religious exemption requests from Plaintiffs and privacy rights are implicated by an invasion of bodily integrity with coerced vaccination.

172.     The case *McDonell v. Hunter,* 746 F.2d 785, 787 (8th Cir. 1984) has factual

similarities with this case. The Plaintiffs were female guards at Iowa Correctional Institution for

Women who were told by prison officials that the Department planned to conduct strip searches,

blood tests, and urinalyses on Department employees and were asked to sign a form consenting

to such searches. The Court held: "The violation of privacy in being subjected to the searches and

tests in question is an irreparable harm that could reasonably be found to outweigh whatever

increase in security the enforcement of the Department's policies might produce."

173.     In *Northeastern Florida Chapter v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.

1990), the court stated:

> (The) area of constitutional jurisprudence where we have said that an ongoing
> violation constitutes irreparable injury is the area of first amendment and right
> of privacy jurisprudence. *See, e.g., Cate v. Oldham,* 707 F.2d 1176, 1189 (11th
> Cir. 1983); *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328,
> 338 (5th Cir. 1981). The rationale behind these decisions was that chilled free
> speech and invasions of privacy, because of their intangible nature, could not
> be compensated for by monetary damages; in other words, plaintiffs could not
> be made whole.

174.     While some courts have taken the position that loss of a job or income is not

irreparable harm, Plaintiffs here argue that the mass layoff of large numbers of skilled employees

all at once on the basis of an illegal executive order merits closer inspection than a cavalier

rejection of such a substantial impact to individuals and a local economy as irreparable harm.

175.     The factual circumstances of many Plaintiffs are such that loss of employment is

different than for most persons who might lose a job. Many plaintiffs are highly trained in

specialized work which is unique to weapons laboratories and nuclear facilities and even unique

to the Sandia National Laboratory. It will be a great challenge for them to find similar

employment at all or with similar compensation. One plaintiff has stated to the undersigned

attorneys, "If terminated, my income would be reduced by 25-50% based on market wages in the Albuquerque area for my career. I might be forced to leave the state to find a comparable wage, but then I would face moving costs and a forced sale of my house. Loss of my job and insurance would cause a reduction in my health and my wife's."

176.    Older employees of SNL are not going to be able to find work outside SNL. Plaintiff Anna Burns is a 67-year-old woman with numerous autoimmune conditions, who needs her health insurance. She moved from Texas where she had lived all her life, to accept employment from SNL, intending this would be where she would work the rest of her working life. She was glad to obtain work with SNL, as they were not discriminating against older workers.

177.    Loss of employment will mean, for many of the plaintiffs, being uprooted, having to sell homes, move from the area, and since many Plaintiffs have worked at SNL and lived in the area for many years, the loss of a community and close personal relationships. Most, if not all, of the plaintiffs enjoy high level national security clearances, of level Q and above, including critical SAPs (Special Access Programs). According to Plaintiffs, this level of security clearance is equivalent to Dept. of Defense "Top Secret" level. These security clearances will be lost if employees are away from their position over a certain period. This can impact and jeopardize future employment as a stigma upon their reputations for having lost their security clearance. Once lost, these clearances can take years to recover.

### C.  BALANCING OF EQUITIES

178.    Enjoining Defendants would save Plaintiffs from loss of employment and security clearances, and from punishment for their exercise of protected constitutional freedoms, as well as from being discriminated against based on their religious beliefs and/or medical conditions. Loss of security clearances is serious and cannot be addressed simply by monetary compensation.

There is a stigma that follows an employee who loses such high-level clearance. The consequence to the Plaintiffs of not obtaining injunctive relief is discussed in the prior section on Irreparable Harm. A potential harm to some plaintiffs is that they will, in fear of losing their career or source of income, unwillingly submit to the injections. This is a serious harm either from the perspective of the very real serious adverse side effects the injections can cause and from the perspective that they will have been coerced into sacrificing their right to make their own medical choices.

179.    What is the injury to Defendants by granting injunctive relief? If their concern is that their workforce will be depleted because many people will become sick with covid, this may be an understandable, albeit false, assumption. However, it is not scientifically supportable for several reasons. First of all, it simply is not true that only those who are "unvaccinated" spread covid. The "vaccines" being injected in Americans do not prevent the recipient from getting or transmitting the SarsCoV-2 virus. Rather, the shot purportedly reduces the severity of symptoms should someone get sick with covid. What this means is that it is just as likely that injected employees will be transmitting the virus as the uninjected. It could even be said that the injected are more likely to spread it since they will have milder symptoms, and therefore, would be likely to go to work. Whereas the "unvaccinated" without natural immunity who get the disease would most likely have symptoms and stay home.

180.    Moreover, the injected are getting covid as much as the uninjected. (*See* section IV(A)). An employee of SNL (not a plaintiff) who is familiar with the health records of the workforce will testify that the majority of recent covid cases at the Lab are of the injected, not the other way around.

### D.  THE PUBLIC INTEREST

181.    It is in the public interest that Plaintiffs remain in their positions at SNL. Many of

them are educated, highly skilled and have very specialized skills and training required by SNL. Losing their services to the nation and its military defense needs is contrary to the public interest. Hundreds of citizens losing their jobs and potentially their careers is contrary to the public interest. Since many Plaintiffs have top secret security clearances, firing many persons with top secret weapon information could be a risk for national security which certainly would be contrary to the public interest.

182.     It is also in the public interest to uphold the public rights and policies ensconced in the United States Constitution for bodily integrity, freedom to consent to medical treatment and for religious freedom. Due to the large number of plaintiffs, vindicating that many people's constitutional rights is in the public interest.

## XVI. CLAIMS

### COUNT I - INJUNCTIVE RELIEF BARRING INJECTION MANDATES
#### (All Defendants)

183.     There exists a fundamental right to bodily integrity which devolves from various of the Bill of Rights' amendments, including the fourth, fifth, and ninth. This right, the Supreme Court has recognized, places "limits on governmental power to mandate medical treatment or to bar its rejection." *Planned Parenthood v. Casey,* 505 U.S. 833, 835 (1992). These limits stand so strongly that "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims." *Planned Parenthood v. Casey,* at p. 835. This high standard indicates that ANY governmental intrusion on decisions related to bodily integrity should be reviewed under the strictest of scrutiny.

184.     *Planned Parenthood v. Casey* upheld rights related to abortion, which results in the death of a child most of the time and cannot be considered a trivial surgery.  This stands in stark contrast to the covid injections which carry unknown long-term risks (there have been no

long-term studies), have the highest risk of side effects, including death, of any vaccine in history, and are being mandated for a disease that has well over a 99% recovery rate for a vast majority of the population that contracts the disease.  Plaintiffs request injunctive relief enjoining the Defendants from taking any negative action against the Plaintiffs for exercising their fundamental right to refuse the injection.

185.    Plaintiffs request injunctive relief enjoining the Defendants from requiring the Plaintiffs to wear masks.

186.    Plaintiffs request injunctive relief enjoining the requirement that Plaintiffs be serially tested for covid-19.

## COUNT II – DECLARATORY JUDGMENT

187.    Plaintiffs request that this Court make the following declarations:

a) EO 14042 is invalid to authorize compulsory EUA "vaccinations" or any vaccinations of employees of federal contractors.

b) The constitutional right to bodily integrity permits an American citizen to refuse without adverse consequences any EUA medical intervention, which includes all covid "vaccines" available in the United States, as well as mask wearing for  prevention of viral transmission, as well as covid antigen and PCR tests.

c)  The constitutional right to bodily integrity permits an American citizen to refuse without adverse consequences a medical test which requires insertion of a swab through the nose all the way up to close to the brain particularly where the tests themselves have been shown to be altogether unreliable.

d) The constitutional right to bodily integrity permits an American citizen to refuse without adverse consequences to cover their face with a mask, and especially where the scientific consensus is that masks do not prevent viral transmission.

## COUNT III -  DECLARATORY RELIEF THAT DEFENDANTS' INJECTION, TESTING AND MASK POLICIES VIOLATE THE AMERICAN DISABILITIES ACT

188.    Plaintiffs request that the Court declare that:

a)  Testing for Covid-19 is a medical exam pursuant to the ADA.

b)   There is no individualized assessment done on uninjected employees who are required to undergo testing and therefore the testing violates the ADA.

**c)**  The uninjected do not pose a direct threat to the workplace and requiring them to have covid testing violates the ADA.

**WHEREFORE**, Plaintiffs ask relief from the Court as described above, and for all other relief as the Court deems just and proper.

Respectfully submitted,
*/S/ N. Ana Garner*
N. Ana Garner, NM Bar No. 921
Attorney for Plaintiffs
206 W. Main St.
Farmington, NM 87401
(505) 930-5170/(505)235-3302
Garnerlaw@yahoo.com


*/s/ Jonathan Diener*
Jonathan Diener
Attorney for Plaintiffs

(575) 535-2760
P.O. Box 27, Mule Creek, NM 88051

NORRED LAW, PLLC
/s/ Warren V. Norred
Warren V. Norred, Texas Bar No. 24045094,
wnorred@norredlaw.com
515 E. Border St., Arlington, Texas 76010
T (817) 704-3984, F (817) 524-6686
Attorney for Plaintiffs
*Pro Hac Vice App. to be submitted*