IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

SNL WORKFORCE FREEDOM ALLIANCE,       )
DAVID PETERSON, JON BROOKS, ANNA      )
BURNS, JOHN DOE #1 AND JANE DOE #2,    )
RICKY ALLEN FERGUSON,                  )
        Plaintiffs,                    )
                            )
v.                                     )      Case No.  1:22-cv-00001-KWR-SCY
                            )
NATIONAL TECHNOLOGY AND                )
ENGINEERING SOLUTIONS OF SANDIA,       )
LLC d/b/a SANDIA NAT'L LABORATORIES,   )
HONEYWELL INTERNAT'L, INC.             )
        Defendants.                   )

**RESPONSE TO DEFENDANT NTESS's**
**MOTION TO DISMISS AMENDED COMPLAINT**

## I.  STANDARD TO BE APPLIED TO 12b MOTION

    A.    Sufficiency of Pleading is not to be confused with proof required.

Defendant has, in some places in its Motion, conflated the issues of sufficiency of

pleading with proof that is required at trial or at summary judgment. Plaintiffs do not have to

prove their case at this stage of proceedings, it is sufficient if they have satisfied the standards of

pleading. To the extent that some of their cited cases address elements of proof, rather than

sufficiency of pleading, they are inapplicable.

Interestingly, which standards of pleading apply is at issue with tension between New

Mexico's "notice pleading" and the "plausibility" standard.  While Federal courts routinely apply

the *Iqbal* and *Twombley* standard of "plausibility", this standard is higher than that required by

New Mexico caselaw. The application of the standard, as set forth in *Ashcroft v. Iqbal,* 556 U.S.

662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), was expressly rejected by New Mexico's Court of

Appeals in *Madrid v. Vill. of Chama*, 283 P.3d 871, 2012 -NMCA- 71, ¶17 (N.M. App. 2012).

Whether this Court will follow New Mexico's more liberal construction of sufficiency of

pleading, or follow the *Iqbal* standard, is an issue of law and determination of which construction

applies here. New Mexico's rules of Civil Procedure are almost identical to the Federal Rules of

Civil procedure, however, its construction of notice pleading does not require quite as high a bar.

New Mexico Rule 1-008(A) states:

A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim or third-party claim shall contain:
> (1)  Proper allegation of venue…
> (2)  A short and plain statement of the claim showing that the pleader is entitled to relief; and
> (3)  A demand for judgment for the relief to which the pleader claims to be entitled to
>
> receive. …

New Mexico courts have embraced a long history of avoiding hypertechnical rules of

pleading so as to secure justice.  *Zamora v. St. Vincents Hospital,* 2014-NMSC-35, 370 P.3d 761

discusses the Courts' commitment to this long standing principal:

> …New Mexico's appellate courts have gone to great lengths to keep the path to justice clear for all who would use it, regardless of their familiarity with the law. 'Since the early adoption of the Federal Rules of Civil Procedure in New Mexico, our courts have recognized that the principal function of pleadings is to give fair notice of the claim asserted.' *Malone,* 1978–NMSC–007, ¶ 10, 91 N.M. 359, 574 P.2d 283. '[I]t is sufficient that defendants be given only a fair idea of the nature of the claim asserted against them sufficient to apprise them of the general basis of the claim; specific evidentiary detail is not required at [the complaint] stage of the pleadings.' *Petty v. Bank of N.M. Holding Co.,* 1990–NMSC–021, ¶ 7, 109 N.M. 524, 787 P.2d 443.  "[The rules of civil procedure] were designed in large part to get away from some of the old procedural booby traps which common-law pleaders could set to prevent unsophisticated litigants from ever having their day in court. If rules of procedure work as they should in an honest and fair judicial system, they not only permit, but should as nearly as possible guarantee that bona fide complaints be carried to an adjudication on the merits." *Martinez v. Segovia,* 2003–NMCA–023, ¶ 12, 133 N.M. 240, 62 P.3d 331 (alteration in original) (citation omitted). "The Rules of Civil Procedure disfavor looking upon pleadings as tests of skill where a single misstep could bar recovery." Id, ¶12.

While *Watson v. Unipress, Inc.*, 733 F.2d 1386 was cited by Defendant in support

of its claim that a fictitious name could not be used by the plaintiff, it is useful in the

proposition set forth here that state rule construction should apply. (Watson is specifically

not on point for Defendant's proposition, as it dealt with fictitious defendant Does named

to toll the statute of limitations against unknown parties). However, the Federal District

Court did address whether Colorado's state rules apply or the federal rules of civil

procedure applied. The Court did not have to decide which, because there was no conflict

between the two. "Where no direct conflict between the federal rule and state law exists,

no choice need be made between federal and state law. *Hanna v. Plumer*, 380 U.S. 460,

85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *Walker v. Armco Steel Corp.*, 446 U.S. 740, 100 S.Ct.

1978, 64 L.Ed.2d 659 (1980)." Id, at 1388.  However, in this case, Plaintiffs submit that

such a conflict does exist, and this Honorable Court is required to resolve that conflict.

Plaintiffs submit that the conflict should be resolved in favor of allowing the case to move

forward to its merits.

## II.  FIRED PLAINTIFFS HAVE STANDING

Defendant claimed in prior pleadings that two Plaintiffs, David Peterson and Jon

Brooks,  quit and are no longer employed at SNL and therefore do not have standing. In

fact, since the filing of the Complaint, Peterson left under constructive termination due to the

oppressive and hostile conditions he faced because he was refusing injection. Brooks did not quit

but was  *fired* because he would not answer questions regarding his vaccination status. His

termination was essentially because he would not comply with the vaccine mandate, albeit a

preliminary part of the procedure.

The Plaintiffs' Motion for TRO states on page two "REQUESTED RELIEF":  "If the

Court does not address this motion prior to the Plaintiffs being terminated, reinstate Plaintiffs to their

positions."

The Defendant cites only the case of *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 457

(S.D.N.Y. 2013) for their argument that since some of the Plaintiffs have already been terminated for not complying with the Defendant's covid mandates, they lack standing. The facts in that non-precedential case reveal it is no authority for dealing with the case at bar. *Kassman* involved a class action lawsuit by women claiming discrimination by a company. Some of the class members no longer worked there nor wished to. That these former employees did not have standing to seek changes in the company's practices is vastly different than Plaintiffs here who were terminated and seek injunctive relief to be reinstated, a remedy for fired employees that is well recognized and not questioned on standing grounds.

There are numerous cases in which a fired employee seeks reinstatement by injunctive relief and none the undersigned found where the defendants argued or the court held that the plaintiff's fired status deprived him of standing. *See generally, Mescalero Apache Tribe v Hickel*, 432 F.2d 956, 957 (10th Cir. 1970); *Bruce v. Kelly*, No. 20-4077-DDC-GEB, at *12 (D. Kan. Sep. 21, 2021); *Moore v. Univ. of Kan.*, 118 F. Supp. 3d 1242, 1249 (D. Kan. 2015); *Lombardi v. Small Business Admin,* 889 F.2d 959 (10th Cir. 1989).

## II.  AN UNINCORPORATED ASSOCIATION MAY SUE TO ENFORCE CONSTITUTIONAL RIGHTS

Defendant's' argument that SNL WORKFORCE FREEDOM ALLIANCE is not a proper plaintiff because it is an unincorporated association flies in the face of Rule 17(b)(3)(a) which states: "(A) a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws;" *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 927 (9th Cir. 2014).

The current case of Feds For Medical Freedom v. Biden, attached to the instant court record as Doc. 29-1, is an unincorporated association of thousands of federal employees

4

throughout the country and even world. (See "About Us" on their website:

https://feds4medfreedom.org/about-us/).  Their right to present their case in federal court has not

been challenged, nor should it be.  We are in historic times where so many rights are being

eroded by governmental responses to a disease that is no worse than the seasonal influenza in

terms of deaths.

Plaintiffs have not brought this suit under 42 USC 1983, nor asked for damages or

attorney's fees as that statutory scheme provides for. They have asked the Court to grant

equitable relief as it is within its inherent powers to do.  *Ex Parte Young*, 209 U.S. 123, 125

(1908); *In Defense of Implied Injunction Relief in Constitutional Cases,* William & Mary Bill of

Rights Journal Volume Volume 22 (2013-2014) Issue 1 Article 2 October 2013.

Any rule or decisional law that would prohibit injunctive relief for an unincorporated

association under 42 USC 1983 et seq. simply has no bearing on this case.

### III.  INJUNCTION REQUIRING A BREACH OF CONTRACT

One of the arguments Defendant appears to make is that it cannot be enjoined as

Plaintiffs are requesting because it will then be violating a contract it has with the federal

government. This argument is specious and when taken to its logical conclusion reveals its lack

of merit. For example, if Defendant had a term in its contract with the government such that

it was required to insure its employees wore hazmat suits at all times even in their homes,

when in bed and in the bathroom so as to protect against contracting or spreading Covid-19,

according to Defendant, the Court would be powerless to enjoin mandates to that effect by the

Defendant simply because it was part of a contract the Defendant had entered into. Being a

party to a contract in no way protects that party from responsibility for violating the

rights of others simply because the contract *required* it.

Moreover, it is black-letter law that unilateral modification of contracts are not enforceable. As a general rule, "an existing contract cannot be unilaterally modified ." *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 481 F.3d 337, 350 (6th Cir.2007);  17A C.J.S. *Contracts* § 410 ("A signed contract . . . cannot be changed without the consent or subsequent agreement of the parties."). Were it otherwise, the option of either party to modify a contract unilaterally would defeat the essential purpose of reaching an agreement in the first place — to bind the parties prospectively.

An injunction by this Court would not be an interference with a contract and even if it were if constitutional rights need protection as they do here,  such interference may be necessary. "It has long been recognized that intervention by the courts into contracts between extremely unequal bargaining parties is permissible. " *Associated Diving Marine Contractors v. Granite Const*, No. 2:01CV330, at *11 n.2 (D. Utah July 16, 2003) The federal government is obviously in a very unequal bargaining position with respect to the Defendant. If the parties were on equal footing, would Defendant agree to allow the DOE to change the contract whenever it suited DOE?

## IV.  STATE ACTORS

There is something that needs mentioning and that in the not-so-distant past governments and private businesses operated more as distinct entities. For example, the idea of prisons being run by corporations would seem strange not too long ago. As would the idea the military would contract with corporations to run military operations. So too would the Department of Energy (DOE) hiring a company to run its top-secret weapons laboratory.

When constitutional rights were first articulated by the framers, it was the government which had all the potential power to violate citizens rights. Corporations, though existent, did not

have anywhere near the position and power over people's lives they do today.  It was the government whom the framers feared could oppress the people. Today things are very different. For example, it is corporations wielding powers in cyberspace, and not the federal government, who are responsible for a very serious attack on free speech in the U.S. today. While these facts are not necessary to find "state actor" status for the Defendant, they provide a meaningful backdrop for the inquiry.

Defendant claims that they are not "state actors".  Using the language of *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179 (1988) cited in the Complaint, is the Defendant not "*willful participants in joint activity with the state"* when it has been "*delegated the authority*" by the State to operate a clinic to vaccinate employees on site in accordance with the Governor's push to vaccinate all New Mexicans? Is it not a willful participant with the State when it has worked together with the State on Governor Grisham's contact tracing program (*See,* Exhibit 2 in the Complaint), a part of which program involves Defendant collecting health information from employees and passing it to the State.

Plaintiffs have alleged on information and belief that Defendant is receiving funding for this work and Defendant, while claiming we have not provided proof, do not deny this allegation. Plaintiffs are not privy to all the dealings the Defendant has with the State. If SNL is anything like its sister lab Los Alamos, it has a great deal more connection related to covid response than what has been alleged and which will be revealed in discovery.

Has not the State, in the language of *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) cited in the Complaint, "provide(d) significant encouragement, either overt or covert," for the Defendant's vaccine program?  New Mexico's Governor's vaccination program is one of the most substantial in the nation now requiring not

just double shots but also boosters for all state employees.

Defendant argues in their motion that "Plaintiffs do not allege (nor can they) that the state of New Mexico nor any other state had any connection to or involvement with the challenged action here." They then attempt to limit the "challenged action" at issue to complying with Executive Order 14042. This narrow focus is misleading. The mandating of vaccination is part of an overall policy of the Defendant which included compelling the wearing of masks, social distancing, PCR testing, quarantining, etc. It cannot be viewed in a vacuum as simply complying with an executive order. And that overall policy is very entwined with the state of New Mexico. Defendant has applied for and obtained a license from the State for actually vaccinating employees on site. Defendant is dutifully following Governor Grisham's mandates on other oppressive covid "practices". It works together with the state in developing contact tracing technology. And Plaintiffs suspect that may be just the tip of the iceberg. Much more remains to be discovered through the discovery process of the lawsuit.

State actor status is a fact determinative issue. Discovery is needed. It is not a basis for dismissal under 12(b). In *Fuller v. Carilion Clinic,* Civil Action No. 7:17CV564 10-29-2018, the Plaintiff alleged that a private force policeman was a state actor. Defendant moved to dismiss on the grounds there was not a plausible state actor claim. The Court stated at pps 11-12:

> The test for determining whether or not a particular private entity is considered a state actor is ***extremely fact specific***. Most if not all of the cases that have decided a similar issue to the one at hand has been ***after a motion for summary judgment has been filed, rather than a Rule 12(b)(6) motion to dismiss.*** Therefore, this Court will assume without deciding that the defendant is a state actor but only for purposes of the defendant's motion to dismiss. Further discovery is needed in order to assess whether or not Carilion Clinic is considered a state actor. (emphasis added)

**V.  PLAINTIFFS' CLAIMS ARE NOT MOOT AND DEFENDANT'S PLEADING VIOLATES FEDERAL RULE OF EVIDENCE  408**

Defendant's Motion to Dismiss includes a violation of FRE 408 that they also included in their prior pleadings to attempt to influence the Court against Plaintiffs. Rule 408 states in relevant part:

Evidence of the following is not admissible ...............

(2) conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Plaintiffs were willing to overlook, in Defendant's response to Plaintiffs' motion for injunctive relief, their bringing to the Court's attention to statements or conduct made in settlement negotiation regarding Defendants' proposal that Plaintiffs voluntarily dismiss their complaint. But they continue to make this argument in violation of Rule 408 and should be admonished.

More importantly, this case is in no way moot. Simply because the Defendants has "paused" their vaccine mandate pending court decisions, the case is not moot. Defendant's use of the word "paused" is telling. They do not claim their vaccine mandate is cancelled or taken off the table. Internet dictionary definitions of *pause* include: a *temporary* stop or rest, especially in speech or action; short pause after each stroke of the oar; a cessation of activity because of doubt or uncertainty; a momentary hesitation; any comparatively brief stop, delay, wait, etc.

The Defendant allegedly is waiting for a decision by the 11th Court of Appeals to decide whether to restart the vaccine mandate or continue to pause it. This Court is not absolutely bound by an 11th Circuit decision. Moreover, it is likely that an appeal from that decision will be taken. Mootness occurs when the recurrence of the conduct sued upon is *very* unlikely.

'It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the

> practice' unless it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189 (2000).'

*Buckhannon Board & Care Home v West Virginia Dept. H & H*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001).

It is simply not clear that the vaccination mandate of Defendant cannot reasonably be expected to recur in this instance. It may very well recur.

### VI.  FEDERAL CONTRACTOR'S VIOLATION OF CONSTITUTIONAL RIGHTS

Plaintiffs claim not only that Defendant is a state actor in conjunction with the state of New Mexico. They also claim that even if it is not a *state actor,* as a federal contractor it can be enjoined from constitutional violations. There is a line of cases which deal with constitutional *damage* claims against private federal contractors. The Supreme Court has said in *Correctional Services Corporation v. Malesko*, 534 U.S. 61 (2001) that Bivens actions will not lie against employees of private companies. Defendant cites this case in support of their position that injunctive relief is not available. This they do in spite of the fact that the *Malesko* court said:

> Inmates in respondent's position also have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief — *long recognized as the proper means for preventing entities from acting unconstitutionally"* (emphasis added). *Malesko* at 62.

Moreover, many courts have made exceptions to the general rule of no Bivens claims against federal contractors. In *Ginn v. Mathews,* 533 F.2d 477 (9th Cir.1976) the Court held that a private company operating a federal Head Start program could be sued for constitutional violations when it was alleged that it was acting as a "de facto arm of the state." Defendants here are clearly acting at the behest of the Department of Energy for whom all of SNL's activities are done.

In *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328 (9th Cir. 1987) a private

10

security company provided services to a U.S. naval industrial base. The Court reversed a

dismissal of a complaint for violation of Plaintiff's constitutional rights by searching his

desk. Citing *Ginn v. Mathews* supra, the Court held, "the private status of the defendant will not

serve to defeat a Bivens claim, provided that the defendant engaged in federal action."

*Schowengerdt* at 1337-1338. The Court went on to cite and quote from the case, *Reuber v.*

*United Sta*tes, 750 F.2d 1039, 1058 (D.C.Cir.1984) stating that:

> "A private person whose conduct is allegedly instigated and directed by federal
> officers should be treated as a federal agent" and "be subject to Bivens liability".
> The Fifth and Sixth Circuits are in accord. See Dobyns v. E- Systems, Inc., 667
> F.2d 1219 (5th Cir.1982); Yiamouyiannis v. Chemical Abstracts Serv., 521
> F.2d 1392 (6th Cir.1975)(per curiam.) "

It has never been asserted that *Malesko* overruled these decisions and these authorities

make it clear that private companies are by no means immune from suit based on constitutional

claims. In the case at bar, there are no damage claims under *Bivens* or 42 USC 1983. Plaintiffs

request injunctive relief in hopes that damages can be avoided. *Malesko* stands for the idea that

where a private company contracts with a federal agency to operate what is essentially a federal

facility and a Bivens damage claim is not available, *injunctive relief* is.

*Malesko* was cited in a holding by the Court in *Williams v. Klien*, 20 F. Supp.3d 1171

(D. Colo. 2014) where the Court wrote, "Conceivably, the Court has not recognized such claims

(Bivens) in the context of claims by prison inmates *because prisoners may pursue claims for*

*injunctive relief based on an alleged violation of the First Amendment*".......The fact that Mr.

Williams may not assert a Bivens claim for damages based on a violation of the First

Amendment does not preclude him from seeking declaratory and injunctive relief." (emphasis

added)

In *Garvin v. Corr. Corp. of America, Inc.*, No. 4:11CV02054, at *6 (N.D. Ohio Jan. 27,

2012) another case where the defendant was a contractor running a federal prison, the Court dismissed damage claims but not an injunctive relief claim. *See also*, *Peoples v. CCA Detention Center,* Civil Action No. 03-3129-KHV (D. Kan. 1/15/2004) (D. Kan. 2004)

The Defendant argues that it is not a federal actor. One must not get lost in semantic distinctions here. In the cases cited by Plaintiffs in this section, the opinions do not focus on whether the defendants were "government actors" as a noun. As for the Bivens damage cases cited, the issue was whether the federal government was directing the defendant private companies. Here Defendant readily admits it was being heavily directed by the federal government. There are contracts which Defendant claims give the DOE unilateral power to modify the contract and create new contractual duties for Defendants. The DOE has very specific needs for the research and work they need done which Defendants are merely taking orders as to what they need and want done.

Defendant is no less and perhaps more under the direction of the federal government than the private companies running prisons and the Head Start program in Plaintiffs' cited cases. Moreover, where injunctive relief is concerned, the *Malesko* case *Williams v. Klien, supra,* appear to be less concerned about direction from the federal government as they are with the need for a remedy for constitutional violations where private companies are tasked with operating a facility that is clearly federal.

The cases cited by Defendant are not on point. In *United States v. New Mexico*, 455 U.S. 720 (1982), the issue was whether federal contractors were independent entities from the federal government such that their income could be taxed. This is too disparate from a federal contractor violating constitutional rights for the analysis in the cited case to be dispositive here.

The case *Jackson v. Metro. Edison Co*., 419 U.S. 345, 350 (1974) Defendant cites

in its section on federal contractors is actually a "state actor" case under 42 USC 1983 and its relevance is questionable as to Defendant's constitutional responsibilities as a federal contractor. So is *Mineo v. Transp. Mgt. of Tenn., Inc*., 694 F. Supp. 417, 419, 424 (M.D. Tenn. 1988) a state actor case. It asked whether there was a symbiotic relationship between a city and a company hired to run its transit system to determine it was acting under color of state law.

Conversely, the cases cited hereinabove by Plaintiffs are cases where federal contractors were held to be responsible to not violate constitutional rights of persons in facilities that were federal and that they were managing for the federal government.  These cases are dispositive.

It is worth noting that the *Mineo v. Transp. Mgt. of Tenn., Inc*., *supra* was on appeal on a summary judgment. Although Plaintiffs do not agree that a "symbiotic relationship" as discussed in *Mineo* is needed for the case at bar, this sort of thinking underscores the need for a factual determination and discovery before the Court will be in a position to rule on the issue of whether Defendant has an obligation to not violate constitutional rights.

### VII. PLAINTIFF ASSOCIATION IS NOT SUING UNDER 42 USC 1983 AND CANNOT BE DISMISSED ON THAT BASIS

Defendant continues to spend considerable time asserting that Plaintiffs have made a Bivens claim or are suing sued under 42 USC 1983, when such is not the case. They go so far as to argue that it is the only way Plaintiffs can obtain injunctive relief for a constitutional violation in spite of the fact that numerous courts have held otherwise. From the 10th district alone come the following cases:

*Burns v. Hickenlooper*, Civil Action No. 14-cv-01817-RM-KLM, at *3 (D. Colo. 2014) is a case in which Plaintiffs, same sex couples, sued for injunctive relief allowing them to marry. There is no mention of section 1983 or Bivens in the opinion. The Court concluded that all the elements for injunctive relief had been met and that the challenged law impermissibly violated

the fundamental right to marry under the Due Process and Equal Protection Clauses.

In *Grayeyes v. Cox,* No. 4:18-cv-00041 (D. Utah 2018) the Plaintiff sought an injunction based on his right to vote. Granting relief, the Court said this "injunction enforces fundamental constitutional rights. Waiving the security requirement best accomplishes the purposes of Rule 65(c)." *Grayeyes* at p. 17. No mention is made of section 1983 but rather Rule 65 of the FRCP.

In *Flood v. Clearone Communications, Inc.*, No. 2:08-CV-00631-DB, at *3 (D. Utah Apr. 17, 2009) there is no mention of section 1983. The Court said: "Ms. Flood would likely suffer grievous harm in the form of lost constitutional rights if an injunction does not issue."

> There are at least three different types of injunctions a federal court may issue. The first is a "traditional" injunction, which may be issued as either an interim or permanent remedy for certain breaches of common law, statutory, **or constitutional rights**. Granting such injunctions fall within the long-recognized, inherent equitable powers of the court.See ITT Comm. Devel. Corp. v. Barton, 569 F.2d 1351, 1359 (11th Cir. 1978) **("[A] federal court, sitting in equity, possesses all of the  common law equity  tools of a Chancery Court** (subject, of course, to congressional limitations) to process litigation to a  just and equitable conclusion."). (emphasis added)

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092 (11th Cir. 2004)

In *Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 326-27 (2015) the Supreme Court said at 327: "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *See also, Bacon v. Core Civic*, No. 2:20-cv-00914-JAD-VCF, 2020 WL 3100827, at *6 (D.Nev. June 10, 2020).

There is no question that this Court has the power and authority to grant injunctive relief to prevent constitutional violations totally independent of 42 USC 1983. Therefore, there is no basis for dismissing the association Plaintiff as Defendants wrongly insist upon.

## VIII. DOE PLAINTIFFS

Defendant argues that *Doe* plaintiffs must be dismissed as if such pleading is never allowed. They so argue in spite of the fact that the Supreme Court implicitly recognized Doe plaintiffs as valid in such noteworthy cases as *Poe v. Ullman,* 367 U.S. 497 (1961); *Roe v. Wade*, 410 U.S. 113 (1973); *Doe v. Rumsfeld,* 2979 F.Supp.2d 119 and *Doe v. Bolton*, 410 U.S. 179 (1973).

Lower federal courts have held that courts have discretion to allow Doe plaintiffs. *Doe v. Indiana Black Expo, Inc.*, 923 F.Supp. 137 (S.D.Ind.1996) ("[T]he federal courts of appeal and a number of district courts have recognized that a district court may have the *discretion* to permit a party to proceed under a fictitious name.") (emphasis added); *Lindsey v. Dayton-Hudson Corp.*, 592 F.2d 1118, 1125 (10th Cir.1979); *Doe v. Frank*, 951 F.2d 320, 322-323 (11th Cir.1992).

In *Doe v. Atchison Hospital,* Case No. 17-2664-JAR (D.Ct. Kansas 2018) the Court stated:

> Whether a plaintiff may proceed anonymously is subject to the discretion of the trial court. In exercising that discretion, the court must "weigh the plaintiff's claimed right to privacy against the countervailing public interest." Id, p2-3. Embarrassment or right to privacy in medical records was not sufficient grounds for remaining anonymous. However, here, the plaintiffs are at risk of discrimination, hostile work conditions, and ultimately being constructively terminated, as was Plaintiff David Peterson. There is no countervailing public interest in knowing the identities of all plaintiffs, just that they are  members of an association of employees who value medical freedom.

There is good reason to allow Doe plaintiffs in this case. Unvaccinated employees who work at SNL are working in an atmosphere of fear, discrimination and ostracization. By being named they run the risk of retaliatory consequences such as firing, ostracization,  segregation and others. It is for these reasons they seek to sue as Doe plaintiffs.

Plaintiffs have filed a formal motion for the Court to rule on the issue.

## IX.  EOC GUIDELINES ARE NOT LAW

Defendant's reliance on the Equal Employment Opportunity Commission's (EEOC) pronouncements and guidance is incorrect. The EEOC is an agency whose central purpose is to provide remedies for persons who have been discriminated against in the workplace on the basis of certain classes such as race, color, sex, etc. When Congress created the Equal Employment Opportunity Commission (EEOC), it declared that the purpose of the agency was to "prevent any person from engaging in any unlawful employment practice" prohibited by Title VII of the Civil Rights Act of 1964. The EEOC similarly states on its website that its mission is "to prevent and remedy unlawful employment discrimination and advance equal opportunity for all in the workplace."

The EEOC does not seem to be an agency which has special expertise on vaccination, medical testing, medical treatment, medical examinations and the like. Given their apparent lack of expertise in the areas they are now giving guidance in, this guidance must not be given much deference. This Court must decide if Defendant's supposed reliance for their covid mandates on EEOC guidance is a legally sufficient basis for violating Plaintiffs' rights.

Even if the EEOC does have significant medical expertise, the important point is that their pronouncements about testing for Covid is *guidance.* They are not regulations which have complied with the rulemaking procedures in the APA which is necessary to become actual legally binding law. As such they provide no substantive basis for the Defendants to use as a defense to the unlawfulness of their requiring vaccination, covid testing and the like.  The question is not whether Defendants' actions are not in accordance with the guidance of the EEOC, but whether, as Plaintiffs contend, the Defendant's actions are violative of the federal

constitution, the ADA or any other laws or are creating irreparable harm to the Plaintiffs such

that injunctive relief may be warranted. Judicial opinions and commentators make it clear that

"non-regulation" pronouncements by administrative agencies do not have the force of law.

> (A)n advisory opinion is also entitled only to limited deference because it is not
> subject to notice and comment procedures. *See Orr*, 156 F.3d at
> 655 ("[A]lthough the rule has the force and effect of a published regulation, it is
> not the product of a notice and comment rulemaking process, and is therefore
> akin to an internal rule entitled to only limited deference."

*Weiss v. Fujisawa Pharmaceutical Co.*, 464 F. Supp. 2d 666, 673 (E.D. Ky. 2006); *see also*

*Pueblo Neighborhood Health Centers, Inc. v. U.S. Dep't. of HHS,* 720 F.2d 622, 625 (10th Cir.

1983) (agency manuals do not have force and effect of law); *Aragon v. United State*s , 146 F.3d

819, 824 (10th Cir. 1998) (agency manuals do not have force and effect of law); *Ramey v.*

*Reinertson,* 268 F.3d 955, 963 (10th Cir. 2001)("the State Medicaid Manual does not have the

force and effect of law, nor is it binding on this court, because it was not promulgated pursuant to

the notice and comment requirements of the Administrative Procedure Act").

In a Duke Law Review article, Volume 42, June, 1992, Number 6, p. 1311 entitled

"Interpretive Rules, Policy Statements, Guidances, Manuals, And The Like-Should Federal

Agencies Use Them To Bind The Public?, the author, professor Robert A. Anthony, states:

> With one exception, the answer to the question in the title (of the article) is "no."
> To use such nonlegislative documents to bind the public violates the Administrative
> Procedure Act (APA) and dishonors our system of limited government. This is true
> whether the agency attempts to bind the public as a legal matter or as a practical
> matter.I An agency may not make binding law except in accordance with the
> authorities and procedures established by Congress. To make binding law through
> actions in the nature of rulemaking, the agency must use legislative rules, which
> ordinarily must be made in accordance with the notice-and-comment procedures
> specified by section 553 of the APA. 2

The exception referred to by Professor Anthony is where an agency interprets a statute

which is not at issue in the case at bar.

## X.  THE CLAIMS FOR DECLARATORY RELIEF ARE PROPERLY BEFORE THE COURT

Defendant argues that there is no controversy for which a declaratory judgment may be made. It bases this in part on the notion that Defendant has no obligations toward rights protected by the Constitution. This issue is covered in Section IV, above.

Defendant also claims that there is no f*undamental* right of bodily integrity or that compelled vaccination does not implicate it. (See Section V at p. 18 of the Amended Complaint for a full discussion of this.) In *Planned Parenthood v. Casey*, 505 U.S. 833(1992), referencing the *Roe v. Wade* decision the Court stated:

> "Roe, however, may be seen not only as an exemplar of Griswold liberty …but as a rule (whether or not mistaken) of personal autonomy and bodily integrity, **with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection. If so, our cases since Roe accord with Roe's view that a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims.** *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990); cf., e. g., *Riggins v. Nevada*, 504 U.S. 127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992); *Washington v. Harper*, 494 U.S. 210, 108 L. Ed. 2D 178, 110 S. Ct. 1028 (1990); see also, e. g., *Rochin v. California*, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952); *Jacobson v. Massachusetts*, 197 U.S. 11, 24-30, 49 L. Ed. 643, 25 S. Ct. 358 (1905). (emphasis added)

Where as here there is coerced vaccination with an Emergency Use Authorization drug which is unlike any traditional vaccine and whose cellular modification technology has never before been used on the public and has not gone through the normal many year process for testing a vaccine and has not been tested at all for potential long term side effects and for which there have already been over ***one million*** adverse events recorded some of them quite serious including approximately 20,000 deaths, this is the very reason these Supreme Court's decisions have said the Constitution places limits on the government's right to mandate medical treatment.

Two years prior to the *Planned Parenthood v. Casey, supra* decision, the Supreme Court in *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278, 289 1990) said:

> The "principle that a competent person has a constitutionally protected liberty interest **in refusing unwanted medical treatment** may be inferred from our prior decisions.......[T]he liberty guaranteed by the Due Process Clause must protect, if it protects anything**,** an individual's **deeply personal decision to reject medical treatment…."** (emphasis added)

> "Because our notions of liberty are inextricably entwined with our idea of physical freedom and self-determination, the Court has often deemed state incursions into the body repugnant to the interests protected by the Due Process Clause." (*Cruzan* at 288, Justice O'Connor's concurrence).

> This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment. Justice Cardozo, while on the Court of Appeals of New York, aptly described this doctrine: "***Every human being of adult years and sound mind has a right to determine what shall be done with his own body … The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment***." (emphasis added) *Cruzan, supra* at pps. 269-270.

Regardless of the conclusions made in non-precedential lower court decisions cited by Defendant in footnote 8 at page 18 of their motion, Plaintiffs contend that the Supreme Court authority just cited leaves no doubt that the bodily integrity right is a fundamental one and that vaccination is an "incursion into the body" which, if not voluntary and coerced, transgresses that right including the right to decide for oneself what medical treatment one receives. Moreover, even if that right is not classified as *fundamental,* that does not end the inquiry. That there is a rational basis for Defendant's mandates is very much contested.

## X.  THE JACOBSON CASE

Defendant cites a recent Indiana case in footnote 8 of the Defendants' Motion which case stated that *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) stands for the proposition that compelled vaccination is constitutional. This lower court decision was from a different circuit and decided a preliminary injunction motion not a merits trial. In addition, that statement was flat

out wrong or, at a minimum, too general a statement to be persuasive to another circuit's district court. For an analysis of the *Jacobson* case this Court is referred to paragraphs 58 through 64 of the Plaintiffs' Amended Complaint which explains why *Jacobson* cannot stand for such a proposition. This point is made even clearer when one considers the factual scenario the Court in *Jacobson* was dealing with. The claimant in *Jacobson* was challenging a law which gave him the option of being vaccinated for smallpox or paying a $5 fine ($100 in today's money). Here the Plaintiffs are threatened with loss of employment and may lose in salary and benefits tens if not hundreds of thousands of dollars. In *Jacobson* the vaccine involved was one which had been in use for a hundred years with great success and little or no signs of causing injuries. Here we have the mandating of a vaccine which has no history, was recently invented, is under an emergency use authorization and for which the VAERS system has recorded 19,532 deaths from the covid injections in the U.S and over a million injuries. Many researchers consider these figures very low as many deaths and injuries are from the covid injections but not believed to be or not reported as such. In *Jacobson* the disease being dealt with was smallpox which those who contracted had a 20% of dying. In the present case, Covid-19 has a 99.8 per cent survival rate which includes the many elderly people with significant comorbidities. For the age groups most of the Plaintiffs belong to the figure would be about 99.98 per cent.

One can easily see the vastly different factual scenario the *Jacobson* court was dealing with and why its ruling is not dispositive for the case at bar. Not only is Defendant willing to mandate the "state incursion" into the body by a needle, but also a chemical concoction which fundamentally changes the ways certain cells in the body operate, causing them to create numerous *spike proteins* that would not ordinarily be in the body (see paragraphs 38-42 of the Amended Complaint) and which, according to many top scientists and doctors, are actually harmful to the body.

Though state actors in covid vaccination cases are quick to cite *Jacobson*, they neglect that court's careful emphasis that "if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Jacobson* at 31. And adding to that exception, the court stated "the police power of a State, whether exercised by the legislature, or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression." *Id.* at 38.

Justice Gorsuch has recently cast doubt on the continuing validity of *Jacobsen*. In his concurrence in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 208 L. Ed. 2d 206, 207 (U.S. 2020), he said,

> **"Why have some mistaken this Court's modest decision in Jacobson for a towering authority that overshadows the Constitution during a pandemic?** In the end, I can only surmise that much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack. Things never go well when we do. .......... *Jacobson hardly supports cutting the Constitution loose during a pandemic...".* (emphasis added)

## XI.  THERE ARE SUFFICIENT FACTS TO SHOW A CONTROVERSY FOR DECLARATORY RELIEF

Defendant argues that insufficient facts have been pled to show a controversy for declaratory relief claiming in their MTD that:

> "Plaintiffs cannot show that there is an "actual controversy" as to whether NTESS's vaccination, testing, or masking policies implicate Plaintiffs' right to bodily integrity.......... Even if NTESS were a governmental actor (which it is not), vaccination requirements do not implicate Plaintiffs' fundamental "rights to bodily integrity and to refuse medical treatment" as a matter of law.8 Plaintiffs' testing and masking claims are even more specious. Plaintiffs have not explained how a simple test or mask requirement equates to medical treatment, and they have made

no attempt whatsoever to explain how wearing a mask implicates bodily integrity."

If requiring injection of a largely untested drug/vaccine which has killed close to 20,000 Americans (a conservative estimate) and injured many, many more into the bodies of Plaintiffs does not implicate rights of bodily integrity it is hard to imagine what would. (*See, Amended Complaint,* paras 41-44 for a more complete discussion)

With respect to mask-wearing, The Amended Complaint states:

"141.  Inherent in the right to be free from interference with our bodies and the right to life itself is the right to breathe freely. Wearing a mask is a serious interference with the very act of breathing. It is through breath that God or the universe literally keeps humans alive. Interference with something so essential to life, to be lawful,  must have a very great benefit which, it will be shown below, mask-wearing does not.
142.    In addition, the interference with one's bodily integrity and zone of privacy that is entailed in compelled mask-wearing also inhibits self-expression, open and clear communication between people, and the ability to understand clearly what a person is trying to express. Even if you have good ears and don't struggle to understand a masked person's words as many do, you will not be privy to the facial expressions that accompany the words, cues which are often as important as the words in determining the meaning of the speaker.

Is this not sufficient facts? Imagine the federal government requiring all citizens to wear face masks at all times forever. Would that not be transgressing on bodily integrity? Is not interfering with breathing a transgression of bodily integrity? It is self-evident to anyone who breathes. That masks interfere with breathing is scientifically verifiable, but Plaintiffs have no duty to prove that fact in their initial pleading.

Because Plaintiffs have not alleged many facts about individual Plaintiffs with regard to masks and testing, this does not mean there is no controversy. Defendant's covid protocols includes mask-wearing and testing *for all uninjected employees* which includes the Plaintiffs.

Paragraph two of the Complaint states as follows: "Plaintiff Sandia Workforce Freedom Alliance (SWFA) is an unincorporated association of several hundred employees whose purpose is to advocate for the constitutional rights and freedoms concerning bodily autonomy, self-determination, privacy, and religious freedom, *as it relates to mandates at SNL requiring* covid

injections, mask wearing and ***medical testing***. (emphasis added)

At p. 5 of the Complaint: "Mr. Ferguson applied for and received a religious exemption to the shot, with the accommodation ***that he undergo differential treatment in the workforce, such as serial testing*** and completion of daily Health Check app, which those who have received the shot are not required to do." Amended Complaint, p. 5.  (emphasis added)

At paragraph 123 of the Amended Complaint: "While Defendants appear to have put the injection mandate on "pause", at least for the time being, they require uninjected employees, including Plaintiffs, to submit to an antigen covid test weekly. Since antigen tests are not as accurate as the traditional PCR test (whose accuracy itself is very weak, see below), employees who get a positive test on the antigen test then are required to take a traditional PCR nasopharyngeal swab test."

At paragraph 125: "The wooden swab is stuck so far up the nasal passage that it is actually close to the brain. There are injuries associated with this form of testing. Several plaintiffs in this case have been injured by the test, such as experiencing bloody noses and pain."

These facts are certainly sufficient to challenge the constitutionality of the mandatory testing and masking and whether testing violates the ADA. Plaintiffs have also explained that the PCR test is, for all intents and purposes, useless as a test for Covid-19 as verified by many studies and scientists who confirm that large numbers of false positive results from the test. These false positive tests have consequences such as Plaintiffs being told to quarantine and not to come to work.

These issues need to be decided based on testimony and evidence. Since a motion to dismiss is at issue, the Court must consider the facts alleged by the Plaintiffs to be true. Plaintiffs

have alleged that the PCR tests are too inaccurate to be useful and they likely involve a swab

treated with a carcinogen. In any event, the controversy here is clear

Defendant also states that covid testing and masking are not medical treatments. In fact,

both face-masks and the PCR tests have been submitted to the FDA for approval and for

emergency use authorization and neither has been approved but remain under emergency use

authorization.

https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/personal-protective-equipment-euas;
https://www.fda.gov/news-events/press-announcements/fda-permits-marketing-first-sars-cov-2-diagnostic-test-using-traditional-premarket-review-process

Pursuant to the emergency use authorization for facemasks, it is characterized as a *medical device*. Medical devices, by their very nature, are medical treatment.

Whether a covid test is a medical treatment is not really the issue. That something is

stuck so far up the nasal cavity as to be near the brain is clearly an incursion into bodily integrity.

The issue of whether something is a medical *treatment* has no bearing on the ADA claims. The

claim of ADA violations is that the covid tests are medical *examinations* and so is Defendant's

inquiry as to whether an employee is injected with the "vaccine". *See, Amended Complaint,*

Section XI. The ADA precludes employers from conducting disability-related inquiries of

employees that are not shown to be "job-related and consistent with business necessity". A

disability-related inquiry is one that seeks to determine if the individual has a disability.

Communicable diseases are considered disabilities. *School Bd. of Nassau County, Fla. v. Arline,*

480 U.S. 273, 289 (1987).

Plaintiffs claim that there is no business necessity to know injection status or to test for

Covid-19 and state very specific science-based reasons why this is so. See *Amended Complaint*,

paragraphs 43-50 and 153-159. These allegations must be taken as true for purposes of a 12(b) motion.

29 C.F.R. § 1630.2(r) (para. 116 of the Amended Complaint) states:

"The determination that an employee poses a direct threat must be based on an individualized assessment of the employee's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence….. Factors for this consideration include
        (1) The duration of the risk;
        (2) The nature and severity of the potential harm;
        (3) The likelihood that the potential harm will occur; and
        (4) The imminence of the potential harm.

There are no individualized assessments of employees carried out by Defendant with regards to the risk they might cause. If one has a positive PCR test they are quarantined from working. It is not considered if they even have a single symptom of Covid-19 or have had Covid-19 already such that they have a natural immunity and that the test result is one of the numerous false positives that the tests produce

Moreover, the ADA's rules for medical exams are not limited to medical exams related to disabilities or impacting persons with disabilities. It covers all medical exams for all employees. See 29 CFR § 1630.14(b)(3) and (c)).[1]

Even if the Court does not issue declaratory judgments, the ADA claims and all other arguments are applicable to the claims for injunctive relief to enjoin mandatory vaccination, testing and mask wearing. Injunctive relief requests for the latter two are stated at paragraphs 185 and 186 of Count One even though the title of the Count only mentions vaccination.

WHEREFORE, Plaintiffs respectfully request that the Defendants Motion to Dismiss be denied.

---

[1] https://eppc.org/publication/how-bidens-covid-testing-mandate-violates-civil-rights/  Authored by the former Civil Rights Director of the U.S. Dept. of Health and Human Services.

Respectfully submitted,

By:  */s/ N. Ana Garner*
Attorney for Plaintiffs
206 W. Main St.
Farmington, NM 87401
(505) 930-5170/(505)235-3302
Garnerlaw@yahoo.com


By: */s/ Jonathan Diener*
Jonathan Diener
Attorney for Plaintiffs
P.O. Box 27
Mule Creek, NM 88051
(575) 535-2760
jonmdiener@gmail.com

NORRED LAW, PLLC

By:  /s/ Warren V. Norred
Warren V. Norred, Texas Bar No. 24045094
wnorred@norredlaw.com
515 E. Border St., Arlington, Texas 76010
Tel. (817) 704-3984, Fax. (817) 524-6686
Attorney for Plaintiffs
*Pro Hac Vice Application to be submitted*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 1st day of March, 2022, I filed the foregoing electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

By:  */s/ N. Ana Garner*
N. Ana Garner
Garner Law Firm
206 W. Main
Farmington, New Mexico 87401
Telephone: (505) 930-5170
Garnerlaw@yahoo.com